# EXHIBIT A

# CONFIGAIR LLC
# OPERATING AGREEMENT

**THIS OPERATING AGREEMENT** (this "<u>Agreement</u>") is made effective as of the 14th day of March, 2011 (the "<u>Effective Date</u>"), by and among ConfigAir LLC, a Connecticut limited liability company (the "<u>Company</u>"), and the parties executing and delivering counterpart signature pages or joinder agreements hereto.

On December 21, 2010, articles of organization and an original appointment of agent were filed with the Secretary of State of the State of Connecticut (the "<u>SOS</u>") forming the Company.

1. **Governance.**

    a. The Company is and shall be a *"manager-managed"* limited liability company, and a board of directors (the "Board"), which shall act by majority approval, is and shall collectively be considered the Company's manager (the "<u>Manager</u>"). The authorized number of directors on the Board shall initially be four (4), and may be adjusted from time to time by the Board. The following individuals shall initially serve on the Board: Nizwer Husain, Henry Kurz, Daniel Naus, and Dung Nguyen.

    b. Subject to Section 1(c) and 1(d), the Manager is hereby authorized and empowered to carry out and implement any and all of the purposes of the Company, including, but not limited to, the following:
        i. make, or permit any subsidiary to make, any loan or advance to, or own any stock or other securities of, any subsidiary or other corporation, partnership, or other entity unless it is wholly owned by the Company;
        ii. make, or permit any subsidiary to make, any loan or advance to any person, including, without limitation, any employee or director of the Company or any subsidiary, except advances and similar expenditures in the ordinary course of business or under the terms of an employee stock or option plan approved by the Board;
        iii. guarantee, directly or indirectly, or permit any subsidiary to guarantee, directly or indirectly, any indebtedness except for trade accounts of the Company or any subsidiary arising in the ordinary course of business;
        iv. approve of any investment consistent with any investment policy approved by the Board;
        v. incur any aggregate indebtedness that is not already included in a budget approved by the Board, other than trade credit incurred in the ordinary course of business;
        vi. otherwise enter into or be a party to any transaction with any director, officer, or employee of the Company or any "associate" (as defined in Rule 12b-2 promulgated under the Exchange Act) of any such person, except for transactions contemplated by this Agreement, and transactions made in the ordinary course of business and pursuant to reasonable requirements of the Company's business and upon fair and reasonable terms that are approved by a majority of the Board;
        vii. hire, terminate, or change the compensation of the executive officers, including approving any option grants or stock awards to executive officers;
        viii. change the principal business of the Company, enter new lines of business, or exit the current line of business;
        ix. sell, assign, license, pledge, or encumber material technology or intellectual property, other than licenses granted in the ordinary course of business; or

11575056.1

x. enter into any corporate strategic relationship involving the payment, contribution, or assignment by the Company or to the Company of money or assets less than $100,000.

c. The right and power of the members to vote and act shall be limited to (i) those actions specified in section 1(d) below or otherwise specified in this Agreement; and (ii) those actions under applicable law as to which the members are required to vote and act. Any vote or act of the members shall require the consent of members holding a majority of the vested Shares then outstanding, which may be given electronically. Each member shall have the right to inspect and review the books and records of the Company on reasonable notice to the Manager.

d. The Manager shall not have the authority to, take any of the following actions on behalf of the Company without approval of members holding a majority of the vested Shares then outstanding:

   i. election of managers to fill initial positions or vacancies
   ii. admission of new members
   iii. dissolution
   iv. amendment to the Articles of Organization
   v. authorization for any contravention of the operating agreement
   vi. approval of any plan or merger or consolidation
   vii. release of a member (including a past member who has assigned his membership interest to an assignee) from his/her liability to the Company in respect to their obligation (made in writing) to make a contribution;
   viii. disassociation of a member in the event of assignment for the benefit of creditors, voluntary petition of bankruptcy, adjudication of bankruptcy or insolvency, appointment of a trustee, receiver or liquidator, death or incompetency, termination of trust (if member is a trust) or dissolution/winding up of an entity (if member is such entity);
   ix. abandonment of approved plan of merger or consolidation (unless provided for with a different required vote in such approved plan)

