## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CONFIGAIR LLC, | ) | |
| | ) | 3:17-cv-02026-JBA |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | **DEFENDANT'S ANSWER,** |
| v. | ) | **AFFIRMATIVE DEFENSES,** |
| | ) | **COUNTERCLAIMS, THIRD-** |
| HENRY KURZ | ) | **PARTY COMPLAINT AND** |
| | ) | **DEMAND FOR JURY TRIAL** |
| Defendant/Counterclaimant. | ) | |
| _____ | ) | July 24, 2018 |
| HENRY KURZ | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DANIEL NAUS, NIZWER HUSAIN, and | ) | |
| DUNG NGUYEN, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |
| _____ | ) | |

## ANSWER TO FIRST AMENDED COMPLAINT AND AFFIRMATIVE DEFENSES

Defendant Henry Kurz ("Kurz"), by and through his undersigned counsel, hereby responds to the First Amended Complaint (the "FAC") of Plaintiff ConfigAir, LLC ("ConfigAir") as set forth herein.

### THE PARTIES

1.       Kurz admits that ConfigAir is a "manager-managed" limited liability company organized under the laws of Connecticut.  Kurz further admits that ConfigAir's members include Daniel Naus, Nizwer Husain, and Dung Nguyen.  Kurz lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 1 of the FAC, and on that basis denies them.

2.      Kurz admits he is a German national and that he has served as an officer and director of ConfigAir.  Kurz states that he is a member of the Company.  Kurz denies the remaining allegations set forth in Paragraph 2 of the FAC.

## JURISDICTION AND VENUE

3.      Kurz does not contest the Court's jurisdiction over the subject matter of this action.  Kurz denies the remaining allegations set forth in Paragraph 3 of the FAC.

4.      Kurz does not contest the Court's exercise of personal jurisdiction in this action. Kurz denies the remaining allegations set forth in Paragraph 4 of the FAC.

5.      Kurz does not contest venue in this action.  Kurz denies the remaining allegations set forth in Paragraph 5 of the FAC.

## BACKGROUND FACTS

6.      Kurz admits that ConfigAir was founded in late 2010 by Daniel Naus, Nizwer Husain, Dung Nguyen, and Henry Kurz and states that all four of these individuals are members of ConfigAir.  Kurz denies the remaining allegations set forth in Paragraph 6 of the FAC.

7.      Kurz admits the allegations set forth in Paragraph 7 of the FAC.

*The Operating Agreement*

8.      Kurz admits that ConfigAir is a "manager managed" limited liability company and that ConfigAir's board of directors serves as the company's manager.  Kurz states that the ConfigAir LLC Operating Agreement speaks for itself.  Kurz denies the remaining allegations set forth in Paragraph 8 of the FAC.

9.      Kurz admits that he signed the Joinder to Operating Agreement on April 9, 2011. Kurz denies the remaining allegations set forth in Paragraph 9 of the FAC.

10.     Kurz admits the allegations set forth in Paragraph 10 of the FAC.

11.     Kurz admits the allegations set forth in Paragraph 11 of the FAC.

12.     Kurz denies the allegations set forth in Paragraph 12 of the FAC.

13.     Kurz states that the Operating Agreement speaks for itself and respectfully refers the Court to the document for a full statement of the terms thereof.  Kurz denies the remaining allegations set forth in Paragraph 13 of the FAC.

14.     Kurz states that the Operating Agreement speaks for itself and respectfully refers the Court to the document for a full statement of the terms thereof.  Kurz denies the remaining allegations set forth in Paragraph 14 of the FAC.

15.     Kurz states that the Operating Agreement speaks for itself and respectfully refers the Court to the document for a full statement of the terms thereof.  Kurz denies the remaining allegations set forth in Paragraph 15 of the FAC.

16.     Kurz states that the Operating Agreement speaks for itself and respectfully refers the Court to the document for a full statement of the terms thereof.  Kurz denies the remaining allegations set forth in Paragraph 16 of the FAC.

17.     Kurz states that the Operating Agreement speaks for itself and respectfully refers the Court to the document for a full statement of the terms thereof.  Kurz denies the remaining allegations set forth in Paragraph 17 of the FAC.

18.     Kurz states that the Operating Agreement speaks for itself and respectfully refers the Court to the document for a full statement of the terms thereof.  Kurz denies the remaining allegations set forth in Paragraph 18 of the FAC.

19.     Kurz states that the Operating Agreement speaks for itself and respectfully refers the Court to the document for a full statement of the terms thereof.  Kurz denies the remaining allegations set forth in Paragraph 19 of the FAC.

20.     Kurz states that the Operating Agreement speaks for itself and respectfully refers the Court to the document for a full statement of the terms thereof.  Kurz denies the remaining allegations set forth in Paragraph 20 that appears on page 5 of the FAC and the remaining allegations set forth in Paragraph 20 that appears on page 6 of the FAC.

*ConfigAir's Development of the Software*

21.     Kurz denies the allegations set forth in Paragraph 21 of the FAC.

22.     Kurz admits he was the Chief Technology Officer of ConfigAir, that he worked on developing software, and that he supervised a development team.  Kurz denies the remaining allegations set forth in Paragraph 22 of the FAC.

23.     Kurz admits that ConfigAir marketed software starting in 2013, and since then, the software has been changed, modified and altered.  Kurz denies the remaining allegations set forth in Paragraph 23 of the FAC.

24.     Kurz admits that ConfigAir has been marketing and selling software from 2013 to late 2017 to customers in the marketplace. Kurz further admits that, upon information and belief, ConfigAir has continued to market and sell software from late 2017 to present day to customers in the marketplace.  Kurz lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 24 of the FAC, and on that basis denies them.

25.     Kurz admits that from the time ConfigAir was founded until as late as mid-2017, he, in his roles as a member owning a one-third interest in ConfigAir, a director, and as an officer in charge of ConfigAir's technology, assisted ConfigAir's efforts to develop, market, and sell software.  Kurz denies the remaining allegations set forth in Paragraph 25 of the FAC, and on that basis denies them.

26.     Kurz denies the allegations set forth in Paragraph 26 of the FAC.

*ConfigAir's Meeting with Defendant in Fort Lauderdale*

27.     Kurz denies the allegations set forth in Paragraph 27 of the FAC.

28.     Kurz states that the Operating Agreement speaks for itself and respectfully refers the Court to the document for a full statement of the contents thereof.  Kurz denies the remaining allegations set forth in Paragraph 28 of the FAC.

29.     Kurz admits that in June of 2017 he served as a director and officer and owned a membership interest in ConfigAir.  Kurz denies the remaining allegations set forth in Paragraph 29 of the FAC.

30.     Kurz denies the allegations set forth in Paragraph 30 of the FAC.

31.     Kurz admits that the members met in Fort Lauderdale, Florida on October 12, 2017.  Kurz denies the remaining allegations set forth in Paragraph 31 of the FAC.

32.     Kurz admits that he was unhappy with the way that ConfigAir was managed.  Kurz denies the remaining allegations set forth in Paragraph 32 of the FAC.

33.     Kurz admits that the software, versions of which ConfigAir marketed since 2013, contains intellectual property created by Kurz.  Kurz denies the remaining allegations set forth in Paragraph 33 of the FAC.

34.     Kurz denies the allegations set forth in Paragraph 34 of the FAC.

35.     Kurz denies the allegations set forth in Paragraph 35 of the FAC.

*The October 18, 2017 Board Meeting*

36.     Kurz admits that the directors of ConfigAir attended a board meeting on October 18, 2017.   Kurz denies the remaining allegations set forth in Paragraph 36 of the FAC.

37.     Kurz admits that Daniel Naus, Dung Nguyen and Nizwer Husain voted to remove Kurz as ConfigAir's Chief Technical Officer and Vice President.   Kurz denies the remaining allegations set forth in Paragraph 37 of the FAC.

38.     Kurz admits that, after the meeting, he remained a director and still owned a membership interest consisting of one-third of the Company.   Kurz denies the remaining allegations set forth in Paragraph 38 of the FAC.

*Defendant's Breaches of the Operating Agreement and Other Tortious Conduct*

39.     Kurz denies the allegations set forth in Paragraph 39 of the FAC.

40.     Kurz admits the allegations contained in subparagraph 40e of the FAC.   Kurz denies the remaining allegations set forth in Paragraph 40 of the FAC.

41.     Kurz admits the allegations set forth in Paragraph 41 of the FAC.

42.     Kurz admits that he posted the October 21, 2017 post reflected in Exhibit B to the FAC, states that the document speaks for itself and respectfully refers the Court to the document for a full statement of the contents thereof.   Kurz further states that it was posted more than seven months after the previous comment was posted and that it was removed within a couple hours.  Kurz denies the remaining allegations set forth in Paragraph 42 of the FAC.

43.     Kurz admits that the October 21, 2017 post was published on a public page and states that the post was removed within a couple hours.  Kurz denies the remaining allegations set forth in Paragraph 43 of the FAC.

44.     Kurz admits that he sent the email reflected in Exhibit C to the FAC, states that the document speaks for itself and respectfully refers the Court to the document for a full statement of the contents thereof.  Kurz denies the remaining allegations set forth in Paragraph 44 of the FAC.

45.     Kurz admits that Daniel Naus made certain unfounded claims and demands against Kurz on or about October 21, 2017.  Kurz lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 45 of the FAC, and on that basis denies them.

46.      Kurz admits that Daniel Naus made certain unfounded claims and demands against Kurz on or about October 27, 2017.  Kurz lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 46 of the FAC, and on that basis denies them.

47.     Kurz states that ConfigAir does not own intellectual property rights in, and must pay for its use of, software, versions of which ConfigAir has marketed and sold to customers since 2013.  Kurz denies the remaining allegations set forth in Paragraph 47 of the FAC.

48.     Kurz admits that he contacted the other members of ConfigAir after he discovered that his access to ConfigAir's internal network was blocked.  Kurz states that his communication to the other members speaks for itself and denies the remaining allegations set forth in Paragraph 48 of the FAC.

49.      Kurz denies the allegations set forth in Paragraph 49 of the FAC.

50.      Kurz admits the allegations set forth in Paragraph 50 of the FAC.

51.      Kurz denies the allegations set forth in Paragraph 51 of the FAC.

52.      Kurz lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 52 of the FAC, and on that basis denies them.

53.      Kurz admits that he sent the email reflected in Exhibit E to the FAC, states that the document speaks for itself, and respectfully refers the Court to the document for a full statement of its contents.  Kurz denies the remaining allegations set forth in Paragraph 53 of the FAC.

54.      Kurz admits that the document attached as Exhibit F to the FAC purports to be a letter from ConfigAir's counsel and states that the document speaks for itself.  Kurz lacks knowledge or information sufficient to form a belief as to the remaining allegations set forth in Paragraph 54 of the FAC, and on that basis denies them.

