UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CONFIGAIR LLC, ) | |
| ) | Case No. 3:17-cv-02026-JBA |
| Plaintiff, ) | |
| ) | |
| v. ) | Judge Janet Bond Arterton |
| ) | |
| HENRY KURZ, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| HENRY KURZ, ) | |
| ) | |
| Third-Party Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| DANIEL NAUS, NIZWER HUSAIN, and ) | |
| DUNG NGUYEN, ) | |
| ) | |
| Third-Party Defendants. ) | |

## SECOND AMENDED COMPLAINT

Plaintiff ConfigAir, LLC ("ConfigAir" or the "Company"), by and through counsel, for

its Second Amended Complaint for Declaratory Relief, Damages, and Injunctive Relief against

Defendant Henry Kurz ("Defendant") states as follows:

## THE PARTIES

1.      ConfigAir is a "manager-managed" limited liability company organized under the

laws of Connecticut and has its principal place of business at 65 Seaside Unit 2, Stamford,

Connecticut 06902.  The Company's members include Daniel Naus, a resident of the State of

Connecticut, Nizwer Husain, a resident of the State of Tennessee, and Dung Nguyen, a resident

of the State of California.

2.      Defendant is a German national who formerly served as an officer and director of

ConfigAir and was a former member of the Company.

**JURISDICTION AND VENUE**

3.      This Court has subject matter jurisdiction over the issues set forth in this Complaint (a) pursuant to 28 U.S.C. §1332 because complete diversity of citizenship exists between the parties and because the amount in controversy exceeds $75,000 and (b) pursuant to 28 U.S.C. §1331 because a number of the claims in this lawsuit arise or involve issues under federal copyright law.

4.      The Court has personal jurisdiction over the parties because ConfigAir is a Connecticut company, Defendant's actions targeted and damaged ConfigAir, and the parties, via written agreement, ceded to the "exclusive jurisdiction" of this Court.

5.      Venue is appropriate in this Court because the forum selection clause contained in the agreement at issue in this case requires the parties to bring this dispute in the state or federal courts located in Fairfield County, Connecticut.

**BACKGROUND FACTS**

6.      ConfigAir was founded in late 2010 by four individuals – Daniel Naus, Nizwer Husain, Dung Nguyen, and Henry Kurz (the "Founders").   Until February 26, 2018, the Founders were all members of ConfigAir.

7.      ConfigAir is an information technology company that specializes in assisting customers with systems applications.

*The Operating Agreement*

8.      In early 2011, the Founders entered into and agreed to the ConfigAir LLC Operating Agreement (the "Operating Agreement"), which established ConfigAir as a "manager managed" limited liability company and established that ConfigAir's board shall serve as the

company's manager.  A true and accurate copy of the Operating Agreement is attached as Exhibit A and is hereby incorporated by reference.

9.      As one of the Founders, Defendant signed the Operating Agreement on April 9, 2011.

10.     The Operating Agreement identified Defendant as an initial board member and as an officer holding the titles of "Chief Technology Officer" and "Vice President."

11.     As memorialized in the Operating Agreement, each of the Founders contributed a capital contribution to ConfigAir in the amount of $20,000.  In exchange, Defendant and Daniel Naus each received 200,000 fully-vested shares in the Company, and Dung Nguyen and Nizwer Husain each received 100,000 fully-vested shares.

12.     As part of the Operating Agreement, Defendant and the other Founders agreed to a number of provisions relating to intellectual property.

13.     In particular, pursuant to section 3(a), they agreed that:

> All technology, ideas, concepts, inventions, improvements, programs, designs, techniques and other works of authorship and development (including but not limited to all *copyright*, trademark, patent, trade secret, know-how and intellectual property rights associated therewith) developed, devised, made, learned of, conceived or reduced to practice by the member, *either solely or in collaboration with others, whether before, on or after the date of this Agreement,* up until and including the final date on which the member holds an interest in or is otherwise engaged by the Company, and which directly relates to the business of the Company (the "Work Product"), is, will become and *will remain the Company's exclusive property.*  The Company does and will own all right, title and interest in and to the Work Product.

(Operating Agreement at §3(a)) (emphasis added).

14.     In addition, section 3(b) states that:

> All Work Product is "*works made for hire*," and the Company is the "*person for whom the work was prepared.*"  As between the parties, the Company is and will be considered the author and/or owner, as appropriate, of the Work Product for purposes of patent, copyright or

> trademark law, and is and will be entitled to secure patent, copyright and trademark protection in the Company's name, if and as applicable, and the [M]ember agrees to cooperate with the Company as reasonably necessary for the Company to secure such patent, copyright and trademark protection.  To the extent that the Work Product and any intellectual property rights therein or related thereto are deemed or treated as not "works made for hire," the member hereby expressly and irrevocably assigns to the Company all of the member's right, title and interest in and to the Work Product and any and all intellectual property rights therein or related thereto.

(*Id.* at §3(b)) (emphasis in original).

15.     Section 3(c) also states that:

> The [Founders] represent[] and warrant[] to the Company that the member has full authority to enter into this Agreement and that in performing under this Agreement, the [Founders] will not violate the terms of any agreement with any third party.  The [Founders have] disclosed, and will continue to disclose to the Company, all tools, technology or other intellectual property owned or held by a third party which is used by the member in connection with the [Founders'] involvement with the Company.

(*Id.* at §3(c))

16.     The Founders further acknowledged in the Operating Agreement that they "will have access to and will participate in the development of and/or be acquainted with confidential or proprietary information of the Company ('Confidential Information')" and agreed to a confidentiality provision (the "Confidentiality Covenant"), which stated that "[f]or so long as the member holds an interest in or is otherwise engaged by the Company," and for 5 years after "the final date on which the member holds an interest in or is otherwise engaged by the Company, the member will not disclose, use or make known for the member's or another's benefit . . . any Confidential Information or use any such Confidential Information in any way."  (*Id.* at §3(d)).

17.     Moreover, the Founders agreed to a non-competition covenant (the "Non-Compete Covenant") such that that they agreed not to "directly or indirectly . . . engage in, become financially interested in, be employed by or have any business connection with" any of

ConfigAir's competitors while a member of the Company and for one year after the final date on which the Member holds a membership interest. (*Id.* at §3(e)).

18.     The Founders agreed to a non-solicitation of customers covenant (the "Customer Non-Solicitation Covenant") preventing each of them while serving as one of the Company's members and up to and including one year after "the final date on which the member holds an interest" from soliciting, "directly or indirectly, any customers of the Company who or which were customers at the Company at any time during the member's relationship with the Company, nor shall the member solicit any potential customers of the Company with whom the member had contact on behalf of the Company during their relationship with the Company." (*Id.* at §3(f)).

19.     Similarly, the Founders agreed to a non-solicitation of employees covenant (the "Employee Non-Solicitation Covenant") preventing each of them while serving as a member and up to and including one year after "the final date on which the member holds an interest" from soliciting or hiring, "directly or indirectly, on the member's behalf or on behalf of any other person or entity, any person employed or otherwise engaged by the Company."  (*Id.* at §3(g)).

20.     The Founders further acknowledged that the "limitations" set forth in the Operating Agreement are "reasonable and properly required for the adequate protection of the . . . Company, that "a remedy at law for any breach or threatened breach of the provisions of this [Operating Agreement] would be inadequate and will cause immediate and irreparable harm to the Company," and that breaching the non-competition, confidentiality, and non-solicitation covenants shall result in the Company being entitled to, in addition to all other relief permitted under the law, "temporary, preliminary and permanent injunctive relief to restrain such breach or threatened breach by the member, and to recover all costs and expenses, including reasonable attorneys' fees, of any proceedings brought to obtain such injunctive relief." (*Id.* at §3(h)).

