## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| CONFIGAIR LLC, ) | |
| ) | 3:17-cv-02026-JBA |
| Plaintiff/Counterclaim Defendant, ) | |
| ) | **HENRY KURZ'S AMENDED** |
| v. ) | **THIRD-PARTY COMPLAINT** |
| ) | **AND DEMAND FOR JURY** |
| HENRY KURZ ) | **TRIAL** |
| ) | |
| Defendant/Counterclaimant. ) | |
| _____ ) | October 2, 2018 |
| HENRY KURZ, individually and derivatively ) | |
| on behalf of CONFIGAIR LLC, ) | |
| ) | |
| Third-Party Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| DANIEL NAUS, NIZWER HUSAIN, and ) | |
| DUNG NGUYEN, ) | |
| ) | |
| Third-Party Defendants. ) | |
| _____ ) | |

Third-Party Plaintiff, Henry Kurz ("Kurz"), individually and derivatively on behalf of

ConfigAir LLC, by and through counsel, for its Third-Party Complaint against Third-Party

Defendants Daniel Naus ("Naus"), Nizwer Husain ("Husain") and Dung Nguyen ("Nguyen")

states as follows:

### THE PARTIES

1.      Kurz is a German national who is a member of ConfigAir LLC ("the Company")

and served as an officer and member of the board of directors of the Company, a "manager-

managed" limited liability company organized under the laws of the State of Connecticut.  Kurz

owns 200,000 shares, constituting a 33.3% interest, in the Company.

2.      Upon information and belief, Naus is a citizen of the State of Connecticut with a residence and principal place of business located 65 Seaside Avenue, Unit 2, Stamford, Connecticut.  He is a member of the Company and served as an officer and member of the board of directors of the Company.  Naus owns 200,000 shares, constituting a 33.3% interest, in the Company.

3.      Upon information and belief, Husain a citizen of the State of Tennessee and has a principal place of business located 65 Seaside Avenue, Unit 2, Stamford, Connecticut.  He is a member of the Company and served as an officer and member of the board of directors of the Company.  Husain owns 100,000 shares, constituting a 16.65% interest, in the Company.

4.       Upon information and belief, Nguyen a citizen of the State of California and has a principal place of business located 65 Seaside Avenue, Unit 2, Stamford, Connecticut.  He is a member of the Company and served as an officer and member of the board of directors of the Company.  Nguyen owns 100,000 shares, constituting a 16.65% interest, in the Company.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over the issues set forth in this Third-Party Complaint pursuant to 28 U.S.C. §1332 because complete diversity of citizenship exists between the parties and because the amount in controversy exceeds $75,000.

6.      The Court has personal jurisdiction over the parties because (a) Naus is a Connecticut citizen; (b) the Third-Party Defendants are officers and members of the board of directors of the Company, a Connecticut limited liability company; (c) upon information and belief, the Third-Party Defendants have a principal place of business in Connecticut; and (d) the Third-Party Defendants' action targeted and damaged Kurz in the State of Connecticut.

7.     Venue is appropriate in this Court because, upon information and belief, the Third-Party Defendants have a principal place of business located in the District of Connecticut.

## FACTS COMMON TO ALL COUNTS

*Development of the Pre-LLC Software*

8.     Kurz was an independent developer of configurator and visualization software.

9.     In or around 2003, Kurz began developing certain configurator and visualization software ("Pre-LLC Software").  The Pre-LLC Software was comprised of four components: (1) CAL; (2) CAL Server; (3) Visualization Engine; and (4) Visualization UI.

10.    Kurz began marketing the Pre-LLC Software in, at least as early as, 2004.

11.    On or about December 1, 2010, Kurz created and registered Henry Kurz Consulting GmbH ("HKC") at the court in Stuttgart, Germany, under the registration number HRB 735665.  Kurz has been the owner and manager of HKC since its registration.

12.    On or about December 2, 2010, Kurz transferred the copyright for the Pre-LLC Software to HKC.  A certified translation of the Software Transfer Agreement between Kurz and HKC is attached at **Exhibit A** and is hereby incorporated by reference.

13.    Naus expressed interest in going into business with Kurz to develop configuration software for mobile devices ("Mobile Software").