e. The officers of the Company shall be appointed by the Manager. Initially, Daniel Naus is and shall be the "Chief Executive Officer" and "President" of the Company; Nizwer Husain is and shall be the "Chief Financial Officer" and "Treasurer" of the Company; Henry Kurz is and shall be the "Chief Technology Officer" and "Vice President" of the Company; and Dung Nguyen is and shall be the "Chief Information Officer" and "Secretary" of the Company. These positions have and shall have the general rights and duties of comparable positions in a Connecticut corporation under the Connecticut Business Corporation Act, provided that the Manager may modify the scope or terms of each such position generally or in a specific instance. Vacancies may be filled or new offices created and filled at any meeting of the Manager. Each officer shall hold office until such officer's successor shall be duly appointed or until the officer's death or until the officer shall resign or shall have been removed in the manner hereinafter provided. An officer may resign at any time by delivering notice to the Company. A resignation shall be effective when the notice is delivered unless the notice specifies a later effective date. If a resignation is made effective at a later date and the Company accepts the future effective date, the Manager may fill the pending vacancy before the effective date if the Manager provides that the successor shall not take office until the effective date. The Manager may remove any officer at any time with or without cause.

## 2. Membership Interests; Membership.

a. Membership interests are and shall be represented by *"Shares."* The Manager may grant and issue Shares, whether directly or indirectly through options or warrants, and whether to evidence *"capital interests"* or *"profits interests,"* and whether voting or non-voting, and whether fully-vested or subject to vesting, all on terms agreed to by the Manager. The terms of any such Shares shall be set forth on the counterpart signature pages or joinder agreements executed and delivered by each respective member.

b. *Third Party Transfers*. Except as set forth in Section 2(c), no member may dispose of any or all of his, her or its Shares without the express, written consent of the Manager. Notwithstanding the foregoing, a member may transfer or otherwise dispose of its Shares to a third party in accordance with the following:

   i. If any member (a "Transferring Member") desires to sell, transfer or otherwise dispose of any of it Shares (the "Offered Shares") to a third party pursuant to a bona fide offer of cash or indebtedness (a "Voluntary Transfer"), the Transferring Member shall first deliver to the Company a notice of sale that sets forth the terms and conditions of such transaction (the "Notice of Sale"). Any proposed Voluntary Transfer in which the purchase price does not consist of cash or indebtedness shall not be considered a bona fide offer, shall not be deemed a Voluntary Transfer and shall not give the undersigned the right to avail itself of these provisions.

   ii. Upon receipt of the Notice of Sale, the Company shall be entitled to purchase some or all of the Offered Shares at the price and on the terms specified in the Notice of Sale. The Company shall deliver to the Transferring Member written notice of its election to purchase some, all or none of such Offered Shares, as the case may be, within ten (10) days after its receipt of the Notice of Sale (the "Notice of Election"). The Company may assign its purchase rights hereunder to some or all of the non-transferring members, at the discretion of the Manager.

   iii. If the Company (or its assignee) does not elect to purchase all of the Offered Shares, then the Transferring Member shall be entitled to transfer those Offered Shares not purchased to the third party at the price and on the terms specified in the Notice of Sale, provided that (a) such right of Voluntary Transfer shall terminate and expire if such Voluntary Transfer is not consummated within thirty (30) days after the termination of the ten (10) day period described above, and (b) each transferee who or which is not presently a member of the Company shall agree in writing to be subject to all restrictions and obligations set forth in this Agreement.

c. *Company and Member Purchase Rights*. Upon the withdrawal of a member (a "Withdrawing Member"), the Company first and then the remaining members shall have the option to purchase all or a portion of the membership interest of the Withdrawing Member pursuant to the following:

   i. In the event of the death or Disability (as defined below) of a member (a "Death or Disability Withdrawal"), the purchase price per Share sold pursuant to this Section 2(c) shall be, the quotient of (i) the Agreed Value (as defined below) as of the Determination Date divided by (ii) the aggregate number of all outstanding Shares.