55.      Kurz admits that he continues to insist that Henry Kurz Consulting GmbH owns intellectual property rights with respect to software.  Kurz denies the remaining allegations set forth in Paragraph 55 of the FAC.

56.      Kurz denies the allegations set forth in Paragraph 56 of the FAC.

57.      Kurz admits the allegations contained in the first sentence of Paragraph 57 of the FAC.  Kurz further admits that, per his request, YouTube temporarily disabled the page and that it was later restored.  Kurz lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 57 of the FAC, and on that basis denies them.

58.     Kurz admits that he sent the letter reflected in Exhibit G to the FAC, states that the document speaks for itself, and respectfully refers the Court to the document for a full statement of its contents.  Kurz further states that the letter was sent after ConfigAir failed to comply with a cease and desist letter sent by Kurz's counsel to ConfigAir.  Kurz denies the remaining allegations set forth in Paragraph 58 of the FAC.

59.     Kurz admits that he sent letters to other customers of ConfigAir.  Kurz denies the remaining allegations set forth in Paragraph 59 of the FAC.

60.     Kurz admits that he sent the email reflected in Exhibit H to the FAC, states that the document speaks for itself, and respectfully refers the Court to the document for a full statement of its contents.  Kurz denies the remaining allegations set forth in Paragraph 60 of the FAC.

*Defendant's Illegal Conduct Has Continued Into 2018*

61.     Kurz denies the allegations set forth in Paragraph 61 of the FAC.

62.     Kurz admits that he made the posts reflected in Exhibit I to the FAC, states that the document speaks for itself, and respectfully refers the Court to the document for a full statement of its contents. Kurz denies the remaining allegations set forth in Paragraph 62 of the FAC.

63.     Kurz admits that he made the post reflected in Exhibit J to the FAC, states that the document speaks for itself, and respectfully refers the Court to the document for a full statement of its contents.  Kurz denies the remaining allegations set forth in Paragraph 63 of the FAC.

64.     Kurz admits the allegations set forth in the first sentence in Paragraph 64 of the FAC.  Kurz denies that Exhibit K is a copy of Kurz's copyright infringement claim submitted to

YouTube.  Kurz lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 64 of the FAC, and on that basis denies them.

65.     Kurz admits that he made the post reflected in Exhibit L to the FAC, states that the document speaks for itself, and respectfully refers the Court to the document for a full statement of its contents. Kurz denies the remaining allegations set forth in Paragraph 65 of the FAC.

66.     Kurz denies the allegations set forth in Paragraph 66 of the FAC.

67.     Kurz denies the allegations set forth in Paragraph 67 of the FAC.

68.     Kurz states that the document attached as Exhibit M speaks for itself and respectfully refers the Court to the document for a full statement of its contents.  Kurz denies the remaining allegations set forth in Paragraph 68 of the FAC.

69.     Kurz admits that he contacted McLaren Automotive employees.  Kurz denies the remaining allegations set forth in Paragraph 69 of the FAC.

70.      Kurz admits that he made the post reflected in Exhibit N to the FAC, states that the document speaks for itself, and respectfully refers the Court to the document for a full statement of its contents. Kurz denies the remaining allegations set forth in Paragraph 70 of the FAC.

*Defendant was Removed as a Member From ConfigAir for Cause in February, 2018*

71.     Kurz admits the allegations set forth in the first sentence of the first Paragraph 71 of the FAC.   Kurz specifically denies that Mr. Naus, Mr. Husain and Mr. Nguyen had any right to remove Kurz as a member of the Company for cause or otherwise, and denies the remaining allegations set forth in the first Paragraph 71 of the FAC.

72.     Kurz admits that ConfigAir provided him with payment of $20,000, an amount equal to his initial capital investment.  Kurz denies the remaining allegations set forth in the first Paragraph 72 of the FAC.

## Count I
### (Declaratory Judgment)

73.     In answer to the allegations set forth in the second Paragraph 71 of the FAC, Kurz repeats and incorporates by reference his answers to each and every allegation previously referenced in this FAC as if fully set forth herein.

74.     Kurz admits that each of the members initially contributed the same amount of capital to the Company and admits that he was given a larger membership interest in ConfigAir than two of the other members because of his experience and expertise in the area of developing systems application software.  Kurz states that he was the only member with such experience and expertise.  Kurz further states that an additional reason for giving Kurz a larger membership interest was because Kurz was the only member with academic degrees in computer software programming and in business information technology.  Kurz denies the remaining allegations set forth in the second Paragraph 72 of the FAC.

75.     Kurz denies the allegations set forth in Paragraph 73 of the FAC.

76.     Kurz denies the allegations set forth in Paragraph 74 of the FAC.

77.     Kurz admits that, after co-founding ConfigAir, he spent years developing software.  Kurz denies the remaining allegations set forth in Paragraph 75 of the FAC.

78.     Kurz admits that he, among other things, wrote code and oversaw the software development team.  Kurz denies the remaining allegations set forth in Paragraph 76 of the FAC.

79.     Kurz denies the allegations set forth in Paragraph 77 of the FAC.

80.     Kurz denies the allegations set forth in Paragraph 78 of the FAC.

81.     Kurz denies the allegations set forth in Paragraph 79 of the FAC.

82.     Kurz admits that he disputes that ConfigAir owns software and/or any intellectual property rights with respect to software, versions of which ConfigAir has marketed and sold since 2013.  Kurz denies the remaining allegations set forth in Paragraph 80 of the FAC.

83.     Kurz admits the allegations set forth in Paragraph 81 of the FAC.

84.     Kurz denies the allegations set forth in Paragraph 82 of the FAC.

85.     Kurz denies the allegations set forth in Paragraph 83 of the FAC.

**Count II**
**(Declaratory Judgment)**

86.     In answer to the allegations set forth in Paragraph 84 of the FAC, Kurz repeats and incorporates by reference his answers to each and every allegation previously referenced in the FAC as if fully set forth herein.

87.     Kurz denies the allegations set forth in Paragraph 85 on page 20 of the FAC.

88.     Kurz denies the allegations set forth in Paragraph 86 on page 20 of the FAC.

89.     Kurz denies the allegations set forth in Paragraph 87 on page 20 of the FAC.

90.     Kurz denies the allegations set forth in Paragraph 88 on page 21 of the FAC.

91.     Kurz admits that he, through counsel, indicated that he believes that ConfigAir had no right to remove him as a member and that ConfigAir was not legally permitted to purchase his membership interest for $20,000.  Kurz denies the remaining allegations set forth in Paragraph 89 on page 21 of the FAC.

92.     Kurz admits the allegations set forth in Paragraph 90 on page 21 of the FAC.

93.     Kurz denies the allegations set forth in Paragraph 91 on page 21 of the FAC.

94.     Kurz denies the allegations set forth in Paragraph 92 on page 21 of the FAC.

**Count III**
**(Breach of Contract)**

95.     In answer to the allegations set forth in Paragraph 93 on page 21 of the FAC, Kurz repeats and incorporates by reference his answers to each and every allegation previously referenced in the FAC as if fully set forth herein.

96.     Kurz denies the allegations set forth in Paragraph 85 on page 22 of the FAC.

97.     Kurz denies the allegations set forth in Paragraph 86 on page 22 of the FAC.

98.     Kurz states that he is a member of ConfigAir and denies the allegations set forth in Paragraph 87 on page 22 of the FAC.

99.     Kurz denies the allegations set forth in Paragraph 88 on page 22 of the FAC.

100.     Kurz denies the allegations set forth in Paragraph 89 on page 22 of the FAC.

101.     Kurz denies the allegations set forth in Paragraph 90 on page 22 of the FAC.

**Count IV**
**(Breach of Contract)**

102.     In answer to the allegations set forth in Paragraph 91 on page 22 of the FAC, Kurz repeats and incorporates by reference his answers to each and every allegation previously referenced in the FAC as if fully set forth herein.

103.     Kurz denies the allegations set forth in Paragraph 92 on page 22 of the FAC.

104.     Kurz denies the allegations set forth in Paragraph 93 on page 23 of the FAC.

105.     Kurz states that he is a member of ConfigAir and denies the allegations set forth in Paragraph 94 of the FAC.

106.     Kurz denies the allegations set forth in Paragraph 95 of the FAC.

107.     Kurz denies the allegations set forth in Paragraph 96 of the FAC.

108.    Kurz denies the allegations set forth in Paragraph 97 of the FAC.

**Count V**
**(Breach of Contract)**

109.    In answer to the allegations set forth in Paragraph 98 of the FAC, Kurz repeats and incorporates by reference his answers to each and every allegation previously referenced in the FAC as if fully set forth herein.

110.    Kurz denies the allegations set forth in Paragraph 99 of the FAC.

111.    Kurz denies the allegations set forth in Paragraph 100 of the FAC

112.    Kurz states that he is a member of ConfigAir and denies the remaining allegations set forth in Paragraph 101 of the FAC.

113.    Kurz denies the allegations set forth in Paragraph 102 of the FAC.

114.    Kurz denies the allegations set forth in Paragraph 103 of the FAC.

**Count VI**
**(Breach of Contract)**

115.    In answer to the allegations set forth in Paragraph 104 of the FAC, Kurz repeats and incorporates by reference his answers to each and every allegation previously referenced in the FAC as if fully set forth herein.

116.    Kurz denies the allegations set forth in Paragraph 105 of the FAC

117.    Kurz denies the allegations set forth in Paragraph 106 of the FAC.

118.    Kurz states that he is a member of ConfigAir and denies the remaining allegations set forth in Paragraph 107 of the FAC.

119.    Kurz denies the allegations set forth in Paragraph 108 of the FAC.

120.    Kurz denies the allegations set forth in Paragraph 109 of the FAC.

**Count VII**
**(Injunctive Relief)**

121.    In answer to the allegations set forth in Paragraph 110 of the FAC, Kurz repeats and incorporates by reference his answers to each and every allegation previously referenced in the FAC as if fully set forth herein.

122.    Kurz denies the allegations set forth in Paragraph 111 of the FAC.

123.    Kurz denies the allegations set forth in Paragraph 112 of the FAC.

124.    Kurz denies the allegations set forth in Paragraph 113 of the FAC.

125.    Kurz denies the allegations set forth in Paragraph 114 of the FAC

126.    Kurz denies the allegations set forth in Paragraph 115 of the FAC.

**Count VIII**
**(Violation of the Connecticut Uniform Trade Secrets Act)**

127.    In answer to the allegations set forth in Paragraph 116 of the FAC, Kurz repeats and incorporates by reference his answers to each and every allegation previously referenced in the FAC as if fully set forth herein.