21.     Moreover, the Founders agreed on procedures for handling the withdrawal or removal of those owning a membership interest in ConfigAir, stating that "members holding a majority of the vested Shares then outstanding" may "elect to cause the withdrawal of a member for Cause," and if so, the "purchase price for the entire membership interest" of the withdrawing member "shall be equal to the initial capital investment of that member."  (*Id.* at §3(c)(i)).  The Operating Agreement defines "Cause" as "(1) gross negligence or willful misconduct that has a material adverse affect [sic] on the Company; (2) fraud or material theft or embezzlement from the Company; or (3) failure of such member to spend at least 50% of their business time on the business and affairs of the Company."  (*Id.* at §2(c)(vi)(2)).

22.     The Founders further agreed that the Operating Agreement:

> shall be governed by and construed in accordance with the internal laws (and not the law of conflicts) of the State of Connecticut and the federal laws of the United States applicable therein.  Any disputes arising under [the Operating Agreement], whether as to interpretation, performance or otherwise, shall be subject to the exclusive jurisdiction of the courts of the County of Fairfield, State of Connecticut and the federal courts located therein and each of the parties hereto hereby irrevocably attorns to the exclusive jurisdiction of the courts of the County of Fairfield, State of Connecticut and the federal courts located therein.

(*Id.* at §6(c)).

*ConfigAir's Software*

23.     ConfigAir currently has two marketable products that it has developed since it was founded in 2010 – ConfigAir Server and ConfigAir Mobile Sales.

24.     ConfigAir Server is software that ConfigAir developed to market and license to companies that sell and produce complex products.  In a nutshell, ConfigAir Server provides an online interface allowing customers to view these companies' products online, to change options

and other inputs relating to those products, and to view the product containing the inputs the customers have selected in real time.[1]

25.　ConfigAir Mobile Sales is separate software that ConfigAir has developed to assist companies with online sales for cell phones, tablets, and other remote devices.  In order to get ConfigAir Mobile Sales, ConfigAir's customers must also license ConfigAir Server .

*ConfigAir's Development of the Software*

26.　After it was founded in 2010, ConfigAir spent years developing and refining various software programs in order to create a marketable product.

27.　Upon ConfigAir's founding, Defendant, who was ConfigAir's Chief Technology Officer at the time, contributed some basic software to ConfigAir that he and the other Founders hoped would assist them in further development of a product that ConfigAir could sell in the marketplace.  More specifically, the software that Defendant contributed included the following technical modules:

- CAL (Configurator Abstration Layer) – a Java software library providing a common interface for communication with third-party business logic libraries. After Defendant's contribution, ConfigAir corrected numerous CAL defects, enhanced and significantly built upon the original version of CAL by adding features, providing support for additional third-party libraries and improving its robustness to allow it to be used in demanding production deployments.  CAL is currently used as one of the technical modules of the ConfigAir Server product in which it assists with a "behind-the-scene" function that helps the program operate smoothly.

---

[1] As an example of how this software is used, this software is the type that car manufacturers use when a customer wants to "build" one of its cars to see what it looks like or how much it will cost.

- CALWebConfiguration – Java/JavaScript application rendering configuration web user interface and using CAL for business logic.  After contribution to ConfigAir, this technical module was renamed WebConf and has been significantly enhanced and further developed, including upgrades of underlying frameworks, support for improved styling, integration with third-party enterprise software, code minification and numerous other improvements.  With respect to ConfigAir Server, this module displays the text that customers of a product see and the inputs that a customer selects regarding particular product.

- CALWSServer – Java server application providing application services (so called webservices) to mobile and web-based application clients.  Since contribution, ConfigAir has enhanced and built upon this module in numerous ways and has used it as a required server component of ConfigAir Mobile Sales.  It is also utilized as part of ConfigAir Server.

- ConfigVisualization – Java application containing logic for rendering basic three-dimensional visualization for a given configuration.  ConfigAir renamed this module ConfVis and enhanced and added to it in numerous ways, e.g. provided support for 2D visualization and provided support for industry standard third-party viewers.  In short, ConfigVisualization assists with creating the image for a product that a potential customer may see once that customer selects various options or inputs that he/she wants the product to include.

28.     Because Defendant was willing to contribute software to ConfigAir and because of his expertise in the area of software development, he was provided – as reflected in the

8

Operating Agreement – 200,000 shares in ConfigAir, as opposed to 100,000 shares that two of the other Founders received even though they contributed the same amount of capital.

29.     Defendant, as the Chief Technology Officer, collaborated with others at ConfigAir, including ConfigAir's development team, to develop ConfigAir's software.

30.     In 2013, after years of development by ConfigAir and its development team, ConfigAir brought the first version of ConfigAir Server to market.  The software underlying that program involved countless technical modules that ConfigAir and its technical team, led by Defendant at the time, developed from scratch.  It also involved a small number of advanced versions of the technical modules that Defendant initially contributed to ConfigAir.

31.     Sometime thereafter, ConfigAir developed and released ConfigAir Mobile Sales. The software underlying that program involved a number of technical modules that ConfigAir and its technical team built from scratch, although it does utilize advanced and modified versions of the technical module of CASWSServer.

32.     Since ConfigAir Server and ConfigAir Mobile Sales were first developed and released, the software underlying those programs has been changed, modified, and altered by ConfigAir's development team many times over.

33.     This includes any software that Defendant originally contributed as, since 2010, that software – to the extent it was utilized by ConfigAir in any way – has been changed, modified, altered, and rewritten over the course of many years that ConfigAir has been in existence.

*Defendant Never Contested ConfigAir's Ownership or Use of the Software at Any Time*

34.     ConfigAir has been marketing and selling ConfigAir Server and updated versions continuously from 2013 to present day to customers in the marketplace.

35.     From the time ConfigAir was founded until as late as mid-2017, Defendant, in his roles as a member owning a one-third interest in ConfigAir, a director, and as an officer in charge of ConfigAir's technology, assisted ConfigAir's efforts to develop, market, and sell the software.

36.     During that time, Defendant never contested that ConfigAir owned the intellectual property rights to any of the versions of ConfigAir Server or ConfigAir Mobile Sales, asserted that ConfigAir was not entitled to use the versions of that software without his permission, or told ConfigAir that he believed he owned intellectual property rights with respect to the versions of any software that ConfigAir had developed.

*ConfigAir's Meeting with Defendant in Fort Lauderdale*

37.     In mid-2017, ConfigAir's relationship with Defendant began to break down.

38.     Per the terms of the Operating Agreement, the Founders were required to "spend at least 50% of their business time on the business and affairs of the Company" or risk the Company repurchasing their membership interest.

39.     However, by June of 2017, despite still serving as a director and officer, and owning the largest membership interest in ConfigAir, Defendant had ceased spending time working for the Company.

40.     Although it had the right to repurchase Defendant's shares per the terms of the Operating Agreement for failing to devote the required amount of time to the Company, ConfigAir did not do so, and instead attempted to get Defendant to re-engage with the Company.

41.     On October 12, 2017, the Founders met in Fort Lauderdale, Florida in an attempt to reach an agreement with Defendant to get him to resume working for the Company.

42.     At the meeting, Defendant revealed that he was unhappy with the way that ConfigAir was managed and demanded that he would return only if he was given full control over ConfigAir's development team.  If ConfigAir would not give him complete control over the development team, Defendant stated that he would not perform any work or assist ConfigAir, would demand a royalty for the software that he helped develop, and would maintain his position as Member owning one-third of ConfigAir.

43.      Defendant further stated that if ConfigAir did not meet either of these demands, he would sue the Company for copyright infringement because – according to him – the software that ConfigAir developed in 2013 and had marketed since that time was "his intellectual property."

44.     This was the first time that ConfigAir learned that Defendant believed that he owned the software that ConfigAir had worked so hard to develop and began marketing in 2013.

45.     ConfigAir refused to agree to either of Defendant's demands.

*The October 18, 2017 Board Meeting*

46.     On October 18, 2017, ConfigAir held a board meeting that all of the Founders attended.

47.     At that meeting, due to Defendant's stated intention to no longer work for the Company, ConfigAir removed Defendant as its Chief Technical Officer and Vice President.

48.     Despite being removed as an officer of ConfigAir, Defendant still remained a director and still owned a membership interest consisting of one-third of the Company.