14.    In late December 2010, Naus and Kurz joined with Husain and Nguyen to form a business for the purpose of developing Mobile Software.

15.    The business of developing Mobile Software is completely distinct from and unrelated to the Pre-LLC Software that Kurz had previously created and developed and, copyright in which, Kurz had previously transferred to HKC.

16.     Upon information and belief, ConfigAir LLC was formed when Naus filed Articles of Organization on or about December 21, 2010.

17.     The name "ConfigAir" was chosen because the members' intent was to provide configuration "on the air," i.e., via mobile devices.

18.     From the time of the founding of the Company, Kurz, Naus, Husain and Nguyen were the only members of the Company and the only members of the board of directors, which functioned as the Company's "manager."

19.     Kurz was appointed Vice President and Chief Technology Officer ("CTO") of the Company.

20.     At the time of the founding of the Company, Naus, Husain and Nguyen represented to Kurz that he would have full and sole authority for decision-making over the technical aspects of production of the Company's software.  They further represented that Kurz was to operate with this authority because of his superior knowledge of the technical aspects of software engineering and project management to the other members.

21.     Kurz relied on these representations when he agreed to join the Company.

22.     These representations were not disclaimed or modified by any agreement of the parties thereafter.

23.     In addition, in his role as CTO, Kurz was charged with devising the overall roadmap for developing products for the Company's clients, as well as direct supervision of software developers, which included assigning work to the developers, checking their work and coaching them with respect to daily activities and long-term goals.

24.     Since the founding of the Company, Kurz, with the permission and approval of the other members of the Company, had developed and implemented a broad roadmap for development of software, which among other things, set forth a structure that involved two teams of developers, one developing the application aspect of the software, while the other developed the platform.

25.     In 2012, Kurz determined that the Mobile Software would not be a viable product for the Company and decided to discontinue development of it. All of the members of the Company agreed that the mobile device approach should be discontinued.  Husain had expressed his doubts about the Company's future business success and expressed that he may leave the Company.

*The Company Changed Direction in 2012*

26.     As a result of this failure concerning the Mobile Software, Naus suggested to the other members that there is a lot of interest in the web/visualization market, which HKC's Pre-LLC Software serves.

27.     Kurz agreed to allow the Company to market HKC's Pre-LLC Software.

28.     In allowing the Company to market HKC's Pre-LLC Software, Kurz relied on the members' representation that Kurz had, and would always have, full and sole authority for decision-making over the technical aspects of production and development of the Pre-LLC Software.

29.     Neither Kurz nor HKC assigned or otherwise transferred copyright in the Pre-LLC Software to the Company.

30.     Thereafter, Kurz added some features to HKC's Pre-LLC Software, extended it and customized it for the needs of certain customers of the Company.

31.     The Company began marketing a version of HKC's Pre-LLC Software in or about 2013.

32.     The Company did not compensate HKC in connection with the Company's copying, public display, distribution, licensing or sale of the Pre-LLC Software, or derivative works based on the Pre-LLC Software, at any time.

*Naus's Self-Dealing*

33.     On or about April 20, 2014, Naus proposed organizing a Czech limited liability company (the "Czech Entity") for the purpose of engaging software developers in the Czech Republic.

34.     Per Naus's proposal, the Company would own 90% of the shares in the Czech Entity, and Naus's friend, Ales Restak would own 10% of the shares in the Czech Entity.  The Company would contribute initial capital in the amount of $4,500, and Restak would contribute initial capital in the amount of $500.

35.     Upon information and belief, all of the members of the Company agreed to this arrangement.

36.     In or about May 2014, Naus informed the members that the U.S. documents presented in connection with establishing the Company as an owner of the Czech Entity were unacceptable to the Czech authorities.

37.     Naus stated that he and Restak had decided that the Company's intended 90% interest in the Czech Entity would instead be owned by Naus personally.  They further decided that Naus's initial capital contribution would be $400, and Restak's contribution would be $100.

38.     Naus represented to the Company's members that, once the Czech Entity was organized, he would secure the necessary documents from the U.S. authorities, and then transfer his 90% personal interest in the Czech Entity to the Company the next time he was in the Czech Republic.