3

In the event that the members holding a majority of the vested Shares then outstanding elect to cause the withdrawal of a Member for Cause (as defined below)(an "Involuntary Withdrawal") or in the event that a Member elects to withdraw from the Company for any reason other than as a result of an Involuntary Withdrawal (a "Voluntary Withdrawal"), the purchase price for the entire membership interest of the Withdrawing Member shall be equal to the initial capital investment of that member.

ii. The Company's purchase option (the "Company Purchase Option") may be exercised in whole or in part by the Manager on behalf of the Company, by giving written notice to the Withdrawing Member within 30 days after the Withdrawal Event (as defined below). The notice shall state the portion of the membership interest of the Withdrawing Member being purchased (if less than all), the purchase price (determined in accordance with Section 2(c)(i) or Section 2(c)(ii), as applicable) for the membership interest of the Withdrawing Member and the proposed time and date of closing (which shall be at least 10 days following the date the notice is mailed). The closing of the purchase of the membership interest of the Withdrawing Member sold shall occur when stated in the Company's notice at the principal place of business of the Company or at such other time and place as the Withdrawing Member and the Company shall agree. Upon any purchase by the Company, the membership interest so purchased and the related Shares shall be canceled.

iii. If the entire membership interest of the Withdrawing Member is not purchased by the Company in accordance with Section 2(c)(iii), then the other members of the Company shall have the option (the "Member Purchase Option") to purchase the remaining portion of such membership interest of the Withdrawing Member. In such case, the Manager shall call a meeting of all of the members (upon not less than 10 nor more than 30 days' prior written notice) to be held within the 60-day period following the Withdrawal Event. The notice of the meeting shall state the portion of the membership interest of the Withdrawing Member remaining to be purchased and the purchase price therefore (determined in accordance with Section 2(c)(i) or Section 2(c)(ii), as applicable). At such meeting, the membership interest of the Withdrawing Member (or such portion thereof as was not purchased by the Company) shall be offered for sale and shall be subject to an option on the part of each member (excluding the Withdrawing Member) to purchase an amount of the membership interest of the Withdrawing Member that equals such member's pro rata membership interest in the Company (determined in this case by excluding the Withdrawing Member). If any member does not purchase all of the portion of the membership interest of the Withdrawing Member that he is entitled to purchase under this Section 2(c)(iv), then the other members who have elected to purchase the entire portion of the membership interest of the Withdrawing Member that they are entitled to purchase may purchase all or a proportionate portion of the membership interest of the Withdrawing Member remaining to be purchased (based upon the relative Shares of those desiring to purchase). Members' options to purchase under this Section2(c)(iv) shall be exercisable only at the meeting of the members described herein, and the closing of the sale of any portion of the membership interest of the Withdrawing Member that is being sold to the other members shall occur at such meeting of members.

iv. If the Company and/or the members do not purchase the entire membership interest of the Withdrawing Member available, the Withdrawing Member shall remain a member

4

of the Company (to the extent of such member's remaining membership interest) and shall continue to be bound by the terms of this Agreement.

v. Immediately following the purchase by the Company and/or the members of the entire membership interest of the Withdrawing Member, and without any further action by the Company, the Manager or the members, the Withdrawing Member shall not be entitled to participate in the management and control of the business and affairs of the Company, including the right to vote on any matters requiring a vote of the Members pursuant to this Agreement or applicable law.

vi. For the purposes of Section 2(c), the following terms shall have the following meanings:

(1) "Agreed Value" means that amount to be determined by an appraiser selected by the mutual agreement of the purchasing member(s), the Company, and the Withdrawing Member (or his personal representative); or if they are unable to agree, the Agreed Value shall be the value determined by the concurrence of three (3) independent appraisers, one selected by the purchasing member(s), one selected by the Withdrawing Member or his personal representative, and a third selected by the other two appraisers. All such appraisers shall be disinterested, independent of any of the parties, and qualified by training or experience to perform such appraisal. In the event a vote of the members is taken to determine the Company's choice of an appraiser, the Shares subject to purchase shall not be entitled to vote with regard to such determination. All costs of any appraisal under this Section 2(c)(vii)(1) shall be borne by the Withdrawing Member.

(2) "Cause" means any of the following with respect to a member: [(1) gross negligence or willful misconduct that has a material adverse affect on the Company; (2) fraud or material theft or embezzlement from the Company; or (3) failure of such member to spend at least 50% of their business time on the business and affairs of the Company.]

(3) "Disability" means [the disability or impairment of health, as certified by a physician acceptable to both the Company and the relevant member, which shall be conclusive of the fact that Member is or has been disabled for the purposes of this Agreement.]