128.    Kurz admits the allegations set forth in Paragraph 117 of the FAC.

129.    Kurz denies the allegations set forth in Paragraph 118 of the FAC.

130.    Kurz denies the allegations set forth in Paragraph 119 of the FAC.

131.    Kurz admits he has copies of and has access to the code underlying the software marketed by ConfigAir and denies the remaining allegations set forth in Paragraph 120 of the FAC.

132.    Kurz denies the allegations set forth in Paragraph 121.

133.    Kurz denies the allegations set forth in Paragraph 122.

134.    Kurz denies the allegations set forth in Paragraph 123.

135.    Kurz denies the allegations set forth in Paragraph 124.

**Count IX**
**(Breach of Fiduciary Duty – Conn. Gen. Stat. §34-263b)**

136.    In answer to the allegations set forth in Paragraph 125 of the FAC, Kurz repeats and incorporates by reference his answers to each and every allegation previously referenced in the FAC as if fully set forth herein.

137.    Kurz admits that ConfigAir is a "manager-managed" limited liability company with ConfigAir's board serving as the "manager" of the Company.  Kurz denies the remaining allegations set forth in Paragraph 126 of the FAC.

138.    Kurz admits that he served as an officer of the Company from the time ConfigAir was founded until he was wrongfully removed from office on October 18, 2017 and denies the remaining allegations set forth in Paragraph 127 of the FAC.

139.    Kurz admits that he served as a member of the board of directors that was collectively considered the Company's "manager" from the time ConfigAir was founded until he was wrongfully removed on October 21, 2017.  Kurz denies the remaining allegations set forth in Paragraph 128 of the FAC.

140.    Kurz denies the allegations set forth in Paragraph 129 of the FAC.

141.    Kurz denies the allegations set forth in Paragraph 130 of the FAC.

142.    Kurz denies the allegations set forth in Paragraph 131 of the FAC.

143.    Kurz denies the allegations set forth in Paragraph 132 of the FAC.

144.    Kurz denies the allegations set forth in Paragraph 133 of the FAC.

**Count X**

**(Tortious Interference with Contract/Business Relationship)**

145.    In answer to the allegations set forth in Paragraph 134 of the FAC, Kurz repeats and incorporates by reference his answers to each and every allegation previously referenced in the FAC as if fully set forth herein.

146.    Kurz lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 135 of the FAC, and on that basis denies them.

147.    Kurz denies the allegations set forth in Paragraph 136 of the FAC.

148.    Kurz denies the allegations set forth in Paragraph 137 of the FAC.

149.    Kurz lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 138 of the FAC, and on that basis denies them.

150.    Kurz denies the allegations set forth in Paragraph 139 of the FAC.

151.    Kurz denies the allegations set forth in Paragraph 140 of the FAC.

**Count XI**
**(Defamation, Business Disparagement, and Trade Libel)**

152.    In answer to the allegations set forth in Paragraph 141 of the FAC, Kurz repeats and incorporates by reference his answers to each and every allegation previously referenced in the FAC as if fully set forth herein.

153.    Kurz admits that ConfigAir does not own the software, versions of which ConfigAir has marketed and sold since 2013, and admits that those using or working on the software without authorization could be subject to criminal penalties.  Kurz states that Henry Kurz Consulting GmbH owns the software and intellectual property rights to the software, a version of which ConfigAir has marketed and sold.  Kurz denies the remaining allegations set forth in Paragraph 142 of the FAC.

154.    Kurz denies the allegations set forth in Paragraph 143 of the FAC.

155.    Kurz denies the allegations set forth in Paragraph 144 of the FAC.

156.    Kurz denies the allegations set forth in Paragraph 145 of the FAC.

**Count XII**
**(Injunctive Relief re: Tortious Conduct)**

157.    In answer to the allegations set forth in Paragraph 146 of the FAC, Kurz repeats and incorporates by reference his answers to each and every allegation previously referenced in the FAC as if fully set forth herein.

158.    Kurz denies the allegations set forth in Paragraph 147 of the FAC.

159.    Kurz denies the allegations set forth in Paragraph 148 of the FAC.

160.    Kurz denies the allegations set forth in Paragraph 149 of the FAC.

**Count XIII**
**(Attorneys' Fees)**

161.    In answer to the allegations set forth in Paragraph 150 of the FAC, Kurz repeats and incorporates by reference his answers to each and every allegation previously referenced in the FAC as if fully set forth herein.

162.    Kurz denies the allegations set forth in Paragraph 151 of the FAC.

163.    Kurz denies the allegations set forth in Paragraph 152 of the FAC.

164.    Kurz denies the allegations set forth in Paragraph 153 of the FAC.

**Count XIV**
**(Punitive Damages)**

165.    In answer to the allegations set forth in Paragraph 154 of the FAC, Kurz repeats and incorporates by reference his answers to each and every allegation previously referenced in the FAC as if fully set forth herein.

166.    Kurz denies the allegations set forth in Paragraph 155 of the FAC.

167.    Kurz denies the allegations set forth in Paragraph 156 of the FAC.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

168.    The Complaint, in whole or in part, fails to state a cause of action upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

169.    Plaintiff's claims are barred, in whole or in part, for failure to join an indispensable party.  Kurz alleges that HKC is an indispensable party, because it owns the copyright in the Pre-LLC Software that is the subject of several of Plaintiff's claims.  As such, its interest is not adequately represented by the present parties, and the disposition of this action might impair its ability to protect such interest.

### THIRD AFFIRMATIVE DEFENSE

170.    Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.

### FOURTH AFFIRMATIVE DEFENSE

171.    Plaintiff's claims are barred, in whole or in part, by the doctrine of estoppel.

### FIFTH AFFIRMATIVE DEFENSE

172.    Plaintiff's claims are barred, in whole or in part, by the doctrine of waiver.

### SIXTH AFFIRMATIVE DEFENSE

173.    Plaintiff's claims are barred, in whole or in part, by the doctrine of acquiescence.

### SEVENTH AFFIRMATIVE DEFENSE

174.   The remedies sought by the claims for relief are limited or precluded by Plaintiff's failure to mitigate damages.

### EIGHTH AFFIRMATIVE DEFENSE

175.   Plaintiffs' claims are barred, in whole or in part, by the doctrine of release.

### NINTH AFFIRMATIVE DEFENSE

176.   Plaintiff's claims are barred, in whole or in part, due to Plaintiff's material breaches of its contractual obligations of the Operating Agreement.

### TENTH AFFIRMATIVE DEFENSE

177.   The damages, if any, that Plaintiff has suffered or will suffer are subject to complete setoff and/or recoupment.

### ELEVENTH AFFIRMATIVE DEFENSE

178.   The matters that are the subject of Plaintiff's Complaint, in whole or in part, are attributable to third parties over whom Kurz neither had control nor right of control.

### TWELFTH AFFIRMATIVE DEFENSE

179.   Each and every act of Kurz, as alleged in the instant action or otherwise, was duly and rightfully undertaken and was not in breach of any right of Plaintiff or any duty owed by Kurz to Plaintiff.

### THIRTEENTH AFFIRMATIVE DEFENSE

180.   Plaintiff's claims are barred because Plaintiff induced Kurz's acceptance of the Operating Agreement through fraud, deceit, or misrepresentation.

### FOURTEENTH AFFIRMATIVE DEFENSE

181.   Plaintiff's claims for relief are barred, in whole or in part, by the doctrine of laches.

## FIFTEENTH AFFIRMATIVE DEFENSE

182.   Plaintiff's causes of action fail because Plaintiff has suffered no damages.

## RESERVATION OF RIGHTS

183.   Kurz expressly reserves the right to raise such additional affirmative defenses as may be established during discovery and by the evidence in this case.

WHEREFORE, Kurz requests that judgment be entered in his favor dismissing all causes of action set forth in the Complaint with prejudice; that Kurz be awarded all costs, including attorney's fees, resulting from the defense of the Complaint; and for such other and further relief as the Court deems just and proper.

## COUNTERCLAIMS

Defendant/Counterclaim Plaintiff Henry Kurz ("Kurz"), by and through counsel, for its Counterclaims against Plaintiff/Counterclaim Defendant ConfigAir LLC ("the Company") states as follows:

### *Development of Pre-LLC Software*

1.   Long before Kurz became a member of the Company, Kurz was an independent developer of configurator and visualization software.

2.   In or around 2003, Kurz began developing certain configurator and visualization software ("Pre-LLC Software"). The Pre-LLC Software was comprised of four components: (1) CAL, (2) CAL Server, (3) Visualization Engine, (4) Visualization UI.

3.     Kurz began marketing the Pre-LLC Software in, at least as early as, 2004.

4.     From in or about 2006 through in or about 2009, Kurz made the Pre-LLC Software available for demonstration on the website of Integrity GmbH, a German consulting company that Kurz had formed with two partners.

5.     In or about October 2006, Daniel Naus ("Naus") first expressed to Kurz his interest in the Pre-LLC Software.

6.     In or about October 2009, Naus, then the CEO of eSpline LLC ("eSpline"), a consulting company, again expressed to Kurz his interest in the Pre-LLC Software.  Naus offered Kurz a partnership in eSpline LLC.  The deal terms proposed by Naus on behalf of eSpline included a requirement that Kurz assign the copyright in the Pre-LLC Software to eSpline.

7.     Kurz refused the offer on those terms.

8.     Instead, Kurz agreed to allow eSpline to demonstrate the Pre-LLC Software to potential customers.

9.     Kurz and Naus agreed that, if eSpline were able to negotiate a license of the Pre-LLC Software, it would receive a commission on the licensing fee.

10.     eSpline began hosting the source control system ("SVN") where the Pre-LLC Software was maintained.

11.     On or about December 1, 2010, Kurz created and registered Henry Kurz Consulting GmbH ("HKC") at the court in Stuttgart, Germany, under the registration number HRB 735665.  Kurz has been the owner and manager of HKC since its registration.

12.     On or about December 2, 2010, Kurz transferred the copyright for the Pre-LLC Software to HKC.  A certified translation of the Software Transfer Agreement between Kurz and HKC is attached at **Exhibit A** and is hereby incorporated by reference.

13.     Subsequently, Naus expressed interest in leaving eSpline and going into business with Kurz to develop software for mobile devices.

*Formation of ConfigAir for Purposes of Developing Mobile Software*

14.     In late December 2010, Naus and Kurz joined with Nizwer Husain ("Husain") and Dung Nguyen ("Nguyen") to form a business for the purpose of developing configuration software for mobile devices ("Mobile Software").

15.     The Mobile Software was completely distinct from the Pre-LLC Software that Kurz had previously created and developed and, copyright in which, Kurz had previously transferred to HKC.