*Defendant's Breaches of the Operating Agreement and Other Tortious Conduct*

49.     Shortly after the October 18, 2017 board meeting, Defendant undertook a number of actions in an attempt to damage ConfigAir in violation of his obligations under the Operating

Agreement and obligations that he owes the Company and other Founders as a member of a closely-held company.

      50.    Over the next few months, Defendant:

      a.    contacted ConfigAir's customers and told them, among other things, that they are using "pirated software" that belongs to him, not ConfigAir, and that ConfigAir cannot support them and that they should hire him instead;

      b.    disclosed confidential information regarding ConfigAir and its operations to third parties;

      c.    disparaged ConfigAir on social media and in communications with third parties;

      d.    contacted and threatened ConfigAir's employees in an attempt to cause them to leave the Company; and

      e.    caused YouTube to temporarily disable ConfigAir's account, resulting in ConfigAir's website not working properly.

      51.    For instance, one of ConfigAir's customers posted a comment on ConfigAir's Facebook page thanking ConfigAir for its work, stating, "Thanks for all that ConfigAir has done for OpenM Tech, we appreciate the excellent work and consider you a tier one provider."

      52.    In a lengthy response to that comment posted on ConfigAir's Facebook page on October 21, 2017, Defendant stated that ConfigAir's CEO "keeps accepting deadlines which are impossible to realize," that the CEO "works now directly with developers in a desasterous [sic] way," that ConfigAir's development department is located in a "stupid" location because "only developers fresh from University would be available," and that the CEO is unqualified to work "with the development team."  Defendant further stated that "with me departing nobody except for one senior developer [is] left who can properly maintain this software," that "[t]hings like visualization were already ruined by our CEO," that the "chosen technology" for new software being developed "is the wrong one to support the landscape that ConfigAir had in mind," and that the "24/7 support from ConfigAir is a joke now."  Moreover, Defendant declared that "[t]his

company will fail to architect things properly or to deliver quality software in time," and that "[s]oftware will be full of demo driven code that is impossible to maintain and which leads to down times [sic] in production systems."  Finally, he concluded with the statement that "if you are an existing customer and want to be helped professionally, please contact me directly."  A true and accurate copy of Defendant's October 21, 2017 post on Facebook is attached as <u>Exhibit B</u> to this Complaint and is incorporated herein by reference.

53.     The October 21, 2017 post was published on a public page so that anyone visiting ConfigAir's Facebook page could see it before ConfigAir had an opportunity to remove it.

54.     Furthermore, on the same day, Defendant contacted BRP, one of ConfigAir's customers, via email and stated that:

> Until this [W]ednesday I was vice president and CTO of ConfigAir LLC. ConfigAir does your configuration web ui.
>
> I am no longer VP or CTO, but I will file a legal request against ConfigAir about the software sold to you and other companies from ConfigAir as I developed it and ConfigAir took it away from me.  Plus they won't be able to support you properly after firing me.
>
> I am ready to help you the best I can.  Please contact me via this email address (henry.kurz@hkc-group.de).

A true and accurate copy of Defendant's email is attached as <u>Exhibit C</u> to this Complaint and is incorporated herein by reference.

55.     On October 21, 2017, after discovering Defendant's Facebook post from earlier that day, ConfigAir held an emergency board meeting and its directors voted to remove Defendant as a director of the Company.  On the same day, Daniel Naus contacted Defendant on behalf of ConfigAir's board and demanded that he "cease and desist from posting confidential information, approaching [ConfigAir's] customers and making defamatory statements, as this is

detrimental to the company and a breach of the Operating Agreement which [Defendant] signed."

56.    On October 27, 2017, ConfigAir was contacted by BRP and learned for the first time of the email that Defendant had sent BRP on October 21st.  In response, ConfigAir again contacted Defendant and told him that ConfigAir's board "considers this action on your part a breach of the ConfigAir Operating Agreement" and demanded that Defendant "immediately cease and desist from posting Company confidential and defamatory messages either directly to customers and on public websites."

57.    On that same day, Defendant contacted the other Founders of ConfigAir stating that he owned the intellectual property rights with respect to all versions of the software that ConfigAir had marketed and sold to customers since 2013 and demanded that he be paid for ConfigAir's use of the software.

58.    On October 31, 2017, Defendant contacted ConfigAir after he discovered that ConfigAir had blocked his access to its internal network, stating:

> I tried hard to keep ConfigAir's business up and running even after you guys fired me, but if simple things like keeping me connected to the company network are too much to ask for, you can explain to a judge what you think the meaning of intellectual property is or what you did in order to prevent this situation from happening.  ConfigAir will now get other legal issues with all customers after the customer's servers will be detentioned [sic] by the police.  I think that once the first customer calls you about this you will for the first time understand the meaning of intellectual property.  From now on it is too late.  I will not grant ConfigAir any right again to use my IP.  You have been warned more than once and kept ignoring all my warnings.  This is the end of ConfigAir.

59.    Later that day, Defendant again threatened to file a lawsuit against ConfigAir with respect to the software that ConfigAir developed in 2013.

60.    The next day, Defendant informed ConfigAir that he filed a report with police in Germany and with the FBI regarding ConfigAir's use of the software.

14

61.    Then, on November 2, 2017, Defendant sent a letter to all members of ConfigAir's development team.  The letter stated, in part, that:

> [A]s you know I (Henry) am no longer with ConfigAir LLC.  Without going into the reasons for this step the much more important thing is the legal situation.
>
> Working on any software that is based on CAL, CALServer, CALUi, Visualization or even just making use of it is considered a criminal act due to copyright violation.  I request you to immediately stop working on this software an [sic] any related software.  If Daniel forces you to continue on it, best consult a lawyer and ask him how you can make sure to not being belonged [sic] for knowingly violating copyright.  This is not a tiny little crime.  The penalty is up to 5 years of prison and a fine.  I ask you to stop all work on any of the software that was originally based on any of my products or which is using it.  So basically everything – even the intel project is using it.
>
> * * *
>
> Daniel was informed about the legal situation and decided to ignore it. The penalty for knowingly and willingly violating copyright is up to 5 years of prison and a monetary fine.  Please make sure that you are not also driven into illegal work on copyrighted material.  I have already filed a law case against ConfigAir and informed the FBI of illegal usage of copyrighted material not only be [sic] ConfigAir but also by ConfigAir's customers.  It will just take some time.
>
> I am unhappy that it went so far.  I also offered Daniel multiple times to issue a valid license, but he ignored it thinking he would own my IP anyway so I should not get any compensation at all.  Once my IP is pulled out of the company, customers will start sueing [sic] ConfigAir as they are also not allowed any longer to run their servers.  They have a valid license with ConfigAir, but ConfigAir sold them software that it doesn't hold a valid license for.  This will be a very interesting law case.  If I were you, I would already look for a  new job as ConfigAir has reached unfortunately a dead end.  I tried very hard behind the scenes to come up with a solution that would work for ConfigAir and me.  I issued ConfigAir verbally a valid license until my lawyer has prepared a license agreement.
>
> * * *
>
> I was disconnected from the company network.  No redmine – no vpn. Daniel did not want to give it to me back.  Not kidding . . . With this choice he ended the future of ConfigAir.

PS: you can reach me under henry.kurz@hkc-group.de

A true and accurate copy of Defendant's November 2, 2017 letter is attached as Exhibit D and is hereby incorporated by reference.

62.     After receiving Defendant's letter, a number of ConfigAir's developers refused to work on projects involving the software that Defendant claimed would subject them to criminal proceedings.

63.     On November 3, 2017, Defendant sent ConfigAir another email stating that he had again discussed the copyright issue with the German police and that he "informed the FBI that ConfigAir and all of ConfigAir's clients are running on pirated software."   A true and accurate copy of Defendant's November 3, 2017 email is attached as Exhibit E and is hereby incorporated by reference.