39.     Kurz agreed to this proposal, based on Naus's representation that he would transfer his 90% personal interest in the Czech Entity to the Company the next time he was in the Czech Republic.

40.     On or about July 9, 2014, Naus organized ConfigAir s.r.o., a Czech limited liability company.

41.     Naus owned a 90% interest in ConfigAir s.r.o., and Rastak, owned a 10% interest in ConfigAir s.r.o.

42.     Contrary to his representations, Naus never transferred his 90% personal interest in the Czech Entity to the Company on his next trip to the Czech Republic or at any time thereafter.

43.     Upon information and belief, although Naus has been to the Czech Republic multiple times since July 2014, Naus remains owner of a 90% interest in ConfigAir s.r.o., and the Company does not own any share in ConfigAir s.r.o.

44.    Naus knew, but failed to disclose to the other members of the Company, the true owners of ConfigAir s.r.o., including the fact that Naus personally remained a majority owner of ConfigAir s.r.o., to the Company's other members or its board of directors after July 2014.

45.    Upon information and belief, in or about July 2014, Naus provided a copy of the Pre-LLC Software to ConfigAir s.r.o. without HKC's permission and without controls in place to ensure that third-parties would not own copyright in software developed based on the Pre-LLC Software.

46.    Upon information and belief, starting in or about July 2014, Naus began transferring large sums of money from the Company to ConfigAir s.r.o.

47.    Upon information and belief, the money Naus transferred from the Company to ConfigAir s.r.o. was used to pay rent for and refurbish offices in Olomouc, Czech Republic, to purchase electronics and furniture for the offices and the developers working there, and to pay salaries of those developers.

48.    The board of directors did not authorize Naus to transfer funds from the Company to an entity, in which the Company did not own any interest.

49.    Naus intended that the board of directors would permit the transfer of the Company's assets to ConfigAir s.r.o. in reliance on Naus's representation that he would transfer his 90% interest in ConfigAir s.r.o. to the Company on his next trip to the Czech Republic and Naus's failure to disclose the fact that, in fact, he never did transfer his 90% interest in ConfigAir s.r.o. to the Company on his next trip or at any time thereafter.

50.    The board of directors did permit the transfer of the Company's assets to ConfigAir s.r.o. in reliance on Naus's representation that he would transfer his  90% interest in

ConfigAir s.r.o. to the Company and due to Naus's failure to disclose the fact that, in fact, he never did transfer his 90% interest in ConfigAir s.r.o. to the Company.

51.     Due to Naus's efforts to conceal his continued personal ownership of ConfigAir s.r.o., Kurz did not discover until in or about November 2017 that Naus had never transferred his 90% interest in ConfigAir s.r.o. to the Company.

52.     Upon information and belief, Husain and Nguyen did not know until 2017 at the earliest that Naus had never transferred his 90% interest in ConfigAir s.r.o. to the Company.

*Naus Prevented Kurz From Exercising His Authority Over Software Development*

53.     Since the founding of the Company, Kurz consistently devoted at least fifty percent (50%) of his business time on the business and affairs of the Company and carried out all of his duties as Vice President and CTO, including exercising his full and sole authority for decision-making over the technical aspects of production of the Company's software.

54.     By agreement of the members, each of the officers worked for the Company from their respective homes.

55.     Kurz primarily worked from his home in Germany.  Starting in or about 2013, Kurz spent one week of each month working in ConfigAir s.r.o.'s offices in Olomouc, Czech Republic, where most of the software development team was based.

56.     Starting in or about 2016, Naus began calling Kurz in the middle of the night, local time at Kurz's home in Germany.

57.     If Kurz did not answer his phone, Naus complained regardless of the fact that Kurz returned Naus's phone calls during business hours in Kurz's time zone and within twelve hours of Naus's attempt to contact him.

58.     In addition to such harassing phone calls and baseless complaints, Naus began preventing Kurz from carrying out the responsibilities of his position.  Naus began giving the developers instructions that were contrary to the instructions that Kurz had previously issued and unilaterally overruled Kurz on a number of decisions as to the technology to be implemented by the Company.