(4) "Withdrawal Event" means either an Involuntary Withdrawal, a Voluntary Withdrawal or a Death and Disability Withdrawal.

d. For so long as a member has not withdrawn or been removed as a member, whether voluntarily or involuntarily, each member shall be made "guaranteed payments" payable in arrears in accordance with the compensation schedule attached hereto as Exhibit A, such compensation schedule being subject to modification from time to time upon consent of the members. Such guaranteed payments shall terminate immediately upon such member's withdrawal, resignation, removal or expulsion, whether voluntarily or involuntarily. This compensation will remain in place until the company reaches a comfortable growth and profitability margin to sustain ramp of the business.

e. No person, corporation, firm, partnership or any other entity, including any transferee who obtains Shares in accordance with Section 2(b), shall become a member unless the following conditions are satisfied:

5

i. the prospective member executes and acknowledges such instruments as the Manager deems necessary or desirable to effect such admission, including, but not limited to, the written acceptance and adoption by the prospective member of the provisions of this Agreement; and

ii. the members holding a majority of the vested Shares then outstanding have consented to the admission.

3. **Covenants.** In consideration of the Shares granted and issued to each member, each such member agrees as follows:

   a. All technology, ideas, concepts, inventions, improvements, programs, designs, techniques and other works of authorship and development (including but not limited to all copyright, trademark, patent, trade secret, know-how and intellectual property rights associated therewith) developed, devised, made, learned of, conceived or reduced to practice by the member, either solely or in collaboration with others, whether before, on or after the date of this Agreement, up until and including the final date on which the member holds an interest in or is otherwise engaged by the Company, and which directly relates to the business of the Company (the "<u>Work Product</u>"), is, will become and will remain the Company's exclusive property. The Company does and will own all right, title and interest in and to the Work Product.

   b. All Work Product is *"works made for hire,"* and the Company is the *"person for whom the work was prepared."* As between the parties, the Company is and will be considered the author and/or owner, as appropriate, of the Work Product for purposes of patent, copyright or trademark law, and is and will be entitled to secure patent, copyright and trademark protection in the Company's name, if and as applicable, and the member agrees to cooperate with the Company as reasonably necessary for the Company to secure such patent, copyright and trademark protection. To the extent that the Work Product and any intellectual property rights therein or related thereto are deemed or treated as not *"works made for hire,"* the member hereby expressly and irrevocably assigns to the Company all of the member's right, title and interest in and to the Work Product and any and all intellectual property rights therein or related thereto.

   c. The member represents and warrants to the Company that the member has full authority to enter into this Agreement and that in performing under this Agreement, the member will not violate the terms of any agreement with any third party. The member has disclosed, and will continue to disclose to the Company, all tools, technology or other intellectual property owned or held by a third party which is used by the member in connection with the member's involvement with the Company.

   d. The member will have access to and will participate in the development of and/or be acquainted with confidential or proprietary information of the Company ("<u>Confidential Information</u>"). The term "Confidential Information" will not include any information that is or becomes generally publicly available (other than as a result of violation of this Agreement by the member). For so long as the member holds an interest in or is otherwise engaged by the Company, and up until and including the [five] year anniversary of the final date on which the member holds an interest in or is otherwise engaged by the Company, the member will not disclose, use or make known for the member's or another's benefit (other than for the benefit of the Company) any Confidential Information or use any such

Confidential Information in any way. Upon termination of the member's relationship with the Company for any reason, the member shall immediately return to the Company all Confidential Information in whatever form maintained (including, without limitation, computer discs and other electronic media).

e. For so long as the member holds an interest in or is otherwise engaged by the Company, and up until and including the one year anniversary of the final date on which the member holds an interest in or is otherwise engaged by the Company, the member will not directly or indirectly (whether as an officer, director, member, proprietor, associate, representative, consultant or in any capacity whatsoever) engage in, become financially interested in, be employed by or have any business connection with any person, corporation, firm, partnership or any other entity whatsoever which competes with the Company anywhere in the world.

f. For so long as the member holds an interest in or is otherwise engaged by the Company, and up until and including the one year anniversary of the final date on which the member holds an interest in or is otherwise engaged by the Company, the member will not solicit, directly or indirectly, any customers of the Company who or which were customers of the Company at any time during the Member's relationship with the Company, nor shall the member solicit any potential customers of the Company with whom the member had contact on behalf of the Company during their relationship with the Company.