16.     Upon information and belief, ConfigAir LLC ("ConfigAir" or the "Company") was formed when Naus filed Articles of Organization on or about December 21, 2010.  Upon information and belief, an operating agreement for the Company ("the Operating Agreement") was executed by Naus on behalf of the Company on or about March 14, 2011.

17.     The name "ConfigAir" was chosen because the members' intent was to provide configuration "on the air," i.e., via mobile devices.

18.     Kurz was not involved in drafting or negotiating the terms of the Operating Agreement.

19.     Kurz signed a Joinder to Operating Agreement on or about April 9, 2011; Nguyen signed a Joinder on or about April 22, 2011; and Husain signed a Joinder on or about April 28,

2011.  Naus signed a Joinder on or about March 14, 2011.  However, upon information and belief, Naus's Joinder was never executed on behalf of the Company.

20.     At the time Kurz signed the Joinder to Operating Agreement and at all times prior, there had been no discussions between Kurz and any of the members of the Company concerning any intention of transferring ownership of the Pre-LLC Software to the Company.

21.     Kurz was, at all times relevant to the founding of the Company, fluent in the German language while attaining more limited proficiency in English.

22.     At all times relevant to the founding of the Company, Kurz relied on the other members of the Company for guidance as to contractual terms.

23.     At the time Kurz signed the Joinder to Operating Agreement, Kurz was not familiar with the terms of the Operating Agreement, nor was he represented by counsel.

24.     On or about the time Kurz signed the Joinder to Operating Agreement, Kurz indicated to Naus, that he had questions about the terms of the Operating Agreement due to his lack of proficiency in English.

25.     In response, Naus stated that the terms of the Operating Agreement could not be changed and were required in order to found a limited liability company in Connecticut.

26.     Kurz contributed $20,000 to the Company in exchange for a one-third ownership interest in the Company.

27.     Upon information and belief, Naus contributed $20,000 to the Company in exchange for a one-third ownership interest in the Company.

28.     Upon information and belief Husain and Nguyen each contributed $20,000 to the Company in exchange for a one-sixth ownership interest in the Company.

29.     From the time of the founding of the Company, Kurz was a member of the Company and served as a member of the board of directors and as Vice President and Chief Technology Officer ("CTO") of the Company.

30.     At the time of the founding of the Company, Naus, Husain and Nyugen represented to Kurz that he would have full authority for decision-making over the technical aspects of production of the Company's software.  They further represented that Kurz was to operate with this authority because of his superior knowledge of the technical aspects of software engineering and project management to the other members.

31.     In his role as CTO, Kurz was charged with devising the overall roadmap for developing products for the Company's clients, as well as direct supervision of software developers, which included assigning work to the developers, checking their work and coaching them with respect to daily activities and long-term goals.

32.     Since the founding of the Company, Kurz, with the permission and approval of the other members of the Company, had developed and implemented a broad roadmap for development of software, which among other things, set forth a structure that involved two teams of developers, one developing the application aspect of the software, while the other developed the platform.

33.     In 2012, Kurz determined that the Mobile Software would not be a viable product for the Company and decided to discontinue development of it. All of the members of the Company agreed that the mobile device approach should be discontinued. Nizwer Husain had expressed his doubts about the Company's future business success and expressed that he may leave the Company.

*The Company Changed Direction in 2012*

34.     As a result of this failure concerning the mobile device approach, Naus expressed to the other members that there is a lot of interest in the web/visualization market, which HKC's Pre-LLC Software serves.

35.     Kurz agreed to allow the Company to market HKC's Pre-LLC Software.

36.     Basing the Company's future on HKC's Pre-LLC Software represented the last opportunity for the Company to succeed.

37.     Unbeknownst to Kurz, Naus had transferred the Pre-LLC Software from eSpline's server to the Company's server at some point in or about 2011.

38.     HKC did not assign or otherwise transfer copyright in the Pre-LLC Software to the Company.

39.     Thereafter, Kurz added some features to HKC's Pre-LLC Software, extended it and customized it for the needs of certain customers of the Company.

40.     The Company began marketing a version of HKC's Pre-LLC Software in or about 2013.

41.     Starting in or about October 2013, the Company made monthly distributions of profits, initially in the amount of $10,000, to Kurz via HKC.

42.     The Company did not compensate HKC in connection with the Company's copying, public display, distribution, licensing or sale of the Pre-LLC Software, or derivative works based on the Pre-LLC Software, at any time.

*Naus's Self-Dealing*

43.     On or about July 9, 2014, Naus organized ConfigAir s.r.o., a Czech limited liability company, for the purpose of engaging software developers in the Czech Republic.

44.     Naus represented to the Company's members that 70% of ConfigAir s.r.o. was owned by the Company, and 30% of ConfigAir s.r.o. was owned by Naus's friend, Ales Rastak.

45.     In fact, the Company did not own any interest in ConfigAir s.r.o.  Naus owned a 90% interest in ConfigAir s.r.o., and Rastak, owned a 10% interest in ConfigAir s.r.o.

46.     Naus knew, but failed to disclose, the true owners of ConfigAir s.r.o., including the fact that he was a majority owner of ConfigAir s.r.o., to the Company's other members or its board of directors.

47.     Upon information and belief, in or about July 2014, Naus provided a copy of the Pre-LLC Software to ConfigAir s.r.o. without HKC's permission.

48.     Upon information and belief, starting in or about July 2014, Naus transferred large sums of money from the Company to ConfigAir s.r.o.

49.     Upon information and belief, the money Naus transferred from the Company to ConfigAir s.r.o. was used to pay rent for and refurbish offices in Olomouc, Czech Republic and to purchase electronics and furniture for the offices and the developers working there.

50.     The board of directors did not authorize Naus to transfer funds from the Company to an entity, in which it did not own any interest.

51.     Naus intended that the board of directors would permit the transfer of the Company's assets to ConfigAir s.r.o. in reliance on Naus's representation that the Company owned a 70% interest in ConfigAir s.r.o. and Naus's failure to disclose the fact that, in fact, he owned a 90% interest in ConfigAir s.r.o.

52.    The board of directors did permit the transfer of the Company's assets to ConfigAir s.r.o. in reliance on Naus's representation that the Company owned a 70% interest in ConfigAir s.r.o. and Naus's failure to disclose the fact that, in fact, he owned a 90% interest in ConfigAir s.r.o.

*Naus Interfered With and Usurped Kurz's Authority Over Software Development
to the Detriment of the Company*

53.    Despite the fact that the members had appointed Kurz the Chief Technology Officer of the Company, and despite the members' representations that Kurz is responsible for all software development and management authority over the development team, in mid-2014, Naus began usurping Kurz's authority over the technical process of software development, mandating the processes to be used, overruling Kurz on technical decisions over software development and management of the developers.

54.    In or about 2014, Naus insisted on the implementation of a "scrum" process, whereby teams of developers reduce work into discrete actions to be completed in set periods of time, referred to as "sprints."

55.    Naus had insisted on this process over Kurz's objections.

56.    In practice, these sprints consisted of two-week periods to meet clients' specifications for software that was created for the benefit of the individual client based on HKC's Pre-LLC Software. At the beginning of these periods, Kurz, together with the entire scrum team, would calculate the work that needed to be done and calculate what could reasonably be completed in that time.

57.    Given the nature of the Company's business, the changing demands of its clients and Naus's lack of discipline, the above-described scrum process was not well-suited to the

Company or to its clients' needs. Such a process was more suited to a company that worked in a more planned manner and with more static and unchanging work goals from clients. In contrast, the Company's business was much more dynamic and changing and ill-suited to such an approach.

58.     This changing and unstable environment was made worse by Naus, who continually changed goals and added additional items that would disrupt the completion of the sprints and consequently the Company's projects.

59.     This approach was also ill-suited to the Company's business, because it required engaging teams of developers that could undertake any of the team's responsibilities. However, in practice, the developers working in these scrums had specialized skill-sets that would not allow them to work on various aspects of the software's development interchangeably.

60.      In addition to micro-managing Kurz's work for the Company, Naus also continually interfered with Kurz's and the developers' work.

61.     Despite the fact that Kurz dutifully carried out his duties as CTO, Naus constantly berated Kurz and imposed unrealistic expectations, including demanding that Kurz be available to take calls in the middle of the night, local time at his home in Germany.

62.     Naus complained even if Kurz had responded via telephone during usual business hours in Kurz's time zone within twelve hours of Naus's attempt to contact Kurz.

63.      In addition to such baseless complaints, Naus began to interfere with Kurz's work by giving the developers instructions that were contrary to the instructions that Kurz had previously issued.  Naus also overruled Kurz on a number of decisions as to the technology to be implemented by the Company.

64.    Upon information and belief, on at least two occasions, Naus also disclosed the Company's clients' confidential information to third parties without authorization and in breach of written non-disclosure agreements with the clients, thus subjecting the Company to significant liability.

65.    In 2016, Naus called a meeting of the members of the Company.  Naus and the other members of the Company refused to discuss Kurz's concerns about Naus's interference with Kurz's supervision of the developers.

66.    Instead, Naus chose to address only the previous instance when Kurz had not answered Naus's calls in the middle of the night.

67.    At the end of this meeting, Naus issued a threat to Kurz that if such a situation arose again, he would be expelled from the Company as CTO, Vice President, and as a member.

68.    Kurz responded that, if he were no longer an officer of the Company, the Company would lose its ability to use, market and license versions of the Pre-LLC Software, copyright in which was owned by HKC.

69.    Thereafter, sometime in 2017, Naus began working in the same physical location in Olomouc, Czech Republic where the developers were predominantly located – the remainder of the developers were located in Prague, Czech Republic – and continued to usurp the supervisory responsibilities that had been reserved to Kurz.

70.    Kurz had planned, with the approval of the other members of the Company, to develop a new user interface in the near future.

71.    On June 16, 2017, Kurz left for a two-week vacation.

72.     While Kurz was on vacation, Naus took on the role of "Scrum Master" – the supervisor for the developers.

73.     Without consulting with Kurz, Naus eliminated the two teams that Kurz had organized and tasked with development in favor of self-managed teams.

74.     Naus also organized – without Kurz's knowledge – a one-week workshop in the Czech Republic for all developers (from both Olomouc and Prague) that took place during Kurz's vacation.

75.     While outlining the Company's roadmap for developing the Pre-LLC Software, Kurz had advised the other members of the Company, including Naus, that React – a javascript library meant for developing user interfaces — was not the appropriate technology to use in developing the software's user interface.

76.     Because the developers were unaware of the roadmap that Kurz had developed, they recommended to Naus that they use React.

77.     Despite being aware of Kurz's roadmap, and despite having no technical training required for carrying out the functions of CTO, Naus approved the use of React. Naus also gave a developer named Milan Vojacek the job of leading the development of the new React-based user interface.