64.     On November 14, 2017, ConfigAir, through counsel, sent Defendant a letter explaining that the software at issue legally belongs to ConfigAir and demanded that Defendant cease and desist (a) contacting ConfigAir's employees and existing and potential customers, (b) falsely claiming that he owns ConfigAir's software and making other similar false statements regarding ConfigAir's products, (c) divulging ConfigAir's confidential information to third parties, and (d) making public statements that are damaging to ConfigAir and its business. A true and accurate copy of the November 14, 2017 letter from ConfigAir's counsel is attached as Exhibit F and is incorporated herein by reference.

65.     Despite receiving the letter, Defendant continues to insist that he owns the intellectual property rights with respect to the software, threaten litigation against ConfigAir, and take other actions in the marketplace with respect to ConfigAir's customers, vendors, and/or employees.

66.     For example, on December 1, 2017, Defendant again sent an email to a member on ConfigAir's development team, stating, among other things, that he will file a lawsuit against him for copyright infringement and that he would "love to work with [him] if ConfigAir crashes."

67.     Moreover, on December 19, 2017, Defendant contacted YouTube, alleged ConfigAir had violated copyrights that he owns, and demanded that multiple ConfigAir product demonstration videos that were linked to ConfigAir's public webpage be disabled.  Per his request, YouTube temporarily disabled the page, and it was only restored after ConfigAir filed a counter notice under the Digital Millennium Copyright Act ("DMCA").

68.     Also, on December 19, 2017, Defendant sent a letter to Grundfos A/S ("Grundfos"), one of ConfigAir's customers, stating that it is "currently illegally running unlicensed software without even knowing," that it "should let ConfigAir LLC know" that it will not accept any replacement software, and that he would offer his "expertise for free to verify" the status of its software.   Defendant then stated that ConfigAir's customer "should remove ConfigAir's access to [the customer's] production site immediately and let upgrades be done by somebody who is independent."   He then proceeded by stating that he "would love to discuss how to make a transition as smooth as possible" and that the customer should contact him "in order to find a solution for a smooth transition."   A true and accurate copy of the December 19, 2017 letter is attached as Exhibit G and is incorporated herein by reference.

69.     Defendant sent letters like the one he sent to Grundfos to other customers of ConfigAir including Dovista A/S, McLaren Automotive Ltd, BRP, Room & Board Inc.  Upon information and belief, Defendant sent similar letters to other customers of ConfigAir as well.

70.     On December 28, 2017, Defendant stated in an email to ConfigAir that he has "decided to go forward and will agree" to accept an offer from one of ConfigAir's "competitors" and that he will proceed with selling "an exclusive usage license" for ConfigAir's software. Defendant then stated that this competitor "will go for" ConfigAir's "clients," that the competitor is "aware that ConfigAir is quickly trying without any senior architect to create an alternative," and that the competitor will "sue the shit out of ConfigAir."  He further stated that ConfigAir's competitor "will take over maintenance and annual license and service fees relating to ConfigAir's clients.  A true and accurate copy of Defendant's December 28, 2017 email is attached as Exhibit H and is incorporated herein by reference.

*Defendant's Illegal Conduct Has Continued Into 2018*

71.     Defendant's illegal and tortious conduct continued well into 2018.

72.     On January 2, 2018, Defendant made posts on Facebook and LinkedIn about what he refers to as an "illegal and false claim of ConfigAir LLC" in which he continued to claim ownership of ConfigAir's software and stated that "pretty much all customers of ConfigAir are currently running illegal software."  A true and accurate copy of Defendant's Facebook and LinkedIn postings are attached as Exhibit I and are incorporated herein by reference.

73.     On January 2, 2018, Defendant again disparaged ConfigAir on social media, stating, "If there will be a Darwin award for business which you get for destroying your own company for the most idiotic reason, I would nominate ConfigAir LLC."  A true and accurate copy of Defendant's January 2, 2018 post on social media is attached as Exhibit J and is incorporated herein by reference.

74.     On January 9, 2018, Defendant contacted YouTube and again succeeded in temporarily blocking ConfigAir's YouTube account.  While ConfigAir promptly filed another

18

copyright counter notice as permitted under the DMCA, ConfigAir's YouTube access was only restored on January 19, 2017 after Defendant failed to substantiate a copyright violation. A true and accurate copy of Defendant's claim for a copyright violation that he submitted to YouTube is attached as <u>Exhibit K</u> and is incorporated herein by reference.

75.    On January 10, 2018, after YouTube had disabled ConfigAir's account, Defendant proceeded to state on social media that all of ConfigAir's "YouTube Videos have been deleted due to copyright violation[s] by ConfigAir," and although he previously agreed to provisions set forth in the Operating Agreement that expressly gave ConfigAir all intellectual property rights to the software, he stated that ConfigAir "thought they could steal my software and get along [sic] with it." In the same post, Defendant stated, among other things, that "2018 won't be good for ConfigAir." A true and accurate copy of Defendant's January 10, 2017 post on social media is attached as <u>Exhibit L</u> and is incorporated herein by reference.

76.    On the same day, Defendant contacted one of ConfigAir's developers and stated that ConfigAir's "YouTube account was deleted because of a massive violation of Copyright." Defendant then stated that "ConfigAir is dead" and proceeded to offer the developer a job.

77.    Also on January 10, 2018, Defendant had his counsel in the Czech Republic send letters to ConfigAir's developers again threatening them with criminal prosecution for working on ConfigAir's software.

78.    On January 12, 2018, Defendant, through his German counsel, filed a complaint with Microsoft Azure under the DMCA alleging copyright infringement against McLaren Automotive, one of ConfigAir's customers. In the Complaint, Kurz claimed that the servers hosted by Microsoft were running ConfigAir's software in violation of a copyright held by HKC GmbH, a foreign entity that Defendant owns. A true and accurate copy of the complaint that

Defendant submitted via German counsel is attached as <u>Exhibit M</u> and is incorporated herein by reference.

79.     Shortly thereafter, Defendant contacted various McLaren Automotive employees directly, threatened them by stating they would be subject to 5 years imprisonment due to violations of copyright laws, and further made disparaging comments regarding ConfigAir.

80.     On January 29, 2018, Defendant stated on social media that "ConfigAir utilizes . . . my own money against me.  My ex partners denied to pay off my share and they invest all of my money to fight against me including such stupid things like the You[T]ube Videos."  A true and accurate copy of Defendant's Facebook post is attached as <u>Exhibit N</u> and is incorporated herein by reference.

*Defendant was Removed as a Member From ConfigAir for Cause in February, 2018*

81.     In February, 2017, Mr. Naus, Mr. Husain, and Mr. Nguyen owned a majority of the vested shares in ConfigAir.

On February 26, 2017, after months of Defendant taking actions in breach of the Operating Agreement and engaging in willful or grossly negligent conduct that has had a material adverse effect on ConfigAir, Mr. Naus, Mr. Husain, and Mr. Nguyen exercised their right, as set forth in the Operating Agreement, to remove Defendant as a member of the Company for cause.  A true and accurate copy of the Agreed Written Consent is attached as <u>Exhibit O</u> and is incorporated herein by reference.

82.     Shortly thereafter and a week or two after Defendant was removed as one of its members, ConfigAir provided Defendant with written notice that he had been removed as a member and provided Defendant with payment of $20,000, which is the amount equal to Defendant's initial capital investment.

## Count I
### (Declaratory Judgment)

83.    ConfigAir realleges each and every allegation previously referenced in this Complaint.

84.    When Defendant co-founded ConfigAir, he was given a larger membership interest in ConfigAir than two of the other Founders even though they contributed the same amount of capital to the Company because of his experience and expertise in the area of developing systems application software and because of the software that he was contributing to ConfigAir.

85.    Moreover, Defendant agreed in the Operating Agreement that any legal rights to any program, software, or other works that he worked on "either solely or in collaboration with others, whether before, on or after the date" of the Operating Agreement "is . . . the Company's exclusive property and that to the extent he had any legal rights with regard to a program or software, he agreed to assign all 'right, title, and interest' to that software to ConfigAir." Operating Agreement §§3(a) & (b).