59.     In or about the summer of 2016, Naus called a meeting of the members of the Company.  At the meeting, Kurz discussed his concerns about Naus's interference with Kurz's supervision of the developers.

60.     Meanwhile, Naus complained of the previous instance when Kurz had not returned Naus's call in the middle of the night.

61.     At the end of this meeting, Naus issued a threat to Kurz that if such a situation arose again, he would be expelled from the Company as CTO, Vice President, and as a member.

62.     Kurz responded that, if he were no longer an officer of the Company, the Company would lose its ability to use, market and license versions of the Pre-LLC Software, copyright in which was owned by HKC.

63.     The Manager did not amend the scope of Kurz's position as Vice President and CTO or his full and sole authority for decision-making over the technical aspects of production of the Company's software.

64.     Sometime in 2017, Naus began working in the ConfigAir s.r.o. offices in Olomouc, Czech Republic.

65.     Around that time, Kurz had planned, with the approval of the other members of the Company, to develop a new user interface in the near future.

66.     On June 16, 2017, Kurz left Germany for a two-week vacation.

67.     While Kurz was on vacation, and without the Manager's or Kurz's permission, Naus took on the role of "Scrum Master" – the supervisor for the developers.

68.     Without consulting with Kurz or the Manager, Naus eliminated the two teams that Kurz had organized and tasked with development in favor of self-managed teams.

69.     Naus also organized – without the Manager's or Kurz's knowledge or approval – a one-week workshop in the Czech Republic for all developers (from both Olomouc and Prague) that took place during Kurz's vacation.

70.     While outlining the Company's roadmap for developing software, Kurz had advised the other members of the Company, including Naus, that React – a javascript library meant for developing user interfaces — was not the appropriate technology to use in developing the software's user interface.

71.     Because the developers were unaware of the roadmap that Kurz had developed, they recommended to Naus that they use React.

72.     When Kurz returned from his vacation, the developers were already developing a new user interface for software to be used by the Company using React.

73.     Despite being aware of Kurz's roadmap, and despite having no technical training required for carrying out the functions of CTO, Naus unilaterally approved the use of React. Naus also gave a developer named Milan Vojacek the job of leading the development of the new React-based user interface.

74.     When Kurz returned from his vacation, Naus advised him that the changes that had been made to the development of software were permanent and that Kurz would have no more input in the direction of the development of that product.

75.     From this point on, Naus unilaterally prevented Kurz from carrying out his duties as CTO.

76.     Without the approval of the Manager, Naus assumed those responsibilities.

77.     Due to his inexperience with the technical aspects of software development, Naus made demands on the developers that were impossible to achieve. Further, he would not accommodate the developers' concerns that his demands were impossible.

78.     Naus regularly imposed on the developers unrealistic deadlines that caused the developers to work exceedingly long hours and compromised the quality and reliability of the software code.

79.     In several instances, the Company missed deadlines that had been unrealistically set by Naus.  Upon information and belief, the clients were damaged as a result.

80.     Upon information and belief, in or about October 2017, due to Naus's lack of experience developing software and his impossible demands, several of the developers, including Martin Mosko, Tom Rejhon, Lukas Vrajik, and Petr Marek, quit.

81.     In or about September 2017, Naus, unilaterally and without the approval of the Manger, instructed Kurz not to direct the developers' activities any longer.

82.     Around this time, two projects – one managed by Nguyen and one managed by Husain – were escalated and required immediate attention in order to correct errors in the software that was having an immediate impact on the customers' business.

83.     At the time of the escalation, Naus was on vacation and could not be reached for direction or assistance with the escalation of either project.

84.     In Naus's absence, Kurz volunteered to assist Husain with the escalation of his project and was able to quickly resolve all issues.

85.     However, Nguyen prevented Kurz from assisting with the escalation of his project. In compliance with Naus's instruction that Kurz not direct the developers' activities, Kurz asked Nguyen to speak directly to Petr Marek, who was directly running the development for the client.  Nguyen refused.

86.     The client's escalation went unresolved. Upon information and belief, the client was damaged as a result.

87.     In early October 2017, Kurz asked Naus to call a meeting of the members to discuss this untenable situation.  Naus refused to call a meeting.