g. For so long as the member holds an interest in or is otherwise engaged by the Company, and up until and including the one year anniversary of the final date on which the member holds an interest in or is otherwise engaged by the Company, the member will not solicit or hire, directly or indirectly, on the member's behalf or on behalf of any other person or entity, any person employed or otherwise engaged by the Company except with the specific written consent of the Company.

h. The member represents that the member's experience, capabilities and circumstances are such that the provisions of this Agreement will not prevent the member from earning a livelihood. The member further agrees that the limitations set forth in this Agreement (including, without limitation, the time and territorial limitations) are reasonable and properly required for the adequate protection of the current and future businesses of the Company. The member further acknowledges that a remedy at law for any breach or threatened breach of the provisions of this agreement would be inadequate and will cause immediate and irreparable harm to the Company in a manner that cannot be measured nor adequately compensated in damages. The Member further acknowledges that in the event of any such breach or threatened breach, and in addition to any and all other remedies that it may have at law or in equity, the Company shall be entitled to temporary, preliminary and permanent injunctive relief to restrain such breach or threatened breach by the Member, and to recover all costs and expenses, including reasonable attorneys' fees, of any proceedings brought to obtain such injunctive relief. Nothing contained herein shall restrict or limit in any manner the Company's right to seek and obtain any form of relief, legal or equitable, against the member in an action brought to enforce its rights hereunder.

i. The member's obligations under this Section 4 shall apply to any time during which the member was previously retained by the company as a member, manager, principal, officer, employee, consultant or contractor.

4. **Capital Contributions.**

   a. Each of the Members covenants and agrees to contribute to the capital of the Company that sum set forth on the joinder agreements executed and delivered by each respective member, for which such member shall receive appropriate credit to his or her capital account (each a "Capital Account").

   b. If the Manager determines that the Company requires additional capital, then, subject to the other provisions of this Agreement, the Manager may authorize the Company to issue such additional Shares, or such other equity securities and/or debt instruments of the Company, as shall be sufficient to satisfy the additional capital requirements of the Company, at such price and on such terms as the Manager determines to be appropriate (such additional Shares, equity securities and/or debt instruments, the "Offered Securities"). The members may, but shall not be obligated to, purchase such Offered Securities in proportion to the number of Shares owned by each of them relative to the total number of Shares then issued and outstanding, as determined on a fully-diluted basis. The Manager shall provide the members with written notice of the proposed issuance, which notice shall set forth, in reasonable detail, the material terms of such issuance, at least thirty (30) days prior to the proposed date of issuance. Each member shall notify the Manager no later than fifteen (15) days after receipt of the written notice as to whether or not he, she or it desires to purchase any of the Shares to be issued by the Company. If any member declines to subscribe for all such Offered Securities permitted to be purchased by such member, then the other members may purchase such unsubscribed Offered Securities in proportion to the number of Shares owned by each of them. The Manager may sell the unpurchased Offered Securities remaining to third parties at a price not less than that offered to the members. Nothing herein shall prohibit the Company from issuing securities or debt instruments convertible into Shares, provided that it first offers to issue such securities or debt instruments to the members as "Offered Securities" in accordance with the provisions of this Section 4.

   c. No Member shall have the right to withdraw any of its Capital Account, except upon dissolution, winding up and liquidation of the Company as provided in this Agreement. No Member shall be entitled to receive any interest on its Capital Account, or any portion thereof.

5. **Dissolution of Company.**

   a. The Company shall be dissolved upon the earliest to occur of any of the following events (an "Event of Dissolution"), it being understood and agreed that the death, resignation, retirement, expulsion, bankruptcy or dissolution of a member, or the occurrence of any other event that terminates the continued membership of a member in the Company under applicable law, shall not constitute an Event of Dissolution:

      i. Written consent of the members holding a majority of the vested Shares then outstanding; or

      ii. The entry of a decree of judicial dissolution under applicable law.

   b. The Company shall terminate when all Company assets have been disposed of (except for any liquid assets not so disposed of), and the net proceeds therefrom, as well as any other liquid or illiquid assets of the Company, shall, unless otherwise required by applicable law, be distributed as follows: (i) first, to the payment of the Company's debts and obligations to

its creditors (including loans, if any, to the Company from members); (ii) second, to the establishment of and additions to such reserves as the Manager deems necessary or appropriate; and (iii) third, to the members, pro rata, in accordance with their respective membership interest in the Company.

  c. Following such distributions and the completion of winding up the affairs of the Company, the Manager is authorized and directed to have prepared and file a certificate of cancellation of the Company with the Connecticut Secretary of State in accordance with applicable law, and take any and all other actions as may be necessary and/or appropriate under applicable law to dissolve and terminate the Company.