78.      When Kurz returned from his vacation, the developers were already developing a new user interface for software to be used by the Company using React.

79.     When Kurz returned from his vacation, Naus advised him that the changes that had been made to the development of software were permanent and that Kurz would have no more input in the direction of the development of that product.

80.     From this point on, Kurz was effectively stripped of all of the job functions of a CTO, and Naus took over those responsibilities.

81.     Due to his inexperience with the technical aspects of software development, Naus made demands on the developers that were impossible to achieve. Further, he would not accommodate the developers' concerns that his demands were impossible.

82.     Naus regularly imposed on the developers unrealistic deadlines that caused the developers to work exceedingly long hours and compromised the quality and reliability of the software code.

83.     In several instances, the Company missed deadlines that had been unrealistically set by Naus.  Upon information and belief, the clients were damaged as a result.

84.     Upon information and belief, due to Naus's lack of familiarity with software development and his impossible demands, several of the developers, including Martin Mosko, Tom Rejhon, Lukas Vrajik, and Petr Marek, quit.

85.     In or about September 2017, Naus instructed Kurz not to direct the developers' activities any longer.

86.     Around this time, two projects – one managed by Nguyen and one managed by Husain – were escalated and required immediate attention in order to correct errors in the software that was having an immediate impact on the customers' business.

87.     At the time of the escalation, Naus was on vacation and could not be reached for direction or assistance with the escalation of either project.

88.     In Naus's absence, Kurz volunteered to assist Husain with the escalation of his project and was able to quickly resolve all issues.

89.     However, Nguyen prevented Kurz from assisting with the escalation of his project.  In compliance with Naus's instruction that Kurz not direct the developers' activities, Kurz asked Nguyen to speak directly to Petr Marek, who was directly running the development for the client.  Nguyen refused.

90.     The client's escalation went unresolved. Upon information and belief, the client was damaged as a result.

91.     The Company failed to make any distribution of profits to Kurz in September 2017.

92.     In early October 2017, Kurz requested a meeting of the members to discuss this untenable situation.  Naus refused to call a meeting.

*The Board Improperly Removed Kurz as an Officer of the Company*

93.     In October 2017, Naus, Husain, and Nguyen were attending a Configuration Workgroup (CWG) conference in Florida. They invited Kurz to come to Florida to have a meeting regarding ongoing disputes between Kurz and Naus over software development.

94.     Kurz traveled to Florida and met with Naus, Husain and Nguyen on or about October 12, 2017.

95.     At the meeting, Kurz sought changes to the operation of the Company in order to improve efficiency and to re-establish his work function as CTO.

96.     In order to bring about these changes, Kurz proposed that: (1) Naus no longer use the same office as the developers in the Olomouc office; (2) Naus discontinue directing technical development of software falling under the purview of the CTO; and (3) the Company delay implementation of the React-based user interface in order for the members to address whether to

change from React to another technology, which would complement the roadmap devised by Kurz.

97.     The other members of the Company refused to entertain or address any of Kurz's proposals and instead issued a document outlining a number of directives for Kurz's job performance and conduct. This document also contained a provision, that if Kurz failed to abide by each directive, he would be terminated and would become a silent partner without any further input in the Company and without any further payment.

98.     Kurz refused to sign the document. Naus, who had already consumed significant amounts of alcohol during this meeting, repeatedly cornered Kurz asking him why he cannot sign the document. Kurz stated that he did not want to answer. Naus replied: "Then let me formalize the reason for you: If you are made a silent partner without any payment, then you will sue us. Right?"  Kurz responded by saying that he does not plan for this, but he does not want to shut down this option for the future either. After Kurz's response, Nguyen, who had also consumed a significant amount of alcohol, ended the meeting, leaving the table with the words "Ok, that's it for me."  Naus left the meeting right after.

99.     During a subsequent conversation, Naus stated to Kurz that the reason that he and Kurz had each received a larger ownership interest in the Company than the other two members was because of the intellectual property they had each contributed.

100.     Kurz challenged Naus's assertion that he had contributed any intellectual property to the Company, at which point, Naus became angry and ceased communicating with Kurz.

101.     Naus then called for a virtual meeting on October 18, 2017, in order to remove Kurz from the Company.

102.    Naus, Husain and Nguyen voted in favor of removing Kurz as an officer of the Company. They agreed that Kurz would keep his Google account associated with the Company and stay on for three months with salary distributions to aid in the transition.

*The Board Improperly Removed Kurz As A Director of the Company*

103.    On October 21, 2017, Naus called an emergency board meeting for the Company, to be held via video-conference.

104.    Kurz received only two hours' notice of the meeting and was unable to attend as a result.

105.    Upon information and belief, at this meeting, Naus, Husain and Nguyen voted in favor of removing Kurz as a director of the Company.  They also voted to cease the guaranteed payments to all initial members of the Company, including Kurz, and to remove the obligation that members devote at least 50% of their time to the Company.

106.    Kurz requested a meeting on October 27, 2017 to address the wrongful actions taken by the members at the previous meeting.

107.    Over Kurz's objections, Naus began video recording the meeting, which caused Kurz to cease his participation.

108.    Thereafter, Kurz offered not to revoke the Company's license to market versions of HKC's Pre-LLC Software.  In exchange, Kurz requested, *inter alia*, access to his customers and contacts using the software.

109.    None of the other members responded to Kurz's offer.

110.    As a result, on October 31, 2017, Kurz notified the Company that it could no longer use versions of HKC's Pre-LLC Software.

111.    That same day, the Company improperly denied Kurz access to the Company's systems, thus depriving Kurz of access to the Company's books and records.

*The Company Created Unauthorized Derivative Software Based on the Pre-LLC Software and Transferred Ownership to a Third Party*

112.    Upon information and belief, in November 2017, Naus held a workshop with the developers in Olomouc, Czech Republic to create an alternate software to the Pre-LLC Software.

113.    Upon information and belief, the project was given the codename "Breeze" and was intended to replace HKC's Pre-LLC Software. Upon information and belief, the alternative software is an identical copy of the Pre-LLC Software, translated into a different computer language, that generates screen displays that are substantially similar to those displayed by the Pre-LLC Software.

114.    Upon information and belief, the developers translated HKC's Configurator Abstraction Layer ("CAL") software and called the translation the Universal Configurator Application ("UCA").

115.    Upon information and belief, they translated HKC's CAL Server and ConfigAir Server software and called the translation the UCA Server.

116.    Upon information and belief, they translated HKC's CAL User Interface software and called the translation the React User Interface.

117.    Upon information and belief, they translated the CAL Visualization software and called the translation the Big Picture.

118.    Upon information and belief, Naus transferred ownership of the copyright in the translated software to ConfigAir s.r.o., the Czech company owned by Naus and Ales Rastak.

119.    Further, upon information and belief, the transfer of copyright in the software to ConfigAir s.r.o. was intended to deprive Kurz of his interest in HKC's Pre-LLC Software and software derived therefrom.

120.    Upon information and belief, ConfigAir s.r.o., in conjunction with the Company, is now poised to exploit Breeze, which contains copies of elements of HKC's Pre-LLC Software. Further, upon information and belief, the Company and ConfigAir s.r.o. intend to exploit Breeze to the exclusion of Kurz and to enter into direct competition with him and HKC.

*The Company Interfered With Kurz's Business Prospects and Improperly Deprived Kurz of His Share of the Company's Profits*

121.    Since the wrongful expulsion of Kurz, the Company has sent communications to Kurz's customers claiming that, if they work with Kurz, ConfigAir may take legal action against them.   A true and correct copy of a letter sent by the Company counsel to one of Kurz's customers is attached hereto as **Exhibit B** and incorporated by reference herein.

122.    The Company knew that these were Kurz's customers at the time it sent the communications.

123.    As a result of these communications, these customers have refused to do business with Kurz.

124.    On or about February 27, 2018, Husain contacted Kurz via email and requested Kurz's bank account information. In the e-mail, Husain represented that he needed the information "for any money that we owe you…"

125.    Thereafter, without any further communication, the Company transferred $20,000 to Kurz's bank account.

126.    This amount equals the distribution of profits amount owed to Kurz for the month of September 2017 and part of the amount owed to Kurz for the month of October 2017.

127.    Kurz has not received any share of the Company's profits since then.

128.    Upon information and belief, the Company continues to copy, distribute, publicly display, license and/or sell versions of the Pre-LLC Software and/or software derived therefrom without authorization from HKC.

129.    Upon information and belief, the Company continues to generate profit from the sale of the Pre-LLC Software and/or software derived therefrom.

130.    Kurz has never agreed to sell his shares in the Company.

**Count I**
**(Judicial Dissolution CONN GEN. STAT. §34-267(a)(5))**

131.    The paragraphs above are re-alleged as if fully set forth herein.

132.    The conduct of Naus, Husain and Nguyen, the controlling members of the Company, as described above, has been oppressive, and calculated to deprive Kurz, a minority member, of his rightful share of the profits of the Company. The Company's complete exclusion of Kurz from the operation of the Company, its disabling of Kurz's access to ConfigAir's books and records, its misappropriation of HKC's Pre-LLC Software, its exclusion of Kurz from any participation or profit of the Company, its alleged purchase of Kurz's membership interest without authorization or compensation, and its expulsion of Kurz as a member of the Company, are oppressive.

133.    The development and transfer of software that is based upon and/or derives from HKC's Pre-LLC Software to a competing company, ConfigAir s.r.o., without compensation

either to the Company or Kurz also constitutes a misapplication or waste of corporate assets to Kurz's prejudice.

134.    When Kurz acquired his shares in the Company, he reasonably expected under the circumstances to share proportionately in the profits of the Company in accordance with his ownership interest and have input in the operation of the Company.

135.    Naus, Husain, and Nguyen knew or should have known that Kurz had these expectations when he became a member of the Company.

136.    The oppressive conduct of Naus, Husain, and Nguyen has substantially defeated Kurz's expectations as a member of the Company, that, objectively viewed, were both reasonable under the circumstances and central to his decision to become a member of the Company.

137.    Furthermore, the conduct of Naus, Husain, and Nguyen has been burdensome, harsh and wrongful; and they have acted with a lack of probity and fair dealing in the Company's affairs to Kurz's prejudice.  In addition, Naus, Husain, and Nguyen have visibly departed from the standards of fair dealing and have engaged in a violation of fair play on which Kurz was entitled to rely.

138.    Therefore, Kurz petitions this Court to dissolve the Company on the grounds that its controlling members and manager have acted, are acting, and will continue to act in a manner that is oppressive; and the corporate assets are being misapplied or wasted.  CONN. GEN. STAT. §34-267(a)(5).