86.    Defendant further agreed that Connecticut law and/or federal law of the United States shall apply to any dispute he has with the Company under the Operating Agreement.

87.    After co-founding ConfigAir, Defendant, working with others on the development team at the Company as well as the other Founders, spent years developing the software to make it marketable.

88.    While Defendant certainly contributed to these efforts by, among other things, providing and writing code and helping to oversee the software's development team, these contributions were made within the scope of his employment with ConfigAir and/or were

specially ordered or commissioned for use as a contribution to the collective software that ConfigAir brought to market in 2013.

89.     Moreover, per the terms of the Operating Agreement, Defendant expressly agreed that ConfigAir's software would constitute a work made for hire under applicable law such that ConfigAir alone would own the intellectual property rights to the software.

90.     Accordingly, all software that ConfigAir has developed, including ConfigAir Server and ConfigAir Mobile Sales, is work made for hire as established under 17 U.S.C. §101 and the terms of the Operating Agreement, and ConfigAir owns all intellectual property rights with respect to that software under applicable United States copyright law.

91.     Furthermore, to the extent Defendant owned any intellectual property rights with respect to various portions of code that he contributed to create ConfigAir's software, Defendant agreed to assign and transfer those rights in writing when agreeing to the terms of the Operating Agreement as authorized under 17 U.S.C. §204.

92.     However, as evidenced by the fact that he has claimed and continues to claim to ConfigAir and throughout the marketplace that he owns all intellectual property rights to all software that ConfigAir has marketed and sold since 2013, claims that German law as opposed to United States law applies to this dispute, and threatens to take legal action against ConfigAir, its customers, and employees if ConfigAir continues to use and work on the software, Defendant disputes that ConfigAir owns the software and/or any intellectual property rights that he claims with respect to the software.

93.     As a result, a material and genuine controversy exists between the parties as to the intellectual property rights to any of the software that ConfigAir has marketed and sold going

back to 2013, and there is a bona fide, actual, present and practical need to resolve this controversy.

94.     ConfigAir seeks and is entitled to a declaration that:

(a)     federal law of the Second Circuit applies to all federal issues relating to the dispute regarding intellectual property rights with respect to the software, and Connecticut law applies to all issues properly decided under state law;

(b)     under applicable law, ConfigAir owns all legal rights with respect to all of the software that it has sold and marketed since 2013 and Defendant does not have any legal rights with respect to that software;

(c)     ConfigAir is permitted under applicable law to use, develop, market, and sell all versions of the software that it has marketed and sold; and

(d)     ConfigAir owned all legal rights with respect to all of the software that it has sold and marketed since 2013 (including ConfigAir Server and ConfigAir Mobile Sales), going back to the beginning of its development shortly after ConfigAir was founded in 2011, and from that time to present day, Defendant has not owned and has had no intellectual property rights with respect to that software.

95.     ConfigAir is legally entitled to this relief as well as any and all costs and fees arising from this dispute and any other relief that this Court may deem is proper.

**Count II**
**(Declaratory Judgment)**

96.     ConfigAir alleges each and every allegation previously referenced in this Complaint.

97.     As set forth in more detail above, in late 2017 and early 2018, Defendant engaged in willful and/or grossly negligent conduct that includes, but is not limited to, soliciting and threatening ConfigAir's customers, soliciting and threatening ConfigAir's employees and members of ConfigAir's software development team, improperly contesting ConfigAir's intellectual property rights, competing with ConfigAir, disparaging ConfigAir and its management team, disclosing ConfigAir's confidential information, refusing to return

ConfigAir's confidential and trade secret information, and temporarily shutting down ConfigAir's YouTube account.

98.     This willful and/or grossly negligent conduct had a material adverse effect on ConfigAir because it, among other things, disrupted and strained ConfigAir's relationships with its customers, disrupted ConfigAir's relationships with its employees and those on ConfigAir's software development team, disrupted ConfigAir's business, and has caused ConfigAir to expend countless time, money, and other resources to address Defendant's improper conduct and the resulting damage to ConfigAir.

99.     As such, Mr. Naus, Mr. Husain, and Mr. Nguyen, were within their rights under Section 2(c)(i) of the Operating Agreement, as members owning a majority of vested shares in ConfigAir, to remove Defendant as a member of ConfigAir on February 26, 2017.

100.    Moreover, pursuant to Section 2(c)(i) of the Operating Agreement, by paying Defendant $20,000, ConfigAir properly provided Defendant with what he was owed for his membership interest in ConfigAir after he was removed as a member for cause.

101.    However, after Defendant was notified of his removal and was paid the $20,000, Defendant, through counsel, has indicated that he believes that ConfigAir had no right to remove him as a member and that ConfigAir was not legally permitted to purchase his membership interest for $20,000.

102.    Therefore, a material and genuine controversy exists between the parties as to whether ConfigAir properly purchased Defendant's membership interest for $20,000 and whether Defendant is currently a member of ConfigAir;, and there is a bona fide, actual, present and practical need to resolve this controversy.

103.    ConfigAir seeks and is entitled to a declaration that:

(a)     Mr. Naus, Mr. Husain, and Mr. Nguyen were within their rights under the Operating Agreement to remove Defendant as a member of ConfigAir for cause in February, 2018;

(b)     As one who was being removed as a member for cause, Defendant was legally owed $20,000, which is the amount equal to Defendant's initial capital investment;

(c)     ConfigAir properly repurchased Defendant's membership interest in ConfigAir by paying him $20,000; and

(d)     Defendant is no longer a member of ConfigAir.

104.    ConfigAir is legally entitled to this relief as well as any and all costs and fees arising from this dispute and any other relief that this Court may deem is proper.

**Count III**
**(Breach of Contract)**

105.    ConfigAir realleges each and every allegation previously referenced in this Complaint.

106.    The Operating Agreement is a valid and binding contract and ConfigAir fully performed all of its obligations under the Operating Agreement.

107.    The Customer Non-Solicit Covenant in the Operating Agreement prohibits Defendant during the time he is a member of ConfigAir and until one year from the final date on which he holds an interest from soliciting, directly or indirectly, any of ConfigAir's customers or potential customers.

108.    Because Defendant was a member of ConfigAir until February 26, 2018, Defendant was not and still is not permitted to solicit any of ConfigAir's customers or potential customers.

109.    Defendant has breached the Operating Agreement by soliciting ConfigAir's customers in his October 21, 2017 Facebook post, in his October 21, 2017 email to BRP, in his

December 19, 2017 letter to Grundfos, and in additional similar correspondence with Dovista A/S, McLaren Automotive, BRP, and Room and Board, Inc.

110.    Upon information and belief, Defendant has also breached the Operating Agreement by soliciting other existing and potential customers of ConfigAir.

111.    As the direct and proximate result of Defendant's actions, ConfigAir's relationships with its existing and potential customers have been damaged and ConfigAir has suffered damages in an amount that will be determined by the trier of fact at trial.

**Count IV**
**(Breach of Contract)**

112.    ConfigAir realleges each and every allegation previously referenced in this Complaint.

113.    The Operating Agreement is a valid and binding contract and ConfigAir fully performed all of its obligations under the Operating Agreement.

114.    The Employee Non-Solicit Covenant in the Operating Agreement prohibits Defendant during the time he is a member of ConfigAir and until one year from the final date on which he holds an interest from soliciting or hiring, directly or indirectly, anyone employed or otherwise engaged by ConfigAir.

115.    Because Defendant was a member of ConfigAir until February 26, 2018, Defendant was and still is not permitted to solicit any of ConfigAir's employees or anyone engaged by ConfigAir to perform work on its behalf.

116.    Defendant has breached the Operating Agreement by soliciting employees of ConfigAir and others engaged by ConfigAir to perform work on its behalf as set forth in his November 2, 2017, December 1, 2017, and January 10, 2018 correspondence with members of ConfigAir's development team.

117.    Upon information and belief, Defendant has also breached the Operating Agreement by soliciting ConfigAir's employees or others engaged by ConfigAir to perform work on its behalf at other times in 2017 and 2018.