*Husain and Nguyen Failed to Restrain Naus*

88.     In October 2017, Naus, Husain, and Nguyen were attending a Configuration Workgroup (CWG) conference in Florida. They invited Kurz to come to Florida to have a meeting regarding ongoing disputes between Kurz and Naus over software development.

89.     Kurz traveled to Florida and met with Naus, Husain and Nguyen on or about October 12, 2017.

90.     At the meeting, Kurz sought changes to the operation of the Company in order to improve efficiency and to re-establish his work function as CTO.

91.     In order to bring about these changes, Kurz proposed that: (1) Naus no longer use the same office as the developers in the Olomouc office; (2) Naus discontinue directing technical

development of software falling under the purview of the CTO; and (3) the Company delay implementation of the React-based user interface in order for the members to address whether to change from React to another technology, which would complement the roadmap devised by Kurz.

92.    The other members of the Company refused to entertain or address any of Kurz's proposals and instead issued a document outlining a number of directives for Kurz's job performance and conduct. This document also contained a provision, that if Kurz failed to abide by each directive, he would be terminated and would become a silent partner without any further input in the Company and without any further payment.

93.    Kurz refused to sign the document. Naus, who had already consumed significant amounts of alcohol during this meeting, repeatedly cornered Kurz asking him why he cannot sign the document. Kurz stated that he did not want to answer. Naus replied: "Then let me formalize the reason for you: If you are made a silent partner without any payment, then you will sue us. Right?"  Kurz responded by saying that he does not plan for this, but he does not want to shut down this option for the future either. After Kurz's response, Nguyen, who had also consumed a significant amount of alcohol, ended the meeting, leaving the table with the words "Ok, that's it for me."  Naus left the meeting right after.

94.    During a subsequent conversation, Naus stated to Kurz that the reason that he and Kurz had each received a larger ownership interest in the Company than the other two members was because of the intellectual property they had each contributed.

95.    Kurz challenged Naus's assertion that he had contributed any intellectual property to the Company, at which point, Naus became angry and ceased communicating with Kurz.

96.     Naus then called for a virtual meeting on October 18, 2017.

97.     Naus, Husain and Nguyen voted in favor of removing Kurz as VP and CTO of the Company. The Board agreed that Kurz would keep his Google account associated with the Company as long as he is a member and that he would stay on for three months at full salary to aid in the transition.

98.     The Company has operated without a CTO or anyone in a comparable position since October 18, 2017.

*Improper Actions of Naus, Husain and Nguyen Resulted in the Revocation of the Company's License to Use, Market, License and/or Sell the Pre-LLC Software*

99.     On October 21, 2017, Naus called an emergency board meeting for the Company, to be held via video-conference.

100.     Kurz received only two hours' notice of the meeting and was unable to attend as a result.

101.     Upon information and belief, at this meeting, Naus, Husain and Nguyen voted in favor of removing Kurz as a member of the Board of the Company.  Upon information and belief, they also voted to cease the guaranteed payments to all initial members of the Company, including Kurz, to remove Kurz's access to the Company's Google account, including access to its books and records, and to remove the obligation that members devote at least 50% of their time to the Company.

102.     Kurz requested a meeting on October 27, 2017 to address the wrongful actions taken by the members at the previous meeting.

103.     Over Kurz's objections, Naus began video recording the meeting, which caused Kurz to cease his participation.

104.    Thereafter, Kurz offered not to revoke the Company's license to market versions of HKC's Pre-LLC Software.  In exchange, Kurz requested, *inter alia*, access to his customers and contacts using the software.

105.    None of the other members responded to Kurz's offer.

106.    As a result, on October 31, 2017, Kurz notified the Company that it could no longer use versions of HKC's Pre-LLC Software.

*The Company Created Unauthorized Derivative Software Based on the Pre-LLC Software and Transferred Ownership to a Third Party*

107.    Upon information and belief, in November 2017, Naus held a workshop with the developers in Olomouc, Czech Republic to create an alternate software to the Pre-LLC Software.

108.    Upon information and belief, the project was given the codename "Breeze" and was intended to replace HKC's Pre-LLC Software.