6. **General Provisions.**

   a. This Agreement shall inure to the benefit of and be binding upon the Company and each of the members, and the legal representatives, successors and assigns of each. The term *"successors and assigns"* as used herein shall include a corporation or other entity acquiring all or substantially all of the business of the Company (whether such acquisition is by way of acquisition of assets, acquisition of stock, merger, consolidation or otherwise, and whether by operation of law or otherwise). Specifically, as to each member, the foregoing invention assignment and confidentiality provisions shall survive the termination of such member's engagement by or relationship with the Company (whether as a member or otherwise) and the assignment of this Agreement by the Company to any successor in interest or other assignee.

   b. Except where the pursuit of equitable, injunctive or judicial relief is otherwise expressly authorized in this Agreement, if any dispute shall arise between the members as to their rights or liabilities under this Agreement, the dispute shall be exclusively determined, and the dispute shall be settled, by arbitration in accordance with the commercial rules of the American Arbitration Association. The arbitration shall be held in the state of Connecticut before a panel of three arbitrators, all of whom shall be chosen from a panel of arbitrators selected by the American Arbitration Association (or such other independent dispute resolution body to which they shall mutually agree). Each of the parties to the dispute shall select one arbitrator and the two arbitrators so selected shall select the third arbitrator. If the two arbitrators are unable to agree upon the third arbitrator, the third arbitrator shall be selected by the American Arbitration Association (or such other independent body to which they shall mutually agree). The decision of the arbitrators shall be final and binding upon the members and the Company and judgment upon such award may be entered in any court of competent jurisdiction. The costs of the arbitrators and of the arbitration shall be borne equally by all parties to the arbitration. The costs of each party's counsel, accountants, etc., as well as any costs solely for their benefit, shall be borne separately by each party. each of the members hereby acknowledges that this provision constitutes a waiver of their right to commence a lawsuit in any jurisdiction with respect to the matters which are required to be settled by arbitration as provided in this Section 4(b).

   c. This Agreement shall be governed by and construed in accordance with the internal laws (and not the law of conflicts) of the State of Connecticut and the federal laws of the United States applicable therein. Any and all disputes arising under this Agreement, whether as to interpretation, performance or otherwise, shall be subject to the exclusive jurisdiction of the courts of the County of Fairfield, State of Connecticut and the federal courts located therein and each of the parties hereto hereby irrevocably attorns to the exclusive jurisdiction of the courts of the County of Fairfield, State of Connecticut and the federal

courts located therein. None of the parties shall contest in any other jurisdiction the enforcement of any judgment or award of the courts of the County of Fairfield, State of Connecticut in relation to this Agreement.

d.  The parties intend this Agreement to be enforced as written. However, if any portion or provision of this Agreement is to any extent declared illegal or unenforceable by a duly authorized court having jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, will not be affected thereby, and each portion and provision of this Agreement will be valid and enforceable to the fullest extent permitted by law.

e.  This Agreement may be amended or restated only by a written instrument signed by such members constituting two-thirds of the vested Shares then outstanding.

f.  This Agreement may be executed in one or more counterparts, and by facsimile or PDF, all of which shall constitute one and the same original instrument. This Agreement shall constitute the Company's *"Operating Agreement,"* as defined in the Connecticut Limited Liability Company Act.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Company has executed this Agreement effective as of the Effective Date.

CONFIGAIR LLC

Signature: _____

Name and Title: Daniel Naus, CEO and President

Date: _____03/14/2011_____

# EXHIBIT A

## Member Guaranteed Payments Compensation Schedule

All initial members are compensated with guaranteed payments per Section 2(d) of the Agreement in the amount of $2000 monthly, $24,000 annually.

# CONFIGAIR LLC
## JOINDER TO OPERATING AGREEMENT

The undersigned is hereby made a party to the Operating Agreement of CONFIGAIR LLC (as such Operating Agreement is in effect on the date hereof and as it is from time to time amended and/or restated hereafter) as a "member" thereunder, and the undersigned hereby agrees to be bound by and to comply with the terms of the Operating Agreement.