### Count II
### (Fraudulent Inducement)

139.    The paragraphs above are re-alleged as if fully set forth herein.

140.    In or about March 2011 and prior to the execution of the Operating Agreement, Naus, Husain and Nguyen represented to Kurz that they would all participate in the running of the Company, with Kurz functioning as the Chief Technology Officer, with all authority over the technical aspects of any software developed by the Company. The other members of the Company also represented that the Company would go into business to develop Mobile Software.

141.    These representations were false, in that the members of the Company intended to use the Pre-LLC Software once the Company was founded, and once said software was secured, they would move to expel Kurz from the operation of the Company.

142.    At the time that the members of the Company made these representations, they were false, and the members making such representations knew them to be false.

143.    Further these members made such representations with the intent of inducing Kurz's reliance upon them in executing the Operating Agreement.

144.    The defendant relied upon these representations in ultimately executing the Operating Agreement and subsequently allowing the Company to market versions of the Pre-LLC Software.

145.    As a result of this reliance, Kurz has suffered damages, including but not limited to, his loss of a share of profits of the Company derived from the exploitation of the Pre-LLC Software through derivative works as well as his loss of ability to exploit said software through other business ventures.

### Count III
### (Fraudulent Inducement)

146.    The paragraphs above are re-alleged as if fully set forth herein.

147.    In or about March 2011 and prior to the execution of the Operating Agreement, Kurz indicated to Naus that he had questions about the exact terms of the Operating Agreement due to his lack of proficiency in English.

148.    In or about March 2011 and prior to the execution of the Operating Agreement, Naus represented to Kurz that the terms contained in the Operating Agreement are required in order to found a limited liability company in Connecticut and could not be changed.

149.    These representations were false, in that the members of a Connecticut limited liability company are not required to execute an operating agreement in order to found the company, the specific terms contained in the Operating Agreement are not required in order to form a limited liability company in Connecticut, and the terms of any operating agreement are subject to negotiation.

150.    At the time that Naus made these representations, they were false, and he knew them to be false.

151.    Further Naus made such representations with the intent of inducing Kurz's reliance upon them in executing the Operating Agreement.

152.    Kurz relied upon these representations in ultimately executing the Operating Agreement and subsequently allowing the Company to market versions of the Pre-LLC Software.

153.    As a result of this reliance, Kurz has suffered damages, including but not limited to, his loss of a share of profits of the Company derived from the exploitation of the Pre-LLC Software through derivative works as well as his loss of ability to exploit said software through other business ventures.

**Count IV**
**(Declaratory Judgment)**

154.    The paragraphs above are re-alleged as if fully set forth herein.

155.    Prior to the execution of the Operating Agreement, Kurz transferred ownership of the Pre-LLC Software to HKC.

156.    Consequently, Kurz had no right, title, or interest in or to the Pre-LLC Software at the time he executed the Joinder to Operating Agreement.

157.    Kurz did not transfer ownership of the Pre-LLC Software to the Company pursuant to the Operating Agreement or otherwise.

158.    HKC is not a member of the Company.

159.    HKC did not transfer ownership of the Pre-LLC Software to the Company pursuant to the Operating Agreement or otherwise.

160.    Therefore, Kurz is entitled to an order declaring that the Company has no right, title or interest in or to the copyright in the Pre-LLC Software.

**Count V**
**(Declaratory Judgment)**

161.    The paragraphs above are re-alleged as if fully set forth herein.

162.    Even if Kurz had the legal capacity to convey ownership of the Pre-LLC Software to the Company, the alleged transfer of ownership in the Pre-LLC Software pursuant to the Operating Agreement was ineffective, in that the Pre-LLC Software was not directly related to the business of the Company at the time that the Operating Agreement was executed.

163.    Similarly, even if Kurz had the legal capacity to convey ownership of the Pre-LLC Software to the Company, the alleged transfer of ownership in the Pre-LLC Software

pursuant to the Operating Agreement was ineffective, in that Kurz had no intention that ownership would be deemed to have been transferred in the event that the business of the Company changed in the future.

164.    Kurz did not transfer ownership of the Pre-LLC Software to the Company pursuant to the Operating Agreement or otherwise.

165.    Therefore, Kurz is entitled to an order declaring that the Company has no right, title or interest in or to the copyright in the Pre-LLC Software.

**Count VI**
**(Declaratory Judgment)**

166.    The paragraphs above are re-alleged as if fully set forth herein.

167.    The Company wrongfully removed Kurz as Chief Technology Officer and Vice President of the Company.

168.    The Company wrongfully removed Kurz as a member of the board of directors of the Company.

169.    The Company wrongfully claims it has purchased Kurz's shares, and Kurz is no longer a member of, or owner of an interest in, the Company.

170.    Kurz seeks and is entitled to a declaration that:

        a.  he is a member of the Company and owns one-third of the shares in the Company with all attendant authority;

        b.  he is a member of the board of directors of the Company with all attendant authority; and

        c.  he is the Chief Technology Officer and Vice President of the Company with all attendant authority.

**Count VII**
**(Constructive Trust)**

171.    The paragraphs above are re-alleged as if fully set forth herein.

172.    Upon information and belief, Plaintiff is in possession of property, revenue, and proceeds derived from HKC's Pre-LLC Software of which Kurz is the beneficial owner.

173.    Kurz permitted access to the Pre-LLC Software to the Company with the intention of benefitting himself through cooperation and participation in the Company's business.

174.    Instead of using the property to benefit all members of the Company, the Company wrongfully expelled Kurz, yet retained the Pre-LLC Software, and improperly disclosed it to third parties.

175.    The Company has wrongfully failed to use the property to the benefit of Kurz and to return the property to its rightful owner.

176.    By virtue of its wrongful acts, the Company should not in equity and good conscience have obtained nor continue to hold and enjoy said property, revenue or proceeds.

177.    The Company has been unjustly enriched.

178.    By virtue of its wrongful acts, the Company holds title to the said property in constructive trust for Kurz.

**Count VIII**
**(Appointment of Receiver Pursuant to CONN. GEN. STAT. §52-504)**

179.    The paragraphs above are re-alleged as if fully set forth herein.

180.    Appointment of a receiver is necessary in the instant action to prevent waste or loss of assets of the Company derived from sales of software containing copies of elements of the Pre-LLC Software.

**Count IX**
**(Injunctive Relief – Tortious Interference)**

181.    The paragraphs above are re-alleged as if fully set forth herein.

182.    Since the institution of the present litigation, the Company through its representatives have sent communications to Kurz's customers claiming that, if they work with Kurz, ConfigAir may take legal action against them.

183.    The Company knew the recipients of the communications were Kurz's customers.

184.    As a result, these potential customers have refused to do business with Kurz.

185.    These claims have irreparably damaged Kurz's business and will cause further harm in the future, not adequately remedied by economic damages in the future.

Therefore, Kurz is entitled to an order from this court prohibiting the Company from communicating with Kurz's customers or potential customers indicating or in any way implying that Kurz's does not have a right to do business them.

**Count X**
**(Expulsion of Daniel Naus Pursuant to CONN. GEN. STAT. § 34-263a(5))**

186.    The paragraphs above are re-alleged as if fully set forth herein.

187.    Naus misrepresented the true ownership of ConfigAir s.r.o. to the board of directors.

188.    Naus failed to disclose to the board of directors that he owns a 90% interest in ConfigAir s.r.o.

189.    Naus transferred the Company's assets, including money and intellectual property, to ConfigAir s.r.o. without authorization from the board of directors and without compensation.

190.    Naus materially breached his fiduciary duty of loyalty to Kurz by transferring the Company's assets, including money and intellectual property, to ConfigAir s.r.o., an entity in which Naus owns a 90% interest, without authorization from the board of directors and without compensation.

191.    Naus materially breached his fiduciary duty of care to Kurz by interfering with and usurping Kurz's authority to direct all technical aspects of software development and to manage the development team.

192.    Naus materially breached his fiduciary duty of care to Kurz by removing Kurz as Chief Technology Officer, Vice President and member of the board of directors of the Company in bad faith.

193.    Naus has engaged, and is engaging, in wrongful conduct that has affected adversely and materially, and will affect adversely and materially, the company's activities and affairs.

194.    Naus has committed willfully and persistently, and is committing willfully and persistently, a material breach of his fiduciary duties under Section 34-255h.

195.    Naus has engaged, and is engaging, in conduct relating to the Company's activities and affairs which makes it not reasonably practicable to carry on the activities and affairs with Naus as a member.

**PRAYER FOR RELIEF**

WHEREFORE, Kurz prays for judgment in his favor and against the Company as follows:

1.  A judicial dissolution of ConfigAir LLC (CONN. GEN. STAT. §34-267; 33-896 *et seq.*);

2.  Judicial disassociation of Naus (CONN. GEN. STAT. §34-263);

3.  A declaration that ConfigAir LLC does not own any right, title or interest in or to the copyright in the Pre-LLC Software;

4.  A declaration that Kurz is:

    a.  A member of the Company owning a one-third ownership interest in the Company;

    b.  A member of the board of directors of the Company;

    c.  Chief Technology Officer and Vice President of the Company;

5.  Recission of the Operating Agreement;

6.  Compensatory damages in an amount to be determined at trial;

7.  Punitive damages in an amount to be determined at trial;

8.  Injunctive relief, the appointment of a receiver or custodian pendente lite with all powers and duties the Court directs, and any other action required to preserve the assets of the Company wherever located (i.e. the imposition of a constructive trust so as to prevent unjust enrichment);

9.  Reasonable fees and expenses of counsel and of any experts employed by Kurz;

10. Costs; and

11. Such other and further relief, at law and in equity, to which Kurz may show himself justly entitled.

**THIRD-PARTY COMPLAINT**

Third-Party Plaintiff, Henry Kurz ("Kurz"), by and through counsel, for its Third-Party Complaint against Third-Party Defendants Daniel Naus ("Naus"), Nizwer Husain ("Husain") and Dung Nguyen ("Nguyen") states as follows:

**THE PARTIES**

1.      Kurz is a German national who is a member of the Company and served as an officer and member of the board of directors of the Company, a "manager-managed" limited liability company organized under the laws of the State of Connecticut.

2.      Upon information and belief, Naus is a citizen of the State of Connecticut with a residence and principal place of business located 65 Seaside Avenue, Unit 2, Stamford, Connecticut.  He is a member of the Company and served as an officer and member of the board of directors of the Company.

3.      Upon information and belief, Husain a citizen of the State of Tennessee and has a principal place of business located 65 Seaside Avenue, Unit 2, Stamford, Connecticut.  He is a member of the Company and served as an officer and member of the board of directors of the Company.