118.    As the direct and proximate result of Defendant's actions, ConfigAir's relationships with its employees and others engaged to perform work on ConfigAir's behalf have been damaged, and ConfigAir has suffered  damages in an amount that will be determined by the trier of fact at trial.

**Count V**
**(Breach of Contract)**

119.    ConfigAir realleges each and every allegation previously referenced in this Complaint.

120.    The Operating Agreement is a valid and binding contract and ConfigAir fully performed all of its obligations under the Operating Agreement.

121.    The Confidentiality Covenant in the Operating Agreement prohibits Defendant during the time he is a member of ConfigAir and until five years from the final date on which he holds an interest from disclosing or using any of ConfigAir's confidential or proprietary information.

122.    Because he was a member of ConfigAir until February 26, 2018, Defendant was not and still is not permitted to disclose or use any of ConfigAir's confidential or proprietary information.

123.     Defendant has breached the Operating Agreement by:

(a)    disclosing confidential and proprietary information to third parties, including confidential information regarding ConfigAir's development team;

(b)    disclosing confidential and proprietary information regarding ConfigAir's software to third parties; and

27

(c)      using the software that ConfigAir developed for his own personal benefit.

124.    As the direct and proximate result of Defendant's actions, ConfigAir has been damaged in an amount that will be determined by the trier of fact.

**Count VI**
**(Breach of Contract)**

125     ConfigAir realleges each and every allegation previously referenced in this Complaint.

126.    The Operating Agreement is a valid and binding contract and ConfigAir fully performed all of its obligations under the Operating Agreement.

127.    The Non-Compete Covenant in the Operating Agreement prohibits Defendant during the time he is a member of ConfigAir and until one year from the final date on which he holds an interest from competing with ConfigAir in any way.

128.    Because he was a member of ConfigAir until February 26, 2018, Defendant was and still is not permitted to compete with ConfigAir in any way.

129.    Defendant has breached the Operating Agreement by undertaking actions that compete with ConfigAir, including, but not limited to, soliciting ConfigAir's customers, disrupting ConfigAir's business activities, disparaging ConfigAir in the marketplace, soliciting ConfigAir's employees and others engaged to perform work for ConfigAir, disclosing ConfigAir's confidential and proprietary information to third parties, attempting to shut down ConfigAir's YouTube account, and using ConfigAir's confidential and proprietary information for his own personal benefit.

130.    As the direct and proximate result of Defendant's actions, ConfigAir has suffered damages in an amount that will be determined by the trier of fact at trial.

## Count VII
## (Injunctive Relief)

131.    ConfigAir realleges each and every allegation previously referenced in this Complaint.

132.    Defendant has breached the Operating Agreement by violating the Customer Non-Solicitation Covenant, the Employee Non-Solicitation Covenant, the Non-Compete Covenant, and the Confidentiality Covenant and has threatened to breach these provisions of the Operating Agreement in the future.

133.    Moreover, Defendant's false statements that he owns the software that ConfigAir has developed and utilizes in the marketplace is in direct conflict with sections 3(a) and 3(b) of the Operating Agreement, and he has threatened to continue making those false statements in the future.

134.    Per the terms of the Operating Agreement, Defendant acknowledged that "a remedy at law for any breach or threatened breach of the provisions of this [Operating Agreement] would be inadequate and will cause immediate and irreparable harm to the Company in a manner that cannot be measured nor adequately compensated in damages" and that "in the event of any such breach or threatened breach, and in addition to any and all other remedies that it may have at law or in equity, the Company shall be entitled to temporary, preliminary and permanent injunctive relief to restrain such breach or threatened breach."  (Operating Agreement §3(h)).

135.    As Defendant acknowledged in the Operating Agreement, ConfigAir lacks an adequate remedy at law for Defendant's breaches of the Operating Agreement, and the breaches and threatened breaches of the Operating Agreement have caused and will continue to cause irreparable harm to ConfigAir in the future.

136.    Accordingly, ConfigAir is entitled to preliminary and permanent injunctive relief consisting of an order from the Court stating the following:

(a)    Defendant is required to refrain from contacting ConfigAir's employees or anyone on ConfigAir's software development team;

(b)    Defendant is required to refrain from contacting ConfigAir's customers until February 26, 2019 unless given express permission from ConfigAir in advance;

(c)    Defendant is required to return all electronic data relating to the software or any other development activities that ConfigAir has undertaken and shall not disclose to anyone any details regarding ConfigAir's development efforts, its development team, or its software;

(d)    Defendant is prohibited from using the software in any way;

(e)    Defendant is prohibited from disclosing the code underlying ConfigAir's software or any other details regarding the software or its development to third parties;

(f)    Defendant is prohibited from stating that he owns or has intellectual property rights with respect to the software that ConfigAir has developed and has marketed and utilized since 2013;

(g)    Defendant is prohibited from threatening ConfigAir's customers, employees, or others affiliated with the Company with criminal action relating to the software that ConfigAir has developed and has marketed and utilized since 2013; and

(h)    Defendant is prohibited from competing with ConfigAir until February 26, 2019 such that he cannot seek employment or perform services for any ConfigAir customers or work for companies competing with ConfigAir by offering product configuration ecommerce or 3D visualization solutions.

**Count VIII**
**(Violation of the Connecticut Uniform Trade Secrets Act)**

137.    ConfigAir realleges each and every allegation previously referenced in this Complaint.

138.    The underlying code of the software that ConfigAir first marketed in 2013 and of all subsequent versions of that software is information that is a compilation and/or program that derives independent economic value from not being generally known to, and not being readily

ascertainable by proper means by, other persons who can obtain economic value from its disclosure.

139.    In order to protect the code's economic value, ConfigAir utilizes reasonable efforts to maintain the secrecy and confidentiality of that information by, among other things, restricting the number of people who have access to the information; protecting where it is stored on ConfigAir's electronic platform; and not disclosing it to third parties.

140.    Accordingly, the code of ConfigAir's software is a trade secret as defined in the Connecticut Uniform Trade Secrets Act codified in Connecticut General Statute Section 35-51.

141.    Upon information and belief, Defendant has copies of and has access to this code underlying ConfigAir's software.

142.    At the time he came into possession of this code, Defendant was authorized to possess it given that he was the Company's Chief Technical Officer and obligated by terms of the Operating Agreement to maintain its confidentiality and secrecy.

143.    Upon being removed as Chief Technical Officer and member of the board, Defendant was no longer authorized to retain the code underlying ConfigAir's software and his retention of that code serves no legal and lawful purpose.

144.    By soliciting ConfigAir's customers, indicating that he intends to compete with ConfigAir, and taking other actions adverse to ConfigAir, Defendant, upon information and belief, is misappropriating the code underlying ConfigAir's software, or at the very least, has threatened to misappropriate that code.

145.    Accordingly, ConfigAir is entitled to preliminary and permanent injunctive relief under Connecticut General Statute Section 35-52 requiring Defendant to refrain from using or disclosing the code, to return all copies of the code to ConfigAir, and to destroy all electronic

information relating to the code, and any additional measures authorized under the Connecticut Uniform Trade Secrets Act. ConfigAir is further entitled to an award of punitive damages and attorneys' fees.

## Count IX
### (Breach of Fiduciary Duty – Conn. Gen. Stat. §34-263b)

146.    ConfigAir realleges each and every allegation previously referenced in this Complaint.

147.    ConfigAir is a "manager-managed" limited liability company with ConfigAir's board serving as the "manager" of the Company.  Operating Agreement at §1(a).

148.    From the time ConfigAir was founded until October 18, Defendant served as officer of the Company.

149.    From the time ConfigAir was founded until October 21, Defendant served as a director of the Company, and as a result, was a member of the board that served as the Company's "manager" under Connecticut law during that time.

150.    As an officer and director of ConfigAir, Defendant owed the Company, among other things, a duty of loyalty such that he was required to refrain from dealing with the Company in a manner that was adverse to ConfigAir and from competing with ConfigAir.