109.    Upon information and belief, the alternative software is an identical copy of the Pre-LLC Software, translated into a different computer language, that generates screen displays that are substantially similar to those displayed by the Pre-LLC Software.

110.    Upon information and belief, the developers translated HKC's Configurator Abstraction Layer ("CAL") software and called the translation the Universal Configurator Application ("UCA").

111.    Upon information and belief, they translated HKC's CAL Server and ConfigAir Server software and called the translation the UCA Server.

112.    Upon information and belief, they translated HKC's CAL User Interface software and called the translation the React User Interface.

113.    Upon information and belief, they translated the CAL Visualization software and called the translation the Big Picture.

114.    Upon information and belief, Naus transferred ownership of the copyright in the translated software to ConfigAir s.r.o., the Czech company owned by Naus and Ales Rastak without compensation.

115.    Further, upon information and belief, the transfer of copyright in the software to ConfigAir s.r.o. was intended to deprive Kurz of his right to control development and licensing of the HKC's Pre-LLC Software and software derived therefrom.

116.    Upon information and belief, ConfigAir s.r.o., in conjunction with the Company, is now poised to exploit Breeze, which contains copies of elements of HKC's Pre-LLC Software.

117.    Further, upon information and belief, the Company and ConfigAir s.r.o. intend to exploit Breeze to the exclusion of Kurz and to enter into direct competition with him and HKC, thereby subjecting the Company to liability for copyright infringement.

*Naus, Husain and Nguyen Interfered With Kurz's Business Prospects*

118.    Since the wrongful expulsion of Kurz, the Company has sent communications to Kurz's customers that, if they work with Kurz, ConfigAir may take legal action against them.  A true and correct copy of a letter sent by the Company's counsel to one of Kurz's customers is attached hereto as **Exhibit B** and incorporated by reference herein.

119.    The Company knew that these were Kurz's customers when it sent the communications.

120.    Upon information and belief, as a result of the communications, the recipients of the communications have refused to do business with Kurz.

*Naus, Husain and Nguyen Have Deprived Kurz of His Share of the Company's Profits and Have Refused to Provide Kurz Access to the Company's Books and Records*

121.   Upon information and belief, the Company continues to copy, distribute, publicly display, license and/or sell versions of the Pre-LLC Software and/or software derived therefrom without authorization from HKC.

122.   Upon information and belief, the Company continues to generate profit from the sale of the Pre-LLC Software and/or software derived therefrom, and otherwise.

123.   Despite owning a one-third interest in the Company, Kurz has not received his share of the Company's profits for the months of October 2017 to the present.

124.   Naus, Husain and Nguyen have failed to pay Kurz his salary in October, November and December 2017.

125.   Naus, Husain and Nguyen have failed to pay Kurz his guaranteed payments in the amount of $2,000 per month.

126.   Naus, Husain and Nguyen have refused to provide Kurz access to the Company's books and records, despite Kurz's written demands.

## Count I
## (Breach of Fiduciary Duty-Self-Dealing and Unauthorized Transfer of Assets Without Compensation)

127.   The paragraphs above are re-alleged as if fully set forth herein.

128.   The officers and members of the board of directors, as manager of the Company, owed a fiduciary duty to Kurz to "account to the company and to hold as trustee for it any property, profit or benefit derived by the [manager]: (A) in the conduct…of the company's activities and affairs; (B) from a use by the member of the company's property; or (C) from the appropriation of a company opportunity" and to refrain "from competing with the company in

the conduct of the company's activities and affairs…" Conn Gen. Stat. §§34-255h(b)(1), (2), (i)(1).

129.    The officers and members of the board of directors, as manager of the Company, breached this duty by transferring assets of the Company to a third-party, ConfigAir s.r.o., without compensation.

130.    Naus, an officer and member of the board of directors, manager of the Company, breached this duty by transferring assets of the Company to a third-party, ConfigAir s.r.o., in which Naus owned a 90% interest, without disclosing such self-interest to the other members, officers or members of the board of directors.

131.    Naus further breached this duty by failing to ensure that third-parties would not own copyright in software developed based on the Pre-LLC Software.