*The 200,000 Shares hereby issued to the undersigned by the Company are fully-vested, with full voting rights. The Shares are being sold and issued to the undersigned in consideration of a capital contribution in the amount of $20,000.00.*

This Joinder may be executed in one or more counterparts, and all counterparts so executed shall constitute one Joinder.

The undersigned hereby agrees and acknowledges that this Joinder shall become effective and enforceable against the undersigned immediately upon its execution and delivery by the undersigned and its acceptance by the Company.

NAME: Henry Kurz

Signature: *[signed] Henry Kurz*

Date: 04/09/2011

AGREED TO AND ACCEPTED BY:

CONFIGAIR LLC

Signature: *[signed]*

Name and Title: Daniel Naus, CEO and President

Date: 03/14/2011

# CONFIGAIR LLC
## JOINDER TO OPERATING AGREEMENT

The undersigned is hereby made a party to the Operating Agreement of CONFIGAIR LLC (as such Operating Agreement is in effect on the date hereof and as it is from time to time amended and/or restated hereafter) as a "member" thereunder, and the undersigned hereby agrees to be bound by and to comply with the terms of the Operating Agreement.

*The 100,000 Shares hereby issued to the undersigned by the Company are fully-vested, with full voting rights. The Shares are being sold and issued to the undersigned in consideration of a capital contribution in the amount of $20,000.00.*

This Joinder may be executed in one or more counterparts, and all counterparts so executed shall constitute one Joinder.

The undersigned hereby agrees and acknowledges that this Joinder shall become effective and enforceable against the undersigned immediately upon its execution and delivery by the undersigned and its acceptance by the Company.

NAME: Dung Nguyen

Signature: _____

Date: 4/22/2011

AGREED TO AND ACCEPTED BY:

CONFIGAIR LLC

Signature: _____

Name and Title: Daniel Naus, CEO and President

Date: 03/14/2011

## CONFIGAIR LLC
## JOINDER TO OPERATING AGREEMENT

The undersigned is hereby made a party to the Operating Agreement of CONFIGAIR LLC (as such Operating Agreement is in effect on the date hereof and as it is from time to time amended and/or restated hereafter) as a "member" thereunder, and the undersigned hereby agrees to be bound by and to comply with the terms of the Operating Agreement.

*The 200,000 Shares hereby issued to the undersigned by the Company are fully-vested, with full voting rights. The Shares are being sold and issued to the undersigned in consideration of a capital contribution in the amount of $20,000.00.*

This Joinder may be executed in one or more counterparts, and all counterparts so executed shall constitute one Joinder.

The undersigned hereby agrees and acknowledges that this Joinder shall become effective and enforceable against the undersigned immediately upon its execution and delivery by the undersigned and its acceptance by the Company.

NAME: Daniel Naus

Signature: _____

Date: _____03/14/2011_____

AGREED TO AND ACCEPTED BY:

CONFIGAIR LLC

Signature: _____

Name and Title: Henry Kurz, Chief Technology Officer and Vice President

Date: _____

# CONFIGAIR LLC
## JOINDER TO OPERATING AGREEMENT

The undersigned is hereby made a party to the Operating Agreement of CONFIGAIR LLC (as such Operating Agreement is in effect on the date hereof and as it is from time to time amended and/or restated hereafter) as a "member" thereunder, and the undersigned hereby agrees to be bound by and to comply with the terms of the Operating Agreement.

*The 100,000 Shares hereby issued to the undersigned by the Company are fully-vested, with full voting rights. The Shares are being sold and issued to the undersigned in consideration of a capital contribution in the amount of $20,000.00.*

This Joinder may be executed in one or more counterparts, and all counterparts so executed shall constitute one Joinder.

The undersigned hereby agrees and acknowledges that this Joinder shall become effective and enforceable against the undersigned immediately upon its execution and delivery by the undersigned and its acceptance by the Company.

NAME: Nizwer Husain

Signature: *Nizwer Husain*

Date: 04/28/2011

AGREED TO AND ACCEPTED BY:

CONFIGAIR LLC

Signature: *[signature]*

Name and Title: Daniel Naus, CEO and President

Date: 03/14/2011