4.       Upon information and belief, Nguyen a citizen of the State of California and has a principal place of business located 65 Seaside Avenue, Unit 2, Stamford, Connecticut.  He is a member of the Company and served as an officer and member of the board of directors of the Company.

**JURISDICTION AND VENUE**

5.      This Court has subject matter jurisdiction over the issues set forth in this Third-Party Complaint pursuant to 28 U.S.C. §1332 because complete diversity of citizenship exists between the parties and because the amount in controversy exceeds $75,000.

6.      The Court has personal jurisdiction over the parties because (a) Naus is a Connecticut citizen; (b) the Third-Party Defendants are officers and members of the board of directors of the Company, a Connecticut limited liability company; (c) upon information and belief, the Third-Party Defendants have a principal place of business in Connecticut; and (d) the Third-Party Defendants' action targeted and damaged Kurz in the State of Connecticut.

7.      Venue is appropriate in this Court because, upon information and belief, the Third-Party Defendants have a principal place of business located in the District of Connecticut.

## FACTS COMMON TO ALL COUNTS

8.      From the time of the founding of the Company, Kurz was a member of the Company and served as a member of the board of directors and as Vice President and Chief Technology Officer ("CTO") of the Company.

9.      At the time of the founding of the Company, Naus, Husain and Nyugen represented to Kurz that he would have full authority for decision-making over the technical aspects of production of the Company's software.  They further represented that Kurz was to operate with this authority because of his superior knowledge of the technical aspects of software engineering and project management to the other members.

10.     In his role as CTO, Kurz was charged with devising the overall roadmap for developing products for the Company's clients, as well as direct supervision of software

developers, which included assigning work to the developers, checking their work and coaching them with respect to daily activities and long-term goals.

11.     Since the founding of the Company, Kurz, with the permission and approval of the other members of the Company, had developed and implemented a broad roadmap for development of software, which among other things, set forth a structure that involved two teams of developers, one developing the application aspect of the software, while the other developed the platform.

*Naus's Self-Dealing*

12.     On or about July 9, 2014, Naus organized ConfigAir s.r.o., a Czech limited liability company, for the purpose of engaging software developers in the Czech Republic.

13.     Naus represented to the Company's members that 70% of ConfigAir s.r.o. was owned by the Company, and 30% of ConfigAir s.r.o. was owned by Naus's friend, Ales Rastak.

14.     In fact, the Company did not own any interest in ConfigAir s.r.o.  Naus owned a 90% interest in ConfigAir s.r.o., and Rastak, owned a 10% interest in ConfigAir s.r.o.

15.     Naus knew, but failed to disclose, the true owners of ConfigAir s.r.o., including the fact that he was a majority owner of ConfigAir s.r.o., to the Company's other members or its board of directors.

16.     Upon information and belief, in or about July 2014, Naus provided a copy of the Pre-LLC Software to ConfigAir s.r.o. without HKC's permission.

17.     Upon information and belief, starting in or about July 2014, Naus transferred large sums of money from the Company to ConfigAir s.r.o.

18.     Upon information and belief, the money Naus transferred from the Company to ConfigAir s.r.o. was used to pay rent for and refurbish offices in Olomouc, Czech Republic and to purchase electronics and furniture for the offices and the developers working there.

19.     The board of directors did not authorize Naus to transfer funds from the Company to an entity, in which it did not own any interest.

20.     Naus intended that the board of directors would permit the transfer of the Company's assets to ConfigAir s.r.o. in reliance on Naus's representation that the Company owned a 70% interest in ConfigAir s.r.o. and Naus's failure to disclose the fact that, in fact, he owned a 90% interest in ConfigAir s.r.o.

21.     The board of directors did permit the transfer of the Company's assets to ConfigAir s.r.o. in reliance on Naus's representation that the Company owned a 70% interest in ConfigAir s.r.o. and Naus's failure to disclose the fact that, in fact, he owned a 90% interest in ConfigAir s.r.o.

*Naus Interfered With and Usurped Kurz's Authority Over Software Development*
*to the Detriment of the Company*

22.     Despite the fact that the members had appointed Kurz the Chief Technology Officer of the Company, and despite the members' representations that Kurz is responsible for all software development and management authority over the development team, in mid-2014, Naus began usurping Kurz's authority over the technical process of software development, mandating the processes to be used, overruling Kurz on technical decisions over software development and management of the developers.

23.     In or about 2014, Naus insisted on the implementation of a "scrum" process, whereby teams of developers reduce work into discrete actions to be completed in set periods of time, referred to as "sprints."

24.     Naus had insisted on this process over Kurz's objections.

25.     In practice, these sprints consisted of two-week periods to meet clients' specifications for software that was created for the benefit of the individual client based on HKC's Pre-LLC Software. At the beginning of these periods, Kurz, together with the entire scrum team, would calculate the work that needed to be done and calculate what could reasonably be completed in that time.

26.     Given the nature of the Company's business, the changing demands of its clients, and Naus's lack of discipline, the above-described scrum process was not well-suited to the Company or to its clients' needs. Such a process was more suited to a company that worked in a more planned manner and with more static and unchanging work goals from clients. In contrast, the Company's business was much more dynamic and changing and ill-suited to such an approach.

27.     This changing and unstable environment was made worse by Naus, who continually changed goals and added additional items that would disrupt the completion of the sprints and consequently the Company's projects.

28.     This approach was also ill-suited to the Company's business, because it required engaging teams of developers that could undertake any of the team's responsibilities. However, in practice, the developers working in these scrums had specialized skill-sets that would not allow them to work on various aspects of the software's development interchangeably.

29.     In addition to micro-managing Kurz's work for the Company, Naus also continually interfered with Kurz's and the developers' work.

30.     Despite the fact that Kurz dutifully carried out his duties as CTO, Naus constantly berated Kurz and imposed unrealistic expectations, including demanding that Kurz be available to take calls in the middle of the night, local time at his home in Germany.

31.     Naus complained even if Kurz had responded via telephone during usual business hours in Kurz's time zone within twelve hours of Naus's attempt to contact Kurz.

32.     In addition to such baseless complaints, Naus began to interfere with Kurz's work by giving the developers instructions that were contrary to the instructions that Kurz had previously issued.  Naus also overruled Kurz on a number of decisions as to the technology to be implemented by the Company.

33.     Upon information and belief, on at least two occasions, Naus also disclosed the Company's clients' confidential information to third parties without authorization and in breach of written non-disclosure agreements with the clients, thus subjecting the Company to significant liability.

34.     In 2016, Naus called a meeting of the members of the Company.  Naus and the other members of the Company refused to discuss Kurz's concerns about Naus's interference with Kurz's supervision of the developers.

35.     Instead, Naus chose to address only the previous instance when Kurz had not answered Naus's calls in the middle of the night.

36.     At the end of this meeting, Naus issued a threat to Kurz that if such a situation arose again, he would be expelled from the Company as CTO, Vice President, and as a member.

37.    Kurz responded that, if he were no longer an officer of the Company, the Company would lose its ability to use, market and license versions of the Pre-LLC Software, copyright in which was owned by HKC.

38.    Thereafter, sometime in 2017, Naus began working in the same physical location in Olomouc, Czech Republic where the developers were predominantly located – the remainder of the developers were located in Prague, Czech Republic – and continued to usurp the supervisory responsibilities that had been reserved to Kurz.

39.    Kurz had planned, with the approval of the other members of the Company, to develop a new user interface in the near future.

40.    On June 16, 2017, Kurz left for a two-week vacation.

41.    While Kurz was on vacation, Naus took on the role of "Scrum Master" – the supervisor for the developers.

42.    Without consulting with Kurz, Naus eliminated the two teams that Kurz had organized and tasked with development in favor of self-managed teams.

43.    Naus also organized – without Kurz's knowledge – a one-week workshop in the Czech Republic for all developers (from both Olomouc and Prague) that took place during Kurz's vacation.

44.    While outlining the Company's roadmap for developing the Pre-LLC Software, Kurz had advised the other members of the Company, including Naus, that React – a javascript library meant for developing user interfaces — was not the appropriate technology to use in developing the software's user interface.

45.     Because the developers were unaware of the roadmap that Kurz had developed, they recommended to Naus that they use React.

46.     When Kurz returned from his vacation, the developers were already developing a new user interface for software to be used by the Company using React.

47.     Despite being aware of Kurz's roadmap, and despite having no technical training required for carrying out the functions of CTO, Naus approved the use of React. Naus also gave a developer named Milan Vojacek the job of leading the development of the new React-based user interface.

48.     When Kurz returned from his vacation, Naus advised him that the changes that had been made to the development of software were permanent and that Kurz would have no more input in the direction of the development of that product.

49.     From this point on, Kurz was effectively stripped of all of the job functions of a CTO, and Naus took over those responsibilities.

50.     Due to his inexperience with the technical aspects of software development, Naus made demands on the developers that were impossible to achieve. Further, he would not accommodate the developers' concerns that his demands were impossible.

51.     Naus regularly imposed on the developers unrealistic deadlines that caused the developers to work exceedingly long hours and compromised the quality and reliability of the software code.

52.     In several instances, the Company missed deadlines that had been unrealistically set by Naus.  Upon information and belief, the clients were damaged as a result.

53.     Upon information and belief, due to Naus's lack of familiarity with software development and his impossible demands, several of the developers, including Martin Mosko, Tom Rejhon, Lukas Vrajik, and Petr Marek, quit.

54.     In or about September 2017, Naus instructed Kurz not to direct the developers' activities any longer.

55.     Around this time, two projects – one managed by Nguyen and one managed by Husain – were escalated and required immediate attention in order to correct errors in the software that was having an immediate impact on the customers' business.

56.     At the time of the escalation, Naus was on vacation and could not be reached for direction or assistance with the escalation of either project.

57.     In Naus's absence, Kurz volunteered to assist Husain with the escalation of his project and was able to quickly resolve all issues.

58.     However, Nguyen prevented Kurz from assisting with the escalation of his project. In compliance with Naus's instruction that Kurz not direct the developers' activities, Kurz asked Nguyen to speak directly to Petr Marek, who was directly running the development for the client.  Nguyen refused.

59.     The client's escalation went unresolved. Upon information and belief, the client was damaged as a result.

60.     In early October 2017, Kurz requested a meeting of the members to discuss this untenable situation.  Naus refused to call a meeting.

*The Board Improperly Removed Kurz as an Officer of the Company*

56

61.     In October 2017, Naus, Husain, and Nguyen were attending a Configuration Workgroup (CWG) conference in Florida. They invited Kurz to come to Florida to have a meeting regarding ongoing disputes between Kurz and Naus over software development.

62.     Kurz traveled to Florida and met with Naus, Husain and Nguyen on or about October 12, 2017.

63.     At the meeting, Kurz sought changes to the operation of the Company in order to improve efficiency and to re-establish his work function as CTO.