151.    Moreover, from the time ConfigAir was founded until February 27, 2018, Defendant was a member of ConfigAir, and during that time, Defendant had a duty to comply with the Operating Agreement and to act under that agreement with the implied contractual obligation of good faith and fair dealing.

152.    While serving as an officer and director of the Company, Defendant has breached the duty of loyalty by disparaging ConfigAir on social media, disclosing confidential and proprietary information to third parties, falsely claiming to own ConfigAir's software, falsely

claiming that ConfigAir and its customers and employees are subject to criminal action for using or working on ConfigAir's software, soliciting ConfigAir's customers and employees in direct violation of the Operating Agreement, attempting to shut down ConfigAir's YouTube account, and taking other adverse actions against the Company.

153.    Moreover, while serving as a member of the Company, Defendant has breached the Operating Agreement and has failed to comply with his legal duty of acting in good faith and fair dealing under that agreement.

154.    As a direct and proximate cause of his breaches of these obligations, ConfigAir has been damaged in an amount that will be determined by the trier of fact at trial.

**Count X**
**(Tortious Interference with Contract/Business Relationships)**

155.    ConfigAir realleges each and every allegation previously referenced in this Complaint.

156.    ConfigAir has employment agreements or general service agreements with members of its development team.

157.    In his capacities as Chief Technical Officer and Vice President of ConfigAir, a board member of ConfigAir, and a member owning one-third of ConfigAir, Defendant was aware of the agreements with ConfigAir's development team.

158.    Defendant improperly contacted members of the development team and falsely told them that he owned ConfigAir's software and that they would be subject to criminal penalties if they continued working for ConfigAir.

159.    Upon being contacted Defendant, a number of members of ConfigAir's development team refused to work on the software based upon Defendant's claim that such work

would subject them to criminal penalties.  Moreover, ConfigAir lost its most senior developer as a direct result of Defendant's actions.

160.    Given what Defendant told the members of ConfigAir's development team was false and that he was prohibited from making such false statements by the Operating Agreement and by duties owed under Connecticut law, Defendant lacked any privilege or justification to excuse his conduct.

161.    As a direct and proximate cause of Defendant's tortious conduct, ConfigAir had to incur the time and expense of replacing members of its development team on projects involving the software and incurred additional damages that will be determined by the trier of fact at trial.

## Count XI
### (Defamation, Business Disparagement, and Trade Libel)

162.    ConfigAir realleges each and every allegation previously referenced in this Complaint.

163.    Beginning in mid-October, 2017, Defendant has intentionally and recklessly misrepresented to ConfigAir, ConfigAir's customers, employees, and to other third-parties, in both social media and in direct communications, that:

(a)    ConfigAir does not own the software that it has marketed and sold since 2013;

(b)    Defendant owns the software and intellectual property rights to the software that ConfigAir has marketed and sold; and

(c)    those using or working on the software would be subject to criminal penalties.

(collectively, the "Misrepresentations").

164.    Each of the Misrepresentations are false as ConfigAir owns all legal rights to its software and has owned those rights since the software was initially developed for the market.

34

165.    By making and publishing the Misrepresentations, Defendant has, among other things, caused uncertainty in the marketplace regarding ConfigAir's software, has adversely impacted ConfigAir's relationships with its customers, its employees, and others performing services for ConfigAir, has caused ConfigAir to incur significant costs relating to addressing these false statements, and has caused harm to ConfigAir's business reputation.

166.    Accordingly, as a direct and proximate cause of Defendant making and publishing the Misrepresentations, Defendant has incurred significant damages that will be determined by the trier of fact at trial.

## Count XII
### (Injunctive Relief re: Tortious Conduct)

167.    ConfigAir realleges each and every allegation previously referenced in this Complaint.

168.    Defendant has intentionally and recklessly engaged in tortious conduct aimed at damaging (a) ConfigAir's business relationships with its customers and potential customers, its employees, and those engaged to perform work for ConfigAir and (b) ConfigAir's goodwill in the marketplace.

169.    ConfigAir lacks an adequate remedy at law for Defendant's tortious conduct including his intentional interference with ConfigAir's contracts, breaches of fiduciary duty owed to ConfigAir, and making and publishing Misrepresentations in the marketplace, and ConfigAir has incurred and will continue to incur irreparable harm as a result.

170.    ConfigAir is entitled to injunctive relief as a result of Defendant's tortious conduct consisting of a preliminary and permanent injunction ordering Defendant to cease contacting ConfigAir's existing and potential customers, to comply with his obligations under

the Operating Agreement in the manner set forth above, and to cease making the Misrepresentations and any other false or defamatory statements relating to ConfigAir.

## Count XVIII
### (Breach of Contract)

171.    ConfigAir realleges each and every allegation previously referenced in this Complaint.

172.    The Operating Agreement is a valid and binding contract and ConfigAir fully performed all of its obligations under the Operating Agreement.

173.    Upon entering into the Operating Agreement, Defendant represented and warranted that he "has disclosed, and will continue to disclose to the Company, all tools, technology or other intellectual property owned or held by a third party which is used by [him] in connection with [his] involvement with the Company."

174.    Defendant has alleged in this litigation and in a separate lawsuit that, prior to entering into the Operating Agreement, he transferred to Henry Kurz Consulting GMBH ("HKC"), a German limited liability company owned and operated solely by Defendant, the intellectual property rights to the software that he later contributed to ConfigAir.

175.    Either prior to entering into the Operating Agreement or while the Operating Agreement was in effect, Defendant never disclosed to ConfigAir that he transferred to HKC or anyone else any intellectual property rights to the software that he contributed or provided to ConfigAir.

176.    To the extent Defendant did, in fact, transfer any intellectual property rights to the software that he contributed to ConfigAir to HKC, he breached the Operating Agreement by failing to disclose that fact to ConfigAir.

177.    HKC has recently taken action to protect rights that it believes it has with respect to ConfigAir's software and has communicated to third parties that it owns legal rights to ConfigAir's software.

178.    As a direct and proximate cause of this breach, ConfigAir has been damaged and will continue to be damaged by the fact that its ownership interest in any of the software that it has developed has been questioned in the marketplace, any costs and damages ConfigAir has and will incur due HKC's and Defendant's efforts to assert any rights to the software that ConfigAir has developed, and other damages that will be determined by the trier of fact.

## Count XIX
### (Breach of Fiduciary Duty – Conn. Gen. Stat. §34-263b)

179.    ConfigAir realleges each and every allegation previously referenced in this Complaint.

180.    ConfigAir is a "manager-managed" limited liability company with ConfigAir's board serving as the "manager" of the Company.  Operating Agreement at §1(a).

181.    From the time ConfigAir was founded until October 18, Defendant served as officer of the Company.

182.    From the time ConfigAir was founded until October 21, Defendant served as a director of the Company, and as a result, was a member of the board that served as the Company's "manager" under Connecticut law during that time.

183.    As an officer and director of ConfigAir, Defendant owed the Company, among other things, a duty of loyalty such that he was required to refrain from dealing with the Company in a manner that was adverse to ConfigAir.

184.     Moreover, from the time ConfigAir was founded until February 27, 2018, Defendant was a member of ConfigAir, and during that time, Defendant had a duty to comply with the Operating Agreement and to act under that agreement with the implied contractual obligation of good faith and fair dealing.

185.     Defendant has alleged in this litigation and in a separate lawsuit that, prior to entering into the Operating Agreement, he transferred to HKC the intellectual property rights to the software that he later contributed to ConfigAir.

186.     Either prior to entering into the Operating Agreement or while the Operating Agreement was in effect, Defendant never disclosed to ConfigAir that he transferred to HKC or anyone else any intellectual property rights to the software that he contributed or provided to ConfigAir.

187.     To the extent Defendant did, in fact, transfer any intellectual property rights to HKC, a company that he solely owns and operates, the software that he contributed to ConfigAir, breached duties that he owed to ConfigAir by failing to disclose that fact to ConfigAir.