132.    As a result of this transfer, Kurz and the Company have been damaged by lost profits and opportunities usurped by Naus for his own purposes at the expense of the Company and its members, including Kurz.

133.    Naus has engaged, and is engaging, in wrongful conduct that has affected adversely and materially, and will affect adversely and materially, the Company's activities and affairs.

134.    Naus has committed willfully and persistently, and is committing willfully and persistently, a material breach of his fiduciary duties under Conn. Gen. Stat. § 34-255h.

135.    Naus has engaged, and is engaging, in conduct relating to the Company's activities and affairs, which makes it not reasonably practicable to carry on the activities and affairs with Naus as a member.

**Count II**
**(Breach of Fiduciary Duty-Preventing Kurz From Exercising Full and Sole Authority**
**Over Software Development)**

136.    The paragraphs above are re-alleged as if fully set forth herein.

137.    The officers and members of the board of directors, as manager of the Company, owed a fiduciary duty to Kurz to act in good faith and to exercise reasonable care in carrying out their obligations to, and directing the activities of, the Company.

138.    Naus, Husain and Nguyen, as officers and members of the board of directors, manager of the Company, failed to act in good faith or to exercise reasonable care and thus breached their fiduciary duties by allowing Naus to:

    (a) take on the role of "Scrum Master" – the supervisor for the developers—without Kurz's knowledge or permission in or about June 2017;

    (b) eliminate the two teams that Kurz had organized and tasked with development and establishing self-managed teams without Kurz's knowledge or permission in or about June 2017;

    (c)  permit development of a new user interface for software to be used by the Company using React without Kurz's knowledge or permission in or about June 2017;

    (d) conduct a one-week workshop in the Czech Republic for all developers (from both Olomouc and Prague) without Kurz's knowledge or permission in or about June 2017;

    (e) permit Milan Vojacek to lead the development of the new React-based user interface without Kurz's knowledge or permission in or about June 2017;

(f) effectively strip Kurz of all of the job functions of a CTO in or about June 2017;

(g) make demands on the developers that were impossible to achieve and failing to accommodate the developers' concerns that his demands were impossible starting in or about June 2017;

(h) regularly impose on the developers unrealistic deadlines that caused them to work exceedingly long hours and compromised the quality and reliability of the software code starting in or about June 2017;

(i) instruct Kurz not to direct the developers' activities any longer in or about September 2017; and

(j) cause long-time developers, Martin Mosko, Tom Rejhon, Lukas Vrajik, and Petr Marek, to quit in or about October 2017.

139.    Naus, Husain and Nguyen failed to act in good faith or to exercise reasonable care and thus breached their respective fiduciary duties by failing to restrain Naus from undertaking these actions or omissions..

140.    Naus, Husain and Nguyen also failed to act in good faith or to exercise reasonable care and thus breached their respective fiduciary duties by failing to engage a CTO qualified to oversee software development.

141.    Naus, Husain and Nguyen undertook these actions or omissions in bad faith and without exercising reasonable care.

142.    As a result of these actions, Kurz has been damaged by the loss of his sole and full authority for decision-making over the technical aspects of software development.

143.    As a result of these actions, Kurz and the Company have been damaged by lost profits of the Company and its members, including Kurz, which would have been generated from the proper development of the software.

**Count III**
**(Breach of Fiduciary Duties—Oppressive Actions Toward Minority Shareholder and Subjecting the Company to Liability for Copyright Infringement)**

144.    The paragraphs above are re-alleged as if fully set forth herein.

145.    Naus, Husain and Nguyen, as officers and members of the board of directors, as manager of the Company, owed a fiduciary duty to Kurz to act in good faith and to exercise reasonable care in carrying out their obligations to, and directing the activities of, the Company.

146.    Naus, Husain and Nguyen failed to act in good faith or to exercise reasonable care and thus breached their duties by:

(a)     failing to make guaranteed payments in the amount of $2,000 per month to Kurz;

(b)     removing Kurz's access to the Company's Google account, including access to its books and records; and

(c)     failing to avert the revocation of the Company's license to copy, publicly display, distribute, license and/or sell the Pre-LLC Software;

(d)     continuing to use, market, distribute, license and/or sell the Pre-LLC Software without authority; and

(e)     creating derivative works based on the Pre-LLC Software without authority.