64.     In order to bring about these changes, Kurz proposed that: (1) Naus no longer use the same office as the developers in the Olomouc office; (2) Naus discontinue directing technical development of software falling under the purview of the CTO; and (3) the Company delay implementation of the React-based user interface in order for the members to address whether to change from React to another technology, which would complement the roadmap devised by Kurz.

65.     The other members of the Company refused to entertain or address any of Kurz's proposals and instead issued a document outlining a number of directives for Kurz's job performance and conduct. This document also contained a provision, that if Kurz failed to abide by each directive, he would be terminated and would become a silent partner without any further input in the Company and without any further payment.

66.     Kurz refused to sign the document. Naus, who had already consumed significant amounts of alcohol during this meeting, repeatedly cornered Kurz asking him why he cannot sign the document. Kurz stated that he did not want to answer. Naus replied: "Then let me formalize the reason for you: If you are made a silent partner without any payment, then you will

sue us. Right?"  Kurz responded by saying that he does not plan for this, but he does not want to shut down this option for the future either. After Kurz's response, Nguyen, who had also consumed a significant amount of alcohol, ended the meeting, leaving the table with the words "Ok, that's it for me."  Naus left the meeting right after.

67.     During a subsequent conversation, Naus stated to Kurz that the reason that he and Kurz had each received a larger ownership interest in the Company than the other two members was because of the intellectual property they had each contributed.

68.     Kurz challenged Naus's assertion that he had contributed any intellectual property to the Company, at which point, Naus became angry and ceased communicating with Kurz.

69.     Naus then called for a virtual meeting on October 18, 2017, in order to remove Kurz from the Company.

70.     Naus, Husain and Nguyen voted in favor of removing Kurz as an officer of the Company. They agreed that Kurz would keep his Google account associated with the Company and stay on for three months with salary distributions to aid in the transition.

*The Board Improperly Removed Kurz As A Director of the Company*

71.     On October 21, 2017, Naus called an emergency board meeting for the Company, to be held via video-conference.

72.     Kurz received only two hours' notice of the meeting and was unable to attend as a result.

73.     Upon information and belief, at this meeting, Naus, Husain and Nguyen voted in favor of removing Kurz as a director of the Company.  They also voted to cease the guaranteed

payments to all initial members of the Company, including Kurz, and to remove the obligation that members devote at least 50% of their time to the Company.

74.    Kurz requested a meeting on October 27, 2017 to address the wrongful actions taken by the members at the previous meeting.

75.    Over Kurz's objections, Naus began video recording the meeting, which caused Kurz to cease his participation.

76.    Thereafter, Kurz offered not to revoke the Company's license to market versions of HKC's Pre-LLC Software.  In exchange, Kurz requested, *inter alia*, access to his customers and contacts using the software.

77.    None of the other members responded to Kurz's offer.

78.    As a result, on October 31, 2017, Kurz notified the Company that it could no longer use versions of HKC's Pre-LLC Software.

*The Company Created Unauthorized Derivative Software Based on the Pre-LLC Software and Transferred Ownership to a Third Party*

79.    Upon information and belief, in November 2017, Naus held a workshop with the developers in Olomouc, Czech Republic to create an alternate software to the Pre-LLC Software.

80.    Upon information and belief, the project was given the codename "Breeze" and was intended to replace HKC's Pre-LLC Software. Upon information and belief, the alternative software is an identical copy of the Pre-LLC Software, translated into a different computer language, that generates screen displays that are substantially similar to those displayed by the Pre-LLC Software.

81.     Upon information and belief, the developers translated HKC's Configurator Abstraction Layer ("CAL") software and called the translation the Universal Configurator Application ("UCA").

82.     Upon information and belief, they translated HKC's CAL Server and ConfigAir Server software and called the translation the UCA Server.

83.     Upon information and belief, they translated HKC's CAL User Interface software and called the translation the React User Interface.

84.     Upon information and belief, they translated the CAL Visualization software and called the translation the Big Picture.

85.     Upon information and belief, Naus transferred ownership of the copyright in the translated software to ConfigAir s.r.o., the Czech company owned by Naus and Ales Rastak.

86.     Further, upon information and belief, the transfer of copyright in the software to ConfigAir s.r.o. was intended to deprive Kurz of his interest in HKC's Pre-LLC Software and software derived therefrom.

87.     Upon information and belief, ConfigAir s.r.o., in conjunction with the Company, is now poised to exploit Breeze, which contains copies of elements of HKC's Pre-LLC Software. Further, upon information and belief, the Company and ConfigAir s.r.o. intend to exploit Breeze to the exclusion of Kurz and to enter into direct competition with him and HKC.

*The Board Interfered With Kurz's Business Prospects*

88.     Since the wrongful expulsion of Kurz, the Company has sent communications to Kurz's customers that, if they work with Kurz, ConfigAir may take legal action against them.

89.     The Company knew that these were Kurz's customers when it sent the communications.

90.     As a result of the communications, the recipients of the communications have refused to do business with Kurz.

**Count I**
**(Ultra Vires Action-Unauthorized Transfer of Assets Without Compensation)**

91.     The paragraphs above are re-alleged as if fully set forth herein.

92.     Without the approval of the board of directors, Naus lacked legal authority to transfer the Company's assets to ConfigAir s.r.o., an entity in which Naus owns a 90% interest, without compensation.

93.     Among the Company's assets that Naus transferred to ConfigAir s.r.o. without authority or compensation is the Pre-LLC Software and derivative versions thereof, of which Kurz is the beneficial owner.

94.     The transfer the Company's assets to ConfigAir s.r.o. constitutes an ultra vires action.

95.     Naus has damaged Kurz by improperly and without authority transferring the Company's assets to ConfigAir s.r.o. without compensation.

**Count II**
**(Breach of Fiduciary Duty-Unauthorized Transfer of Assets Without Compensation)**

96.     The paragraphs above are re-alleged as if fully set forth herein.

97.     The officers and members of the board of directors, as manager of the Company, owed a fiduciary duty to Kurz to "account to the company and to hold as trustee for it any property, profit or benefit derived by the [manager]: (A) in the conduct…of the company's

activities and affairs; (B) from a use by the member of the company's property; or (C) from the appropriation of a company opportunity" and to refrain "from competing with the company in the conduct of the company's activities and affairs…" Conn Gen. Stat. §§34-255h(b)(1), (2), (i)(1).

98.     The officers and members of the board of directors, as manager of the Company, breached this duty by transferring assets of the Company to a third-party, ConfigAir s.r.o., without compensation.

99.     Naus, an officer and member of the board of directors, manager of the Company, breached this duty by transferring assets of the Company to a third-party, ConfigAir s.r.o., in which Naus owned a 90% interest, without disclosing such self-interest to the other members, officers or members of the board of directors.

100.     As a result of this transfer, Kurz has been damaged by lost profits and opportunities usurped by Naus for his own purposes at the expense of the Company and its members, including Kurz.

### Count III
### (Breach of Fiduciary Duty-Interfering With and Usurping Kurz's Authority Over Software Development)

101.     The paragraphs above are re-alleged as if fully set forth herein.

102.     The officers and members of the board of directors, as manager of the Company, owed a fiduciary duty to Kurz to act in good faith and to exercise reasonable care in carrying out their obligations to, and directing the activities of, the Company.

103.    Naus, as an officer and member of the board of directors, manager of the Company, breached this duty by interfering with and usurping Kurz's authority to direct all technical aspects of software development and to manage the development team.

104.    The officers and members of the board of directors, as manager of the Company, breached this duty by failing to restrain Naus from interfering with and usurping Kurz's authority to direct all technical aspects of software development and to manage the development team.

105.    The officers and members of the board of directors, as manager of the Company, undertook these actions or omissions in bad faith.

106.    As a result of these actions, Kurz has been damaged by lost profits of the Company and its members, including Kurz, which would have been generated from the Company's use of the Pre-LLC Software, of which Kurz is a beneficial owner.

**Count IV**
**(Breach of Fiduciary Duty-Removing Kurz as Officer and Member of**
**Board of Directors in Bad Faith)**

107.    The paragraphs above are re-alleged as if fully set forth herein.

108.    The officers and members of the board of directors, as manager of the Company, owed a fiduciary duty to Kurz to act in good faith and to exercise reasonable care in carrying out their obligations to, and directing the activities of, the Company.

109.    The officers and members of the board of directors, as manager of the Company, breached this duty by removing Kurz as Chief Technology Officer, Vice President and member of the board of directors.

110.    The officers and members of the board of directors, as manager of the Company, undertook these actions or omissions in bad faith.

111.    As a result of these actions, Kurz has been damaged by lost profits of the Company and its members, including Kurz, which would have been generated from the Company's use of the Pre-LLC Software, of which Kurz is a beneficial owner.

## PRAYER FOR RELIEF

WHEREFORE, Kurz prays for judgment in his favor and against Naus, Husain and Nguyen as follows:

1.    Compensatory damages in an amount to be determined at trial;

2.    Punitive damages in an amount to be determined at trial;

3.    Reasonable fees and expenses of counsel and of any experts employed by Kurz;

4.    Costs; and

5.    Such other and further relief, at law and in equity, to which Kurz may show himself justly entitled.

Dated: July 24, 2018

Respectfully submitted,


By  /s/Jessica S. Rutherford
Jessica S. Rutherford
ct27273
jrutherford@24iplg.com
Edmund J. Ferdinand, III
ct21287
jferdinand@24iplg.com
FERDINAND IP, LLC
1221 Post Road East, Suite 302
Westport, Connecticut 06880
Telephone: (203) 557-4224
Facsimile: (203) 905-6747

*Attorneys for Defendant/Counterclaimant/*
*Third-Party Plaintiff,*
*Henry Kurz*

## JURY DEMAND

Defendant/Counterclaimant/Third-Party Plantiff, Kurz, hereby demands a trial by jury of all issues so triable in this case.

Dated: July 24, 2018

Respectfully submitted,

By __/s/Jessica S. Rutherford____
Jessica S. Rutherford
ct27273
jrutherford@24iplg.com
Edmund J. Ferdinand, III
ct21287
jferdinand@24iplg.com
FERDINAND IP, LLC
1221 Post Road East, Suite 302
Westport, Connecticut 06880
Telephone: (203) 557-4224
Facsimile: (203) 905-6747

*Attorneys for Defendant/Counterclaimant/*
*Third-Party Plaintiff,*
*Henry Kurz*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 24, 2018, a copy of the foregoing Answer to First Amended Complaint, Affirmative Defenses, Counterclaims and Third-Party Complaint was filed electronically.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

<u>/s/ Jessica S. Rutherford</u>
Jessica S. Rutherford