188.     As a direct and proximate cause of his breaches of these obligations, ConfigAir has been damaged in an amount that will be determined by the trier of fact at trial.

### Count XX
### (Fraudulent Non-Disclosure)

189.     ConfigAir realleges each and every allegation previously referenced in this Complaint.

190.     As an officer and director of ConfigAir, Defendant was in a fiduciary relationship with the Company and had a duty to disclose to it and to the other officers, directors, and Founders material facts that were adverse to ConfigAir and its business.

191.    Moreover, from the time ConfigAir was founded until February 27, 2018, Defendant was a member of ConfigAir, and during that time, Defendant had a duty to comply with the Operating Agreement and to act and comply with the implied contractual obligation of good faith and fair dealing.  This included a duty to disclose whether intellectual property that he contributed or used in connection with his duties or work with ConfigAir was owned or held by a third party

192.    If it is, in fact, true that Defendant transferred to HKC intellectual property rights in the software that it contributed to and used while working with ConfigAir, Defendant was certainly aware of that fact, but failed to disclose it to ConfigAir despite having an obligation to do so.

193.    Defendant failed to disclose this fact to ConfigAir because – as the sole owner of HKC – if ConfigAir used the software he contributed and it really belonged to HKC, he could possibly retain a personal interest in the software that otherwise would have or should have belonged to ConfigAir per the terms of the Operating Agreement.

194.    Defendant's nondisclosure misled ConfigAir into believing that it was acceptable to use the software that Defendant contributed in conjunction with its development efforts and that it owned that software upon Kurz contributing it to ConfigAir.

195.    ConfigAir reasonable and justifiably relied on Defendant's non-disclosure such that, due to Defendant's non-disclosure, it assumed that it had all legal rights to the software that Defendant contributed per the terms of the Operating Agreement and used some of that software to assist with its development efforts.

196.    Had Defendant disclosed that he had transferred intellectual property rights to HKC, ConfigAir either would not have utilized the software in any way with respect to its

development efforts or, at the very least, would have resolved that issue to avoid any future disputes relating to that software.

197.    As a direct and proximate result of Defendant's fraudulent non-disclosure, ConfigAir was damaged by the fact that its ownership interest in any of the software programs that it has developed has been and is questioned in the marketplace, any costs and damages ConfigAir has incurred and will continue to incur due to the efforts HKC has taken and will take to assert any rights to the software that ConfigAir has developed, and other damages that will be determined by the trier of fact.

### Count XXI
### (Attorneys' Fees)

198.    ConfigAir realleges each and every allegation previously referenced in this Complaint.

199.    Section 3(h) of the Operating Agreement provides that ConfigAir "shall be entitled to . . . recover all costs and expenses, including reasonable attorneys' fees, of any proceedings brought to obtain . . . injunctive relief" to enforce the terms and obligations set forth in the Operating Agreement.

200.    An award of attorneys' fees are also authorized under the Connecticut Uniform Trade Secret Act.

201.    Accordingly, ConfigAir is entitled to recover from Defendant all costs and attorneys' fees that it incurs as a result this lawsuit and its dispute with Defendant.

### Count XXII
### (Punitive Damages)

202.    ConfigAir realleges each and every allegation previously referenced in this Complaint.

203.    Defendant's actions with respect to this dispute and as set forth in the preceding allegations were malicious, intentional, reckless, and grossly negligent such that they were made with reckless indifference to the rights of others or were an intentional or wanton violation of those rights.

204.    Accordingly, ConfigAir is entitled to recover punitive damages, costs and attorneys' fees, and any other relief that this Court deems proper.

**PRAYER FOR RELIEF**

WHEREFORE, ConfigAir is entitled to and prays for a judgment consisting of the following:

A.    Compensatory damages in excess of $75,000 in an amount that will be determined by the trier of fact;

B.    A declaration that:

(i)     federal law of the Second Circuit applies to all federal issues relating to the dispute regarding intellectual property rights with respect to the software, and Connecticut law applies to all issues properly decided under state law,

(ii)    under applicable law, ConfigAir owns all legal rights with respect to all of the software that it has sold and marketed since 2013 and Defendant does not have any legal rights with respect to that software,

(iii)   ConfigAir is permitted under applicable law to use, develop, market, and sell all versions of the software that it has marketed and sold, and

(iv)    ConfigAir owned all legal rights with respect to all of the software that it has sold and marketed since 2013 (including ConfigAir Server and ConfigAir Mobile Sales), going back to the beginning of its development shortly after ConfigAir was founded in 2011, and from that time to present day, Defendant has not owned and has had no intellectual property rights with respect to that software.

(v)     the Members were within their rights under the Operating Agreement to remove Defendant as a member of ConfigAir for cause in February, 2018;

41

    (vi)    As one who was being removed as a member for cause, Defendant was legally owed $20,000, which is the amount equal to Defendant's initial capital investment;

    (vii)   ConfigAir properly repurchased Defendant's membership interest in ConfigAir by providing Defendant with notice of his removal and by paying him $20,000 for his shares within 30 days after he was removed as a member of ConfigAir; and

    (viii)  Defendant is no longer a member of ConfigAir.

C.    A preliminary and permanent injunction  ordering that:

    (i)    Defendant is required to refrain from contacting ConfigAir's employees or anyone on ConfigAir's software development team;

    (ii)   Defendant is required to refrain from contacting ConfigAir's customers until the first year anniversary after he ceased to become a Member unless given express permission from ConfigAir in advance;

    (iii)  Defendant is required to return all electronic data relating to the software or any other development activities that ConfigAir has undertaken and shall not disclose to anyone any details regarding ConfigAir's development efforts, its development team, or its software;

    (iv)  Defendant is prohibited from using the software in any way;

    (v)   Defendant is prohibited from disclosing the code underlying ConfigAir's software or any other details to any third parties;

    (vi)   Defendant is prohibited from stating that he owns or has intellectual property rights (or that he ever owned or had intellectual property rights) with respect to the software that ConfigAir has developed and has marketed and utilized since 2013;

    (vii)   Defendant is prohibited from threatening ConfigAir's customers, employees, or others affiliated with the Company with criminal action relating to the software that ConfigAir has developed and has marketed and utilized since 2013; and

    (viii)  Defendant is prohibited from competing with ConfigAir until the first year anniversary after he ceases to become a Member such that he cannot seek employment or perform services for any ConfigAir customers or work for companies offering product configuration ecommerce or 3D visualization solutions.

D.    Punitive damages;

E.      Attorneys' fees and costs;

F.      Pre-judgment and post-judgment; and

G.      Any other relief that this Court deems just and proper.

Dated:  September 18, 2018                    Respectfully submitted,


                                              /s/ *Rebecca A. Brazzano*
                                              Rebecca A. Brazzano (18443)
                                              THOMPSON HINE LLP
                                              335 Madison Avenue
                                              12th Floor
                                              New York, NY  10017-4611
OF COUNSEL:                                   Tel. (212) 344-3941
                                              Fax (212) 344-6101
Anthony J. Hornbach                           Email: Rebecca.Brazzano@ThompsonHine.com
THOMPSON HINE LLP
312 Walnut Street, Suite 1400
Cincinnati, OH  45202
Tel. (513) 352-6721
Fax  (513) 241-4771
Email: Tony.Hornbach@ThompsonHine.com

## JURY DEMAND

Plaintiff demands trial by jury as to all issues.


Dated: September 18, 2018                    Respectfully submitted,


                                             /s/ *Rebecca A. Brazzano*
                                             Rebecca A. Brazzano (18443)
                                             THOMPSON HINE LLP
                                             335 Madison Avenue
                                             12th Floor
                                             New York, NY  10017-4611
                                             Tel. (212) 344-3941
                                             Fax (212) 344-6101
                                             Email: Rebecca.Brazzano@ThompsonHine.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 18th day of September, 2018, a true copy of the foregoing SECOND AMENDED COMPLAINT and Exhibits A-O thereto were filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


/s/ Rebecca A. Brazzano
Rebecca A. Brazzano