147.     Naus, Husain and Nguyen undertook these actions or omissions in bad faith and without proper approval of the Manager or the members in order to oppress Kurz, a minority shareholder in the Company.

148.     As a result of these actions, Kurz and the Company have been damaged by lost profits of the Company and its members, including Kurz, which could have been generated from the Company's authorized use of the Pre-LLC Software.

149.     As a result of these actions, the Company has been damaged by subjecting it to liability for copyright infringement.

150.     Kurz has been damaged by the loss of guaranteed payments in the amount of $2,000 per month and the loss of access to the Company's books and records, despite being a one-third owner of the Company.

**Count IV**
**(Injunctive Relief-Tortious Interference)**

151.     The paragraphs above are re-alleged as if fully set forth herein.

152.     Since the institution of the present litigation, Naus, Husain and Nguyen, though their representatives, have sent communications to Kurz's customers claiming that, if they work with Kurz, ConfigAir may take legal action against them.

153.     The Third-Party Defendants knew that the recipients of the communications were customers or potential customers of Kurz.

154.     These claims have irreparably damaged Kurz's business and will cause further harm in the future, not adequately remedied by economic damages in the future.

155.     Therefore, Kurz is entitled to an order form this court prohibiting the Third-Party Defendants from communicating with Kurz's customers or potential customers indicating or in any way implying that Kurz does not have a right to do business with them.

## PRAYER FOR RELIEF

WHEREFORE, Kurz prays for judgment in his favor and against Naus, Husain and Nguyen as follows:

1.     Compensatory damages in an amount to be determined at trial;

2.     Punitive damages in an amount to be determined at trial;

3.     Dissolution of the Company, pursuant to Conn. Gen. Stat. § 34-267(a)(5);

4.     Appointment of Receiver, pursuant to Conn. Gen. Stat. § 52-504;

5.     Expulsion of Daniel Naus, pursuant to Conn. Gen. Stat. § 34-263a(5);

6.     Injunctive relief, the appointment of a receiver or custodian pendent lite with all powers and duties the Court directs, and any other action required to preserve the assets of the Company wherever located (i.e., the imposition of a constructive trust so as to prevent unjust enrichment);

7.     An accounting;

8.     An Order enjoining Defendants from communicating with Kurz's customers or potential customers indicating or in any way implying that Kurz does not have a right to do business with them;

9.     Reasonable fees and expenses of counsel and of any experts employed by Kurz;

10.     Costs; and

11.     Such other and further relief, at law and in equity, to which Kurz may show himself justly entitled.

Dated: October 2, 2018

Respectfully submitted,


By _/s/Jessica S. Rutherford___
Jessica S. Rutherford
ct27273
jrutherford@24iplg.com
Edmund J. Ferdinand, III
ct21287
jferdinand@24iplg.com
FERDINAND IP, LLC
1221 Post Road East, Suite 302
Westport, Connecticut 06880
Telephone: (203) 557-4224
Facsimile: (203) 905-6747

*Attorneys for Defendant/Counterclaimant/*
*Third-Party Plaintiff,*
*Henry Kurz, Individually and Derivatively*
*on Behalf of ConfigAir LLC*

## JURY DEMAND

Defendant/Counterclaimant/Third-Party Plantiff, Kurz, hereby demands a trial by jury of all issues so triable in this case.

Dated: October 2, 2018

Respectfully submitted,

By _/s/Jessica S. Rutherford____
Jessica S. Rutherford
ct27273
jrutherford@24iplg.com
Edmund J. Ferdinand, III
ct21287
jferdinand@24iplg.com
FERDINAND IP, LLC
1221 Post Road East, Suite 302
Westport, Connecticut 06880
Telephone: (203) 557-4224
Facsimile: (203) 905-6747

*Attorneys for Defendant/Counterclaimant/*
*Third-Party Plaintiff,*
*Henry Kurz*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 2, 2018, a copy of the foregoing Amended Third-Party Complaint was filed electronically.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

<u>/s/ Jessica S. Rutherford</u>
Jessica S. Rutherford
