## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CONFIGAIR LLC,                )

        )    3:17-cv-02026-JBA

    Plaintiff/Counterclaim Defendant,   )

        )    Judge Janet Bond Arterton

    v.                 )

        )

HENRY KURZ,            )

        )

    Defendant/Counterclaimant.     )

_____  )

HENRY KURZ,            )

        )

    Third-Party Plaintiff,       )

        )

    v.                 )

        )

DANIEL NAUS, NIZWER HUSAIN, and  )

DUNG NGUYEN,          )

        )

    Third-Party Defendants.      )

 

## REPLY MEMORANDUM IN FURTHER SUPPORT OF
## MOTION TO DISMISS AMENDED THIRD-PARTY COMPLAINT

Messrs. Daniel Naus, Nizwer Husain, and Dung Nguyen ("Defendants" or "Third Party Defendants") respectfully submit this Reply Memorandum in further support of their Motion to Dismiss ("Defs.' Mot.") [Dkt. 47] the ATPC ("ATPC") (Am. [Dkt. 45] filed by Henry Kurz ("Kurz").

## I.   INTRODUCTION

After reciting nearly every allegation in his ATPC, Kurz fails to address or even acknowledge the majority of Defendants' substantive arguments demonstrating that those allegations do not give rise to viable claims for breach of fiduciary duty or tortious interference. Kurz cannot escape his own self-defeating allegations with regard to Counts I, II, and III, which conclusively establish that he lacks standing to pursue any of his claims for breach of fiduciary duty, whether directly or derivatively on behalf of ConfigAir LLC ("ConfigAir" or the "Company"). Moreover, Kurz does not dispute that he fails to state a claim for breach of fiduciary duty based on "the loss of his sole and full authority for decision-making" with respect to the development of ConfigAir's Software (Count II) or based on his inability to access "the Company's Google account" (Count III). Furthermore, the Court can and should consider the terms of the Company's Operating Agreement and apply the business judgment rule, both of which insulate the Defendants from liability in connection with the alleged management decisions Kurz complains of in Counts II and III. Finally, Kurz cannot rescue his claim for tortious interference in Count IV by relying on "facts" that are not alleged in the ATPC. Accordingly, Defendants respectfully request that the Court dismiss the ATPC, with prejudice, in its entirety.

## II.  LEGAL ARGUMENT

Following an exhaustive and unnecessary recitation of the facts alleged in his ATPC, Kurz begins the argument on page 13 of his Opposition by misstating the legal standard applicable to Defs.' Mot.. (*See* Memorandum of Law in Opposition to Motion to Dismiss Third-Party Complaint ("Opp.") [Dkt. 51] p. 13). First, Kurz completely ignores the standard

applicable to Defendants' arguments under Federal Rule of Civil Procedure 12(b)(1) to dismiss Counts I, II, and III for lack of standing. Unlike a motion to dismiss for failure to state a claim, a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) challenges the court's statutory or constitutional authority to adjudicate the matter before it. *Schumann v. Schumann*, No. 3:11-cv-888 (WWE), 2012 WL 2016192, at *1 (D. Conn. June 5, 2012). "Once the question of jurisdiction is raised, the burden of establishing subject matter jurisdiction rests on the party asserting such jurisdiction." *Id.*; *accord Halo Tech Holdings, Inc. v. Cooper*, No. 3:07-cv-489 (AHN), 2008 WL 4080081 (D. Conn. Aug. 27, 2008) (party seeking relief has the burden of demonstrating that it is the proper party to invoke judicial resolution of the dispute).

Second, with regard to Defendants' separate arguments for dismissal under Fed. R. Civ. P. 12(b)(6), Kurz recites the 1950's, outdated standard, originally set forth in *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957) ("a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"). (Opp. pp. 13-14). However, this standard was abrogated by the Supreme Court more than a decade ago in *Bell Atlantic Corp. v. Twombly. See* 550 U.S. 544, 127 S. Ct. 1955, 1961, 167 L. Ed. 2d 929 (2007), syllabus ("The 'no set of facts' language has been questioned, criticized, and explained away long enough by courts and commentators, and is best forgotten as an incomplete, negative gloss on an accepted pleading standard.").  Under current applicable law, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face'" in order to survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim for relief is facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Conclusory allegations are insufficient to survive a motion to dismiss. *Id.* 678-79.  Applying the

appropriate standards, the Court should dismiss the ATPC, in its entirety, pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6).

### A. Kurz Lacks Standing to Maintain a Claim for Breach of Fiduciary.

The Court should dismiss Count I of the ATPC pursuant to Federal Rule of Civil Procedure 12(b)(1).  Kurz has failed to establish that he has standing to assert a direct claim or a derivative claim for breach of fiduciary duty based on the alleged transfer of Company assets.

#### 1. Kurz does not dispute that he lacks standing to pursue a direct claim.

The Defendants move to dismiss Count I of the ATPC on the ground that Kurz lacks standing to maintain a claim for breach of fiduciary duty in his individual capacity based on the alleged transfer of Company assets that resulted in harm to the Company as a whole. (Mot. pp. 7-10).  In his Opposition, Kurz does not address this argument, but rather, lumps together his three claims for breach of fiduciary duty and concludes (but does not plead) that "he has suffered actual injuries, separate and distinct from any injury suffered by ConfigAir." (Opp. p. 18).  However, none of the allegations that Kurz references in support of his argument relate in any way to the alleged transfer of Company assets at issue in Count I. Nor does Kurz attempt to distinguish or even acknowledge the case law cited by Defendants.  By declining to address Defendants' argument, Kurz concedes that he has not alleged any facts demonstrating that he sustained a direct injury, and as a result, he lacks standing to maintain a direct claim for breach of fiduciary duty. As such, the Court should dismiss Count I with prejudice.

### B. Kurz cannot pursue a derivative claim on behalf of ConfigAir.

Kurz concedes that he did not make a demand on the Company's manager before filing suit.  Equally, Kurz cannot escape the stringent pleading requirements for derivative claims under Connecticut law by asserting for the first time in his Opposition that the demand should be excused as futile. In order to state a derivative claim on behalf of a limited liability company, a pleading "must state with particularity: (1) The date and content of plaintiff's demand and the response by the managers or other members to the demand; or (2) why the demand should be

excused as futile." CONN. GEN. STAT. § 34-271c.  Unable to argue that his pleading contains the particulars of any pre-suit demand, Kurz claims that he "alleged that the demand should be excused as futile." (Opp. p. 17). The ATPC contains no such allegation. Kurz cannot cite to any paragraph in his pleading – much less a separate allegation supporting each purportedly derivative claim – in which he explains, with particularity, "why the demand should be excused as futile" with respect to each derivative count. *See* CONN. GEN. STAT. § 34-271c. Instead, Kurz argues that the allegations relating to his breach of fiduciary duty claims against the Third-Party Defendants *also* explain and justify his failure to make a pre-suit demand on the Company's manager. That, though, is not what the Uniform Limited Liability Act requires. If allegations of wrongdoing by management were sufficient to excuse a pre-suit demand, then the legislature would not have adopted the unambiguous requirement that a member asserting a derivative claim "state with particularity . . . why the demand should be excused as futile." *Id.* Kurz cites no authority for the proposition that a purported member of a limited liability company can satisfy the pleading requirements for a derivative action without so much as a reference to any contemplated demand on the company. Therefore, as more fully set forth in pages 10-11 of Defs.' Mot., the Court should dismiss Count I with prejudice because Kurz lacks standing to maintain a derivative claim for breach of fiduciary duty.

### C. Kurz Lacks Standing and Fails to State a Claim for Breach of Fiduciary Duty.

The Court should also dismiss Count II of the ATPC pursuant to Federal Rule of Civil Procedure 12(b)(1) because Kurz does not have standing to assert a direct claim or a derivative claim for breach of fiduciary duty based on the alleged mismanagement of the Company. Kurz does not dispute that his claim is likewise subject to dismissal to the extent that it is based on "the loss of his sole and full authority for decision-making" with respect to the development of ConfigAir's Software. Finally, the Court should also dismiss Count II under Federal Rule of

Civil Procedure 12(b)(6) because the alleged conduct is authorized by ConfigAir's Operating Agreement and protected by the business judgment rule.

### 1. Kurz lacks standing to pursue a direct claim.

As more fully set forth in pages 12-14 of Defs.' Mot., Kurz lacks standing to pursue a claim for breach of fiduciary duty in his individual capacity based on management decisions with which he did not agree and alleged harm suffered *by the Company* as a result. Kurz's insistence that "he was prevented and then prohibited from managing software development" falls far short of establishing a unique and distinct injury suffered by Kurz alone. (Opp. p. 13). Furthermore, Kurz makes no attempt to distinguish *Moore v. F.A. Investment Holdings*, in which this Court held that a shareholder's claim based on his own removal as a director belonged to the company, and not to the shareholder in his individual capacity. No. 3:10-cv-891 (VLB), 2012 WL 711473, at *11 (D. Conn. Mar. 5, 2012) ("The harm from having a less able and competent board of directors is an injury that belongs to the Corporation in general and therefore [plaintiff] did not suffer any unique or distinct injury as is necessary to bring a direct action."). Nor does Kurz cite any authority of his own to support his argument. Accordingly, the Court should dismiss Count II with prejudice.

### 2. Kurz concedes there is no viable claim for breach of fiduciary duty.

Kurz declines to address Defendants' argument that he cannot maintain a claim for breach of fiduciary duty by asserting that he was deprived of a right unrelated to his status as a member of the Company, thereby conceding that he fails to state a claim on that basis. As more fully set forth in pages 14-15 of Defs.' Mot., Kurz fails to allege that his self-proclaimed "sole and full authority for decision-making" with respect to the development of ConfigAir's Software is related in any way to his status as a member. Kurz ignores Defendants' legal authority for dismissal on that basis and again makes no attempt to distinguish *Moore*, in which this Court held that a plaintiff shareholder could not maintain a claim for breach of fiduciary duty based on

the loss of a privilege that was separate from plaintiff's rights as a shareholder. 2012 WL 711473, at *10-11.

### 3. Kurz cannot pursue a derivative claim.

As in Count I, Kurz cannot maintain a claim on behalf of the Company in Count II because his pleading does not satisfy the statutory requirements for derivative actions. CONN. GEN. STAT. § 34-271c. Given that Kurz did not make a pre-suit demand on the Company and that he fails to allege with particularity why the requisite demand should be excused as futile, the Court should dismiss Count II.

### 4. The Operating Agreement and business judgment rule are controlling.

In his Opposition, Kurz asks the Court to ignore the central contract governing the parties' relationship (Opp. p. 4) – a document that has been in the record since ConfigAir filed its original Complaint on December 5, 2017 and the authenticity of which is not in dispute.[1] As an initial matter, it is important to note that the foregoing reasons justifying dismissal of Count II do not require the Court to rely on the terms of the Operating Agreement.  Nevertheless, the Court can and should consider the Operating Agreement in light of the fact that Kurz's allegations regarding the governance of ConfigAir and his own role in the Company reference and incorporate the terms of the Operating Agreement.[2] Moreover, given that Kurz affirmatively alleges that he signed a joinder to the Operating Agreement, (Countercl. ¶ 19), and admits that the Operating Agreement attached to ConfigAir's Second Amended Complaint "speaks for itself" and "respectfully refers the Court to the document for a full statement of the terms thereof," (Answer ¶¶ 8, 13), his insistence that the Court should disregard the Operating Agreement for purposes of this Motion is disingenuous. And, when taking into account the unambiguous language of the Operating Agreement, it is clear that, among other things, Kurz did

---

[1] The Operating Agreement is also attached as Exhibit A to the Declaration of Rebecca Brazzano in support of Defs.' Mot. [Dkt. 47-4].
[2] For instance, Kurz alleges that when the Company was founded, "Kurz, Naus, Husain and Nguyen were the only members of the Company and the only members of the board of directors, which functioned as the company's 'manager.'" (ATPC ¶ 18). This is a direct reference section 1(a) of the Operating Agreement.

not have exclusive authority over the software development team and he was in a subordinate position to Naus, ConfigAir's President and CEO, who had the express authority to overrule Kurz on decisions relating to the Company's operations. In other words, the Operating Agreement permits ConfigAir's board to make the management decisions alleged in Kurz's ATPC, and they cannot serve as the basis for a claim for breach of fiduciary duty.  Apart from urging the Court to disregard the Operating Agreement, Kurz barely acknowledges Defendants' argument that the conduct alleged in Count II is protected by the business judgment rule. Kurz cites no authority to support his bare assertion that "in light of their self-dealing and bad faith, none of the Defendants' actions is [sic] protected by the business judgment rule." (Opp. p. 19). Although accepting the premise that Connecticut's business judgment rule applies to claims for breach of fiduciary duty in the management of limited liability companies, Kurz offers no support for his argument that conclusory allegations of "self-dealing and bad faith" are sufficient to remove Defendants' allegedly poor management decisions from the purview of the business judgment rule. As more fully set forth in pages 16-17 of Defs.' Mot., the Court should dismiss Count II with prejudice for failure to state a claim because the conduct alleged is permitted under the Operating Agreement and protected by the business judgment rule.

**D.  Kurz Lacks Standing and Fails to State a Claim for Breach of Fiduciary Duty.**

The Court should dismiss Count III of the ATPC pursuant to Federal Rule of Civil Procedure 12(b)(1) because Kurz does not have standing to assert a direct claim or a derivative claim for breach of fiduciary duty based on injuries allegedly suffered by the Company. Kurz does not dispute that his claim is likewise subject to dismissal to the extent that it is based on his inability to access "the Company's Google account." Finally, to the extent that Kurz's claim is based on the cessation of guaranteed monthly payments to the Company's members, the Court should also dismiss Count III because the alleged conduct is authorized by the Operating Agreement and protected by the business judgment rule.

### 1.   Kurz lacks standing to pursue a direct claim

As more fully set forth in pages 18-19 of Defs.' Mot., Kurz does not have standing to pursue a claim for breach of fiduciary duty in his individual capacity based on injuries allegedly suffered by the Company. In his Opposition, Kurz does not even attempt to articulate how ConfigAir's alleged lost profits and copyright liability relating to the use of its Software could possibly constitute direct injuries suffered by Kurz alone. (*See* ATPC ¶¶ 146(c)-(e), 148-149). Arguing that his allegations are sufficient to demonstrate a separate and distinct injury, Kurz complains that the Third Party Defendants "remove[d] him as Vice President, Chief Technology Officer, and a member of the board of directors." (Opp. p. 18).  However, his removal from those positions is not alleged as the basis for any of the claims asserted in the operative ATPC. And, as Defendants noted in their Motion, Kurz's claim that the Company's board "removed the obligation to pay the members guaranteed payments, thus depriving him of any salary or share of the profits in ConfigAir" (*id.*) does not represent an injury unique to Kurz because his own allegations establish that the board "voted to cease the guaranteed payments to *all* initial members of the Company." (ATPC ¶ 101) (emphasis added). Finally, Kurz's assertion that the Defendants "refused to provide him access to the Company's books and records" (Opp. p. 18) does not give him standing to maintain a direct claim based on the "lost profits of the Company," "liability for copyright infringement," or "loss of guaranteed payments" alleged in Count III. (ATPC ¶¶ 148-150). And, as more fully set forth below, Kurz's allegation that he is unable to access "the Company's Google account" fails to state a viable cause of action any event. Accordingly, the Court should dismiss Count III with prejudice.

### 2.   Kurz cannot pursue a derivative claim.

As in Counts I and II, Kurz cannot maintain a claim on behalf of the Company in Count III because his pleading does not satisfy the statutory requirements for derivative actions under Connecticut law. CONN. GEN. STAT. § 34-271c. Kurz neither alleges that he made a demand on ConfigAir nor explains, with particularity, why it would have been futile to make such a demand.

As a result, the Court should dismiss Count III to the extent it seeks to assert a derivative claim for breach of fiduciary duty because Kurz does not have standing to pursue such a claim.

**3.   Kurz does not dispute that he fails to state a claim for breach of fiduciary duty based on his inability to access the Company's Google account.**

Kurz also fails to address Defendants' argument that his allegations regarding "the Company's Google account" are insufficient to state a claim for breach of fiduciary duty. Instead, after arguing that the Court cannot consider the Operating Agreement in connection with this Motion, Kurz attempts to rely on the Operating Agreement in defense of his baseless claim.[3] (Opp. p. 19 fn. 2). The terms of the Operating Agreement, though, cannot rescue his claim for breach of fiduciary duty. After all, he does not assert a claim for breach of the Operating Agreement. Nor does he allege that he was denied access to the books and records of the Company after providing "reasonable notice to the Manager" of his request. (Operating Agreement, § 1(c)). As more fully set forth in pages 20-21 of Defs.' Mot., Kurz fails to allege any factual basis for his claim that Defendants breached their fiduciary duties by voting to remove Kurz's access to "the Company's Google account," and the Court should dismiss Count III with prejudice for this reason as well.

**4.   To the extent Kurz's claim is based on the cessation of guaranteed monthly payments to the Company's members, the alleged conduct is authorized by the Operating Agreement and protected by the business judgment rule.**

Just like Defendants' argument that Kurz fails to state a claim for breach of fiduciary duty in Count II based on decisions made by the Company's management, Kurz declines to substantively address Defendants' argument that the cessation of guaranteed monthly payments is expressly authorized by the Operating Agreement and protected by the business judgment rule. Kurz's argument that the Court should disregard the Operating Agreement is without merit and he cites no legal authority to support his claim that "none of the Defendants' actions is [sic] protected by the business judgment rule." (Opp. p. 19). As more fully set forth in pages 21-22 of

---

[3] Kurz should not be permitted to have it both ways and use the Operating Agreement as both a sword and a shield in his efforts to avoid dismissal of the Amended Third-Party Complaint.

the Defs.' Mot., the Operating Agreement expressly permits the cessation of guaranteed payments and such a decision falls squarely within the business judgment rule. As such, the Court should dismiss Count III with prejudice for failure to state a claim upon which relief can be granted to the extent that it is based upon the allegation that the board of directors voted to cease guaranteed monthly payments to the Company's members.

### E.  Kurz Fails to State a Claim for Tortious Interference (Count IV).

Defendants move to dismiss Count IV on the ground that Kurz fails to allege any facts demonstrating improper motive, improper means, or otherwise tortious conduct as required to state a claim for tortious interference under Connecticut law. *See Blake v. Levy*, 191 Conn. 257, 262, 464 A.2d 52 (Conn. 1983). In his pleading, Kurz alleges that "the Company has sent communications to Kurz's customers that, if they work with Kurz, ConfigAir may take legal action against them," (ATPC ¶ 118); that the Company "knew these were Kurz's customers when it sent the communications," (*id.* ¶ 119); and that "the recipients of the communications have refused to do business with Kurz." (*Id.* ¶ 120). Implicitly recognizing that these allegations alone are insufficient to state a claim for tortious interference, Kurz now asserts for the first time that Defendants "misrepresented the scope of the alleged non-compete, non-solicitation, and non-disclosure obligations and intimidated Kurz's customers." (Opp. p. 19). Kurz, though, cannot revive his claim for tortious interference with the brand new allegation that the Company's communications regarding its former executive "do not describe the limited scope of any alleged obligations." (*Id.*). The ATPC is devoid of any allegation that Kurz's non-competition, non-solicitation, and non-disclosure agreements were limited in scope, much less that the Company misrepresented the scope of those agreements in its alleged communications. Accordingly, as more fully set forth in pages 22-24 of Defs.' Mot., the Court should dismiss Count IV for failure to state a claim upon which relief can be granted.

## III. CONCLUSION

For the foregoing reasons, Third-Party Defendants Daniel Naus, Nizwer Husain, and Dung Nguyen respectfully request that the Court dismiss, with prejudice, all claims asserted in the ATPC.

Dated: November 28, 2018                    Respectfully submitted,

                                            /s/ Rebecca A. Brazzano
                                            Rebecca A. Brazzano (18443)
OF COUNSEL:                                 THOMPSON HINE LLP
                                            335 Madison Avenue
Anthony J. Hornbach                         12th Floor
THOMPSON HINE LLP                           New York, NY  10017-4611
312 Walnut Street, Suite 1400               Tel. (212) 344-3941
Cincinnati, OH  45202                       Fax (212) 344-6101
Tel. (513) 352-6721                         Email: Rebecca.Brazzano@ThompsonHine.com
Fax  (513) 241-4771
Email: Tony.Hornbach@ThompsonHine.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 28th day of November, 2018, a true copy of the foregoing REPLY IN FURTHER SUPPORT OF MOTION TO DISMISS AMENDED THIRD-PARTY COMPLAINT was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ Rebecca A. Brazzano
Rebecca A. Brazzano

Schumann v. Schumann, Not Reported in F.Supp.2d (2012)
2012 WL 2016192
Case 3:17-cv-02026-JBA    Document 55    Filed 11/28/18    Page 14 of 34

KeyCite Yellow Flag - Negative Treatment
Distinguished by Sojitz America Capital Corp. v. Keystone Equipment
Finance Corp., D.Conn., January 26, 2015

2012 WL 2016192
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

David D. SCHUMANN, Keith W.
Schumann, and Heidi Schumann, Plaintiffs,
v.
Douglas D. SCHUMANN and
P–Q Controls, Defendants.

No. 3:11cv888 (WWE).
|
June 5, 2012.

**Attorneys and Law Firms**

James E. Miller, Karen Leser Grenon, Laurie Rubinow,
Patrick A. Klingman, Shepherd, Finkelman, Miller &
Shah, LLP, Chester, CT, Miranda P. Kolbe, Robert C.
Schubert, Willem F. Jonckheer, Schubert, Jonckheer &
Kolbe, LLP, San Francisco, CA, for Plaintiffs.

Andrew M. Zeitlin, Shipman & Goodwin, Stamford, CT,
David A. Ball, Cohen & Wolf, P.C., Bridgeport, CT, for
Defendants.

*MEMORANDUM OF DECISION
ON PENDING MOTIONS*

WARREN W. EGINTON, Senior District Judge.

**\*1** In this action, plaintiffs David D. Schumann, Keith
W. Schumann and Heidi Schumann allege that defendant
Douglas D. Schumann has abused his position as
President, Chairman of the Board of Directors ("Board")
and majority shareholder of P–Q Controls, Inc. ("P–Q")
by engaging in unauthorized, self-dealing transactions
with defendant P–Q.

Plaintiffs allege claims of fraud and breach of
fiduciary duty against defendant Schumann, and request
appointment of a receiver and judicial dissolution of P–
Q pursuant to Connecticut General Statutes § 33–896.
Defendants have filed a motion to dismiss and a motion
to purchase shares.

For the following reasons, the motion to dismiss will be
granted in part and denied in part. The motion to purchase
shares will be granted because the Court will order that
defendant P–Q may exercise its statutory right to elect to
purchase shares pursuant to Connecticut General Statutes
§ 33–900.

**BACKGROUND**

Plaintiffs allege the following facts that are taken to be true
for purposes of ruling on this motion.

Plaintiffs are minority shareholders of P–Q. Commencing
in January 2001, defendants Schuman and P–Q have
engaged in unauthorized and self-dealing transactions,
including P–Q's payment of $32 million in salary to
defendant Schumann for his role as President; P–Q's
payment of $3.5 million to defendant Schumann for loans
made by defendant Schumann to P–Q; P–Q's payment
of $4.4 million to defendant Schumann for the lease
of property used as P–Q's headquarters; payment of
approximately $3.5 million to Exec–Jet, Inc., an entity
wholly owned by defendant Schumann, for the lease of
airplanes; and a series of transactions between P–Q and
P–Q Maine, Inc., an entity wholly owned by defendant
Schumann.

Between 2001 and 2008, no board meetings or shareholder
meetings were held for approval of transactions as
required by state law, Connecticut General Statutes §§ 33–
783 and 33–784.

On May 7, 2009, defendant Schumann sent plaintiffs
notice of the annual meeting of shareholders to be held
on May 22, 2009. He attached to the notice proposed
amendments to P–Q's bylaws. Such meeting had not been
held in more than ten years.

On May 22, defendant Schumann convened a meeting of
P–Q's shareholders to adopt amended bylaws. Defendant
Schumann, who was the only shareholder in attendance,
voted to adopt the Amended Bylaws, which then
permitted him to elect himself to serve as the single
Director.

Plaintiffs have not received any distributions from P–Q since the third quarter of 2008. Plaintiffs have not received any financial statements from P–Q for either 2009 or 2010.

## DISCUSSION

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) "challenges the court's statutory or constitutional power to adjudicate the case before it." 2A James W. Moore et. al., Moore's Federal Practice, ¶ 12.07, at 12–49 (2d ed.1994). Once the question of jurisdiction is raised, the burden of establishing subject matter jurisdiction rests on the party asserting such jurisdiction. *See Thomson v. Gaskill,* 315 U.S. 442, 446 (1942).

**\*2** The function of a motion to dismiss under FRCP 12(b)(6) is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Ryder Energy Distrib. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984). When deciding a motion to dismiss for failure to state a claim, the Court must accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the pleader. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984). The complaint must contain the grounds upon which the claim rests through factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556 (2007).

*Standing*

Defendants assert that plaintiffs lack standing to bring their claims directly rather than derivatively against defendants. Plaintiffs counter that they have been injured as individuals separate from the corporation and therefore have a direct cause of action.

To establish standing, plaintiffs must allege that (1) they have suffered an injury in fact, (2) which is fairly traceable to the challenged action of defendants, and (3) which is likely to be redressed by the requested relief. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992).

*Fraud and Breach of Fiduciary Duty*

The Connecticut Supreme Court has explained that, in most instances, individual stockholders cannot sue corporate officers at law on the basis of corporate mismanagement that has rendered their stock of less value. *Yanow v. Teal Industries, Inc.,* 178 Conn. 262, 281–82 (1979). The injury is generally not to the shareholder individually, but to the corporation and to the shareholders collectively who have the right to sue derivatively on behalf of the corporation alleged to be injured. *May v. Coffey,* 291 Conn. 106, 114 (2009). "[A] claim of injury, the basis of which is a wrong to the corporation, must be brought in a derivative suit, with the plaintiff proceeding secondarily, deriving his rights from the corporation which is alleged to have been wronged." *Fink v. Golenbock,* 238 Conn. 183, 200 (1996). According to Connecticut statutory law, "[w]henever any corporation or any unincorporated association fails to enforce a right which may properly be asserted by it, a derivative action may be brought by one or more shareholders or members to enforce the right, provided the shareholder or member was a shareholder or member at the time of the transaction of which he complained or his membership thereafter devolved on him by operation of law." Conn. Gen.Stat. § 52–572j(a).

"[I]f the injury is one to the plaintiff as a stockholder, and to him individually, and not to the corporation, as where an alleged fraud perpetrated by the corporation has affected the plaintiff directly, the cause of action is personal and individual." *Yanow,* 178 Conn. at 282. In *Yanow,* the plaintiff had a separate and distinct injury because he had alleged that the corporate officer's fraudulent conduct had depressed the value of his stock shares so that the shares could be purchased for less than fair market value. *Id.* at 267 ("these causes of action are based upon alleged unlawful acts relating soley to the stock owned by the plaintiff...."). Nevertheless, even a sole shareholder does not have standing to allege wrongs to the corporation. *Smith v. Snyder,* 267 Conn. 456, 461 (2004).

**\*3** In this instance, plaintiffs have alleged that defendants' self-dealing and mismanagement has caused P–Q to underperform and earn substantially less income. Plaintiffs complain that they have not received any distributions since 2008. However, in the counts of fraud and breach of fiduciary duty, the harms asserted—corporate fraud, looting and mismanagement—represent damage sustained by the corporation. Plaintiffs have not asserted any injuries that are separate and distinct from that suffered by the corporation or where the remedy should belong to the shareholders rather than to the

Case 3:17-cv-02026-JBA   Document 55   Filed 11/28/18   Page 16 of 34

corporation. *See Fink,* 238 Conn. at 201. Accordingly, as to the first two counts, the Court will grant the motion to dismiss for lack of standing but will permit plaintiffs to amend the complaint.

*Receivership and Dissolution*
Plaintiffs maintain that the claim for receivership and dissolution may be brought directly pursuant to the plain language of Connecticut General Statutes § 33–896(a)(1), which provides for dissolution by a superior court:

> In a proceeding by a shareholder if it is established that: (A)(i) The directors are deadlocked in the management of the corporate affairs, (ii) the shareholders are unable to break the deadlock, and (iii) irreparable injury to the corporation is threatened or being suffered or the business and affairs of the corporation can no longer be conducted to the advantage of the shareholders generally, because of the deadlock; (B) the directors or those in control of the corporation have acted, are acting or will act in a manner that is illegal, oppressive or fraudulent; (C) the shareholders are deadlocked in voting power and have failed, for a period that includes at least two consecutive annual meeting dates, to elect successors to directors whose terms have expired; or (D) the corporate assets are being misapplied or wasted.

Plaintiffs argue that the reference to a proceeding by a "shareholder" contemplates a direct rather than derivative cause of action for dissolution and receivership. In construing a state statute, the court should "presume that laws are enacted in view of existing relevant statutes." *State v. John F.M.,* 285 Conn. 528, 546 (2008). The Court should not consider extratextual evidence if the meaning of the statute is plain and unambiguous after examination of the text and its relationship to relevant statutes. Conn. Gen.Stat. § 1–2z.

Defendants point out that the words "a shareholder" is also used in Connecticut's statute devoted to the standards for derivative action standing, Connecticut General Statutes § 33–721. However, Section 33–896 is silent as to the type of action that may be brought to pursue a judicial dissolution.

State superior courts have noted that the legislature sought to protect shareholders of closely held corporations when it enacted Section 33–896. *Johnson v. Gibbs Wire & Steel Co., Inc.,* 2010 WL 4276768 (Conn.Sup.Ct.2010). The stock of closely held corporations is generally not readily salable and a minority shareholder "at odds with management policies may be without either a voice in protecting his or her interests or any reasonable means of withdrawing his or her investment." *Matter of Kemp and Beatley, Inc.,* 64 N.Y.2d 63, 72–73 (1984).

**\*4** However, the Connecticut legislature has enacted a statutory scheme that gives a voice to that minority shareholder, who can file for appointment of receiver and dissolution when faced with corporate mismanagement. After filing a petition for dissolution, the corporation may purchase for the fair market value the shares of the "petitioning shareholder's shares, and if the corporation declines, the remaining shareholders may purchase such shares. Conn. Gen.Stat. § 33–900. Further, after a hearing upon the shareholder's petition for dissolution, the court may appoint a custodian to manage the corporation or a receiver to wind-up and liquidate the corporation. Conn. Gen.Stat. § 33–898. Accordingly, Section 33–896 and the related statutes provide a remedy for a shareholder oppressed by corporate malfeasance. The Court will allow plaintiffs to proceed with their direct action for appointment of receiver and dissolution against defendants.

*Motion to Purchase Shares*
Defendant P–Q requests that the Court grant permission for it to buy out the plaintiffs' shares pursuant to Connecticut General Statute § 33–900(b). Although P–Q seeks to file this election beyond the ninety days provided by Section 33–900, the statute provides that the Court may in its discretion allow such action at a later time. The Court finds that good cause exists for allowing defendant to pursue a buy-out of the plaintiffs' shares. The buyout will eliminate the need for a judicial dissolution as sought by plaintiffs and therefore allow P–Q to remain

in business. Further, the purchase of plaintiffs' shares will allow for plaintiffs to receive their financial interest in P–Q. The Court will also stay the proceedings related to the plaintiffs' motions for preliminary relief so that a fair valuation of plaintiffs' shares may proceed.

## CONCLUSION

For the foregoing reasons, the motion to dismiss [doc. # 33] is GRANTED without prejudice as to the counts for fraud and breach of fiduciary duty, and is DENIED as to count three for appointment of a receiver and dissolution.

Defendants' motion to purchase shares is GRANTED [doc. # 76], and the Court STAYS all proceedings related to plaintiffs' motions for preliminary relief.

Consistent with this ruling, plaintiffs may replead counts one and two within fifteen days of this ruling's filing date, and defendant P–Q should commence the process of electing to purchase plaintiffs' shares within ten days of this ruling's filing date.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2016192

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4080081
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

HALO TECH HOLDINGS, INC.,
v.
Randall COOPER, et al.

Civ. No. 3:07–CV–489(AHN).
|
Aug. 29, 2008.

**Attorneys and Law Firms**

David M. Wallman, Wallman Law Firm, Stamford, CT, for Plaintiff.

Brenda M. Hamilton, George C. Springer, Jr., Patrick M. Birney, Thelen Reid Brown Raysman & Steiner LLP, Hartford, CT, Michael Weinstock, Richard J. Capriola, Weinstock & Scavo, P.C., Atlanta, GA, Frederick S. Gold, Laurie Ann Sullivan, Shipman & Goodwin, Stamford, CT, Pearson N. Bownas, Jones Day, Cleveland, OH, for Defendants.

*RULING ON DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT*

ALAN H. NEVAS, District Judge.

**\*1** The plaintiff, Halo Tech Holdings, Inc. ("Halo"), brings this action against an investment bank, venture capitalists, and the management team of its former wholly-owned subsidiary, alleging that they conspired to force Halo to sell its shares in the subsidiary at a discounted price. Now pending before the court is a motion to dismiss the second amended complaint by the venture capitalists—Primus Venture Partners, Inc., Primus Capital Fund V LP, LLC, Primus Venture Partners V, LLC, Jonathan E. Dick, Phillip C. Molner, and Primus Venture Partners (collectively "the Primus defendants"). The Primus defendants claim that Halo lacks standing to bring the claims against them in the second amended complaint. For the reasons given below, the court agrees and grants the Primus defendants' motion to dismiss.

*FACTS AND PROCEDURAL BACKGROUND*

The court assumes the parties' familiarity with the facts and procedural history of this case and only relates those facts necessary to address the arguments raised by the Primus defendants. In addition, because this is a motion to dismiss, the court construes the facts and all reasonable inferences therefrom in favor of the non-moving party, Halo.

Halo acquires, manages, and sells software companies. In 2006, Halo acquired all of the shares of Empagio, Inc. Thereafter, Halo combined Empagio, Inc. with two other companies it also had acquired, and formed a new company, also called Empagio, Inc. ("Empagio"). Halo became the sole shareholder of the new Empagio. In addition, Halo tapped the management team of Empagio, Inc., Randall Cooper ("Cooper"), Steven Payne, Steven Garrett ("Garrett"), and Lynne Fraas (collectively "the Cooper Group"), to manage the new Empagio.

In acquiring Empagio and the other two companies, Halo incurred debt of approximately $20 million. As a condition of the loan, Halo was required to make two payments in the first quarter of 2007, totaling $1.5 million. If Halo defaulted on either payment, the entire $20 million debt would be accelerated and fees and penalties would be imposed.

Shortly after forming Empagio in 2006, Halo considered selling the company. Halo anticipated that the sale price of the reconstituted company would cover the $20 million debt and also yield a substantial profit.

The Cooper Group did not want Empagio to be sold to a third party and instead wanted to purchase it for themselves. To that end, they hired investment bankers, Croft & Bender ("C & B"), and secured financing through the Primus defendants.

At some point, all the defendants—the Cooper Group, C & B, and the Primus defendants—conspired to force Halo to sell Empagio for the cheapest price possible. In furtherance of that conspiracy, some or all of the defendants chased away potential buyers by telling them that Cooper had a right of first refusal to purchase Empagio, that Cooper intended to exercise that right, and that if Halo sold Empagio to anyone other than

the Cooper Group, some of Empagio's clients would not renew their licensing agreements with the company.

**\*2** In January 2007, after the defendants had succeeded in driving away other potential buyers, the Cooper Group sent Halo a "Letter of Intent," outlining a proposed agreement between the Cooper Group and Halo to purchase Empagio for up to $17 million, much less than Halo's anticipated sales price. The letter provided for a six-week period during which the defendants could conduct due diligence on Empagio and Halo had to refrained from negotiating with other buyers. The letter further indicated that the Primus defendants had agreed to finance most of the Cooper Group's purchase of Empagio.

Because of the lack of interest from other buyers in purchasing Empagio, Halo agreed to the terms of the Letter of Intent. Halo was not aware of the extent to which the defendants had dissuaded other potential buyers.

Having induced Halo to enter into the Letter of Intent, the defendants took other actions to drive down the purchase price of Halo. In particular, because Halo derived all of its operating income from a "sweep" of excess cash from its subsidiaries' bank accounts, including Empagio, the Primus defendants and the Cooper group jointly planned and instructed lower-level employees of Empagio to delay invoicing certain Empagio clients, including Burlington Northern, and to change the payment terms of other clients, such as Northeast Utilities.

The intended and actual effect of this conduct was twofold. First, because the defendants delayed Empagio's receipt of revenues, Halo received less cash from its "sweep" of Empagio's accounts. By reducing the cash that Empagio could sweep from its account to Halo, the defendants intended to make it difficult for Halo to pay its lender so that Halo would be more inclined to accept an undervalued offer for Empagio. Second, because the negotiated purchase price in the Letter of Intent included an upward adjustment for the value of Empagio's accounts receivable, the defendants could reduce the purchase price of Empagio and divert the deferred revenues to themselves.

At the end of the exclusivity period, the defendants offered Halo $2.5 million less for Empagio than the amount stated in the Letter of Intent. Halo rejected that offer and sought other buyers. But as a result of the reduced cash flow it received from Empagio, Halo defaulted on the two payments required by its lender during the first quarter of 2007, and the lender accelerated the note and imposed penalties and fees. Ultimately, because of increasing financial pressure from its lender, Halo sold Empagio for $16 million in May 2007 to another buyer. Thereafter, Halo filed for bankruptcy.

Halo then brought this action, claiming: (1) unfair trade practices, in violation of Conn. Gen.Stat. §§ 42–110a *et seq.* ("CUTPA") against Cooper, Garrett, and the Primus defendants; (2) breach of fiduciary duty against Cooper and Garrett; and (3) civil conspiracy against Cooper, Garrett, and the Primus defendants. [1]

The Primus defendants now move to dismiss the second amended complaint under Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction on the ground that Halo lacks standing to bring these claims against them. [2]

*STANDARD*

**\*3** "[S]tanding imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III. This is the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In particular, the court's subject-matter jurisdiction for lack of standing "can be called into question either by challenging the sufficiency of the allegation or by challenging the accuracy of the jurisdictional facts alleged." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 68, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) (Scalia, J., concurring in part and concurring in the judgment) (emphasis omitted). If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, as the Primus defendants do here, "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." [3] *Robinson v. Malaysia,* 269 F.3d 133, 140 (2d Cir.2001) (internal citations and quotation marks omitted). Halo, as the one seeking relief, has the burden "to allege facts demonstrating that [it] is the proper party to invoke judicial resolution of the dispute." *Thompson v. Cty. of Franklin,* 15 F.3d 245, 249 (2d Cir.1994).

## DISCUSSION

The Primus defendants argue that Halo has asserted claims for injuries that are derivative of injuries suffered by Empagio, and therefore, under well-known rules of shareholder standing, Halo would have standing to bring a derivative action, that is, an action to recover damages on behalf of Empagio, but does not have standing to bring a direct action to recover on its own behalf. Because Halo has brought this case as a direct action, the Primus defendants contend that Halo's claims should be dismissed for lack of standing. Halo, however, argues that it suffered separate and distinct injuries apart from those suffered by Empagio and that its direct injuries give rise to individual standing. The court agrees with the Primus defendants that Halo has not alleged a separate and distinct injury giving rise to direct standing to recover for the wrongs done to it individually.

A shareholder has standing to bring a derivative action against a third party to redress wrongs suffered by the corporation. *Smith v. Snyder,* 267 Conn. 456, 461–462, 839 A.2d 589 (2004). Any recovery in a derivative action is returned to the corporation, for the benefit of all shareholders. *Id.* Generally, however, an individual shareholder "cannot pursue a [direct] cause of action [and recover individually] against third parties for wrongs or injuries to a corporation in which he or she holds stock, even if the stockholder suffers a harm that flows from the injury to the corporation, such as a reduction in the value of his or her stock." *Peterson v. Parillo,* No. CV030477220S, 2005 WL 3663125, at *1 (Conn.Super.Dec.8, 2005); *accord Smith,* 267 Conn. at 461–62, 839 A.2d 589 ("It is commonly understood that '[a] shareholder—even the sole shareholder—does not have standing to assert [direct] claims alleging wrongs to the corporation.' ") quoting *Jones v. Niagara Frontier Trans. Auth.,* 836 F.2d 731, 736 (2d Cir.1987)). [4]

*4  In some instances, however, a shareholder may have standing to bring a direct action and recover individually, not on behalf of the corporation. In order to have standing for a direct action, a shareholder must "sustain[ ] a loss separate and distinct from that of the corporation, or from that of other shareholders...." *Yanow v. Teal Indus., Inc.,* 179 Conn. 262, 282 (1979). In other words, the shareholder "must demonstrate that the duty breached was owed to the [shareholder] and that he or she can prevail without showing an injury to the corporation." *Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* 845 A.2d 1031, 1039 (Del.2004). If a shareholder cannot demonstrate a "separate and distinct" injury, then a shareholder does not have standing "to seek redress in a personal capacity for the wrong done to him individually." *Yanow,* 179 Conn. at 282, 426 A.2d 271.

Here, Halo seeks damages caused by the defendants' conspiracy to self-deal and mismanage Empagio in order to drive down the purchase price of Empagio. Halo's claimed injuries include lost revenue from Empagio because of the defendants' interference with Empagio's "business expectations" during the first quarter of 2007, "a loss of substantial opportunity to realize a profit in [Halo's] acquisition and subsequent sale of Empagio and its constituent companies," fees and penalties charged by Halo's lender after Halo defaulted on its debt, and the "enterprise value" of Halo, which filed for bankruptcy after it defaulted on its debt. (2d Am.Compl.¶¶ 48, 64, 66–67.)

These injuries, however, all flow from the defendants' mismanagement of Empagio for their own benefit. For instance, when the defendants re-negotiated the payment terms with Empagio customers, Empagio received less revenue during the first quarter of 2007. With less revenue flowing into Empagio, there was less revenue to "sweep" to Halo. Thus, Halo's Empagio shares produced less revenue than Halo anticipated. As a result, Halo could not make the $1.5 million payments to its lender, and the lender accelerated the $20 million loan and imposed fees and penalties. Further, the defendants' mismanagement and self-dealing caused Halo to receive less revenue when it sold its shares of Empagio to a third party. This ultimately caused Halo to file for bankruptcy.

In short, the defendants' interference with Empagio's revenues set off a domino reaction—one injury causing another, and so on. But this does not mean that the defendants' self-dealing and mismanagement vis-à-vis Empagio directly injured Halo or, put another way, that Halo's injuries are separate and distinct from Empagio's injuries. *See Smith,* 267 Conn. at 461–462, 839 A.2d 589. Indeed, Halo could not prevail without also showing an injury to Empagio, a prerequisite to demonstrating a direct injury. *See Tooley,* 845 A.2d at 1039. For this reason, Halo's injuries are derivative of Empagio's

Case 3:17-cv-02026-JBA Document 55 Filed 11/28/18 Page 21 of 34

injuries, and as such, Halo would only have standing to bring a derivative action on behalf of Empagio. Halo's injuries do not confer standing to bring a direct action to recover individually for harm that was indirectly caused by wrongs inflicted on Empagio, as it seeks to do here. *See, e.g., May v. Coffey,* No. X10UWYCV065001410S, 2007 WL 1121748, at *6 (Conn.Super.Mar.30, 2007) ("Generally, individual stockholders cannot sue the officers at law for damages on the theory that they are entitled to damages because mismanagement has rendered their stock of less value, since the injury is generally not to the stockholder individually, but to the corporation—to the shareholders collectively."); *accord Kramer v. Western Pac. Indus., Inc.,* 546 A.2d 348, 353 (Del.1988) ("Delaware courts have long recognized that actions charging mismanagement which depresses the value of stock allege a wrong to the corporation; i.e., the stockholders collectively, to be enforced by a derivative action." (quotations and alterations omitted)).

**\*5** Indeed, this situation is analogous to one the Second Circuit faced in *In re Ionosphere Clubs, Inc. (Sobchack v. American Nat'l Bank & Trust Co.),* 17 F.3d 600, 604–07 (2d Cir.1994), where preferred shareholders alleged that a third party took actions that devalued the assets of a corporation to such an extent that the corporation no longer had enough money to pay the preferred shareholders a dividend. The Second Circuit held that the corporation's loss of assets, which resulted in the loss of the shareholders' dividend, "was not inflicted [on the shareholders] 'directly' or 'independently of the corporation.' " *Id.* Rather, the alleged depletion of assets was inflicted only on the corporation, and the nonpayment of the dividend suffered by the shareholders "occurred only as an indirect consequence of those wrongs against" the corporation. *Id.* at 606–07. Therefore, the Second Circuit concluded that the preferred shareholders' allegations did not give rise to a direct action because "the injury to the preferred shareholders' contractual rights to receive a dividend ... was not inflicted directly or independently of the corporation but occurred as an indirect consequence of the diversion of assets from the corporation to other entities." *Id.* at 606; *see also Manson v. Stacescu,* 11 F.3d 1127, 1131 (2d Cir.1993) (holding that a fifty-percent shareholder lacked standing to pursue a direct action where the shareholder claimed that, by looting the company, the defendants violated their fiduciary duties to the shareholder because the

shareholder did not sustain an injury that was separate and distinct from the injury sustained by the corporation.)

Halo's injuries are no different from the injuries suffered by the preferred shareholders in *Ionosphere Clubs, Inc.* Like those shareholders, Halo's claims are against third parties for self-dealing and the mismanagement of Empagio, which caused a decrease in Empagio's revenue and the value of its shares. And just as with those shareholders, Halo's injuries were "not inflicted directly or independently of [Empagio] but occurred as an indirect consequence of the diversion of assets from [Empagio]...." *Id.* Therefore, like the preferred shareholders in *Ionosphere,* Halo lacks standing to bring a direct action against the third parties who allegedly injured the corporation Halo owned.

This is true even though Halo was the sole shareholder of Empagio and thus the only shareholder injured by the defendants' misconduct because Connecticut law does not make an exception to shareholder standing rules for closely-held corporations. For example, in *Fink v. Golenbock,* the Connecticut Supreme Court rejected the argument that any injury to a shareholder in a closely-held corporation would necessarily give rise to a direct action by the plaintiff-shareholder. 238 Conn. 183, 202–03, 680 A.2d 1243 (1996). Indeed, the Connecticut Supreme Court has made it clear that shareholder standing rules apply even where a single shareholder holds all the shares. *Smith,* 267 Conn. at 461–62, 839 A.2d 589 ("It is commonly understood that a shareholder-even the sole shareholder —does not have standing to assert [direct] claims alleging wrongs to the corporation.") (alternations and internal quotation marks omitted).

**\*6** While Halo makes two arguments in support of standing, neither argument has merit. First, Halo claims that it had a contract with the Cooper Group to receive the "swept" revenues, independent of its ownership of Empagio's shares, and thus has standing to recover for injuries caused by the Primus defendants' interference with that separate contract. The court, however, cannot consider this claim because the second amended complaint does not allege the existence of any such separate contract between Halo and the Cooper Group regarding the "swept" revenues. Moreover, the court cannot reasonably infer that Halo had a right to Empagio's revenues except through its ownership of Empagio's shares because it is a "fundamental principle of corporate law that the parent

corporation and its subsidiary are treated as separate and distinct legal persons," *SFA Folio Collections, Inc. v. Bannon,* 217 Conn. 220, 232, 585 A.2d 666 (1991), and it is a general rule of corporate law that a shareholder does not have a right to the corporation's revenues until they are distributed by the corporation. As the Connecticut Supreme Court has stated:

> It is well settled in this state that a corporation ... own[s] the undivided earnings of the business, rather than the stockholders ... [and] that the latter cannot become the separate owners of any part of the common property until set apart by the management for that purpose, by declaring a dividend or otherwise....

*Spooner v. Phillips,* 62 Conn. 62, 24 A. 524, 526 (Conn.1892). Thus, the only reasonable inference from the allegations in the second amended complaint is that Halo had no right to Empagio's revenues until they were set aside by Empagio to be "swept" to Halo as a dividend.

Second, Halo contends that it has standing to sue the Primus defendants, not because of its status as an Empagio shareholder, but because it had a contract to sell Empagio to the defendants. But Halo does not even allege the existence of any contractual relationship between it and the Primus defendants. Indeed, the second amended complaint alleges that Halo entered into the Letter of Intent with the Cooper Group, not the Primus defendants. And even so, the second amended complaint does not assert any claim that the Cooper Group breached that contract. To the contrary, the whole thrust of Halo's second amended complaint is that the Primus defendants conspired with the Cooper Group to breach the Cooper Group's fiduciary duties to Halo, the sole shareholder of Empagio. For example, Halo alleges that, in violating CUTPA, the defendants "entered into a conspiracy to wrongfully divert and impede Empagio's cash flow, misappropriate corporate opportunities and expectancies belonging to Empagio and Halo, and tortiously interfere with Empagio's contractual relationships with its client[s] to the detriment of Halo *as its sole shareholder.*" (Am.

Compl. ¶¶ 49 (emphasis added), 67 (alleging that the defendants "conspired to unlawfully and tortiously interfere with Empagio's contractual relationships with its clients and Halo's lender, and to tortiously impede Halo's cash flow by interrupting Empagio's business operations in order to reduce Empagio's cash flow, *by engaging in fiduciary misconduct* ...") (emphasis added).) These allegations are based on Halo's status as an Empagio shareholder, not on any contract between the parties, and therefore, the court cannot find that Halo has standing to pursue claims against the Primus defendants based on a contract for the sale of Empagio. [5]

**\*7** Accordingly, the court finds that Halo does not have standing to bring a direct action and recover individually against the Primus defendants. While Halo may have been able to bring a derivative action on behalf of Empagio, it cannot do so now because it sold all its Empagio shares to a third party. Once a shareholder disposes of his shares, he loses standing to bring a derivative action. *Guarnieri v. Guarnieri,* 104 Conn.App. 810, 821, 936 A.2d 254 (2007) ("No longer a shareholder in the corporation, the defendant cannot maintain a derivative action on its behalf.") Therefore, Halo lacks standing to pursue the civil conspiracy and CUTPA claims against the Primus defendants, and therefore, those claims must be dismissed. [6]

*CONCLUSION*

For the foregoing reasons, the court GRANTS the motion to dismiss the second amended complaint [doc. # 117] by Primus Venture Partners, Inc., Primus Capital Fund LP, LLC, Primus Venture Partners V, LLC, Jonathan E. Dick, Phillip C. Molner, and Primus Venture Partners and DISMISSES the second amended complaint without prejudice.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4080081

Footnotes

2008 WL 4080081

1    In the second amended complaint, Halo alleges that the other members of the Cooper Group and C & B were involved in the conspiracy, but Halo does not name them as defendants because the court previously granted their motions to dismiss the first amended complaint for lack of personal jurisdiction.

2    The Primus defendants also move to dismiss Halo's CUTPA claim, but the court does not consider that argument because the court finds that the allegations in the second amended complaint do not support Halo's standing to bring either the CUTPA or the civil conspiracy claim.

3    On a motion to dismiss pursuant to Rule 12(b)(1), where a defendant challenges the factual accuracy of the plaintiff's allegations, a district court may resolve disputed factual issues by reference to evidence outside the pleadings. *See, e.g., Goonewardena v. New York,* 475 F.Supp.2d 310 (S.D.N.Y.2007). However, because the Primus defendants only contest the sufficiency of Halo's allegations regarding standing, not their factual accuracy, the court need not look outside the second amended complaint and instead assumes for the purpose of this motion that Halo's allegations in the second amended complaint are true.

4    In determining standing, courts differ on whether to apply the law of the state in which the suit is brought or the law of the state of incorporation. *Compare, e.g., Kennedy v. Venrock Assoc.,* 348 F.3d 584, 589 (7th Cir.2003) ("The question whether a suit is derivative by nature or may be brought by a shareholder in his own right is governed by the law of the state of incorporation."), *with Morgan Howard (United States), LLC v. Lewis,* 2006 WL 2348892, at *4 (Conn.Sup.Ct.2006) ("Since Morgan Howard U.S. is a Delaware limited liability company, Delaware law would control as to defining or limiting defendant's rights as a shareholder or member of the company, but Connecticut law controls as to standing to maintain a lawsuit in this court."). The parties assume that Connecticut law applies. While the second amended complaint does not indicate where Empagio is incorporated, the court knows from ruling on the first amended complaint that Empagio is incorporated in Delaware. Nevertheless, because the principles of shareholder standing are largely similar under Connecticut and Delaware law, the court nominally applies Connecticut law and looks to Delaware law to the extent it is instructive. *See, e.g., Morgan Howard (United States), LLC,* 2006 WL 2348892, at *4 (stating that, even though Connecticut law determines a shareholder's standing to bring suit, "Delaware law is nonetheless instructive on the standing issue").

5    Halo also argued at oral argument that it has standing to bring claims against the Primus defendants, even though they were not in privity of contract with Halo, because they conspired with the Cooper Group to breach the Letter of Intent. Given that this argument was raised for the first time at oral argument, was never briefed by the parties, and relies on allegations absent from the second amended complaint, the court does not consider it at this time.

6    While the Primus defendants ask the court to dismiss Halo's complaint with prejudice, the court declines to do so because Halo indicated at oral argument that it believes it can plead facts sufficient to establish standing. *See* Fed.R.Civ.P. 15(a) (providing that leave to amend a complaint "shall be freely given when justice so requires"); *see also Porat v. Lincoln Towers Cmt'y Ass'n,* 464 F.3d 274, 276 (2d Cir.2006) (stating the "this circuit strongly favors liberal grant of an opportunity to replead after dismissal of a complaint ...").

---

**End of Document**        © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 711473
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Wildey J. MOORE, Plaintiff,
v.
F.A. INVESTMENT HOLDINDS, LTD., Defendants.

Civil Action No. 3:10cv891(VLB).
|
March 5, 2012.

**Attorneys and Law Firms**

Frank J. Scinto, Gager Emerson Rickart Bower & Scalzo, Southbury, CT, for Plaintiff.

David R. Makarewicz, Richard S. Order, Updike, Kelly & Spellacy, PC, Hartford, CT, for Defendants.

*MEMORANDUM OF DECISION
GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT [DKT. # 31]*

VANESSA L. BRYANT, District Judge.

 **\*1** Before the Court is a motion for summary judgment filed by the Defendant, F.A. Investment Holdings, LTD. ("F.A. Investment or FAI"). The Plaintiff, Wildey J. Moore ("Moore") brought this suit in diversity in his individual capacity alleging two claim. First, that F.A. Investment as majority shareholder in Wildey F.A., Inc. (the "Corporation") breached the fiduciary duty it owed to Moore, the Corporation's minority shareholder, and second that Defendant engaged in a negligent infliction of emotional distress. For the reasons stated hereafter, Defendant's motion for summary judgment is granted.

**Background**

On December 15, 2011, the present case was transferred to this Court from another court in the District of Connecticut. The case was originally removed from the Connecticut Superior Court to the District of Connecticut on June 7, 2010.

On July 30, 2007, Defendant moved to dismiss Plaintiff's breach of fiduciary duty claim on the basis that Plaintiff lacked standing to assert such a claim in his individual capacity. *See* [Dkt. # 17]. Defendant argued that the claim belonged to the Corporation and could only be asserted in a derivative not direct action. On November 17, 2010, the prior court denied Defendant's motion to dismiss without prejudice to raising the same issues in a motion for summary judgment. *See* [Dkt. # 29]. Defendant then filed a motion for summary judgment on this same exact issue arguing again that Moore lacks standing to bring a breach of fiduciary duty claim directly. *See* [Dkt. # 31]. Defendant also argues that summary judgment should be granted on Plaintiff's negligent infliction of emotional distress claim since Plaintiff has admitted that he did not suffer any emotional distress as a result of Defendant's conduct. In opposition to the summary judgment motion, Plaintiff indicated that he has abandoned his claim for negligent infliction of emotional distress and conceded to judgment entering in favor of Defendant on that claim. See [Dkt. # 38, Pl. Mem. at 2].

After the case was transferred to this Court, the Court ordered the parties to confer and file a joint status report and directed the Plaintiff to indicate if he intended to amend the complaint to bring a derivative action. *See* [Dkt. # 45]. In the joint status report, Plaintiff indicated that he did not intend to amend the complaint to assert a derivative claim. *See* [Dkt. # 46].

*Facts*

The following facts relevant to Defendant's motion for summary judgment are undisputed unless otherwise noted. Although Defendant has filed a motion for summary judgment, both parties mainly rely on the allegations made in Plaintiff's verified complaint as opposed to the parties' Local Rule 56 statements. However, a verified complaint may "be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

 **\*2** The Corporation is a Connecticut corporation with a principal office in Warren, Connecticut and is engaged in the design, development, production, sale manufacture and export of automatic and semi-automatic firearms. See [Dkt. # 1, Compl. at ¶ 3]. Moore founded the Corporation in 1973 and has a 49% ownership interest in the Corporation. [*Id.* at ¶ 4].

King Abdullah II of Jordan and the King Abdullah II Design and Development Bureau ("KADDB") approached Moore about developing a semiautomatic pistol for the Jordanian armed forces which would be later named the "Viper." [*Id.* at ¶ 5]. On December 6, 2006, the Corporation obtained a Manufacturing License Agreement from the United States Department of State in connection with the design and development of the Viper. [*Id.* at ¶ 6].

Haitham Mufti ("Mufti") headed KADDB and then formed F.A. Investment, a British Virgin Island corporation. Mufti was appointed as president of F.A. Investment. [*Id.* at ¶¶ 2, 7]. F.A. Investment acquired a 51% ownership interest in the Corporation from Moore's then majority partner Richard Rodrigue. [*Id.*].

Moore alleges that Mufti represented that F.A. Investment would be a passive investor who had no authority to direct or cause the direction of the management, policies and buying and selling practices of the Corporation. [*Id.* at ¶ 8]. Moore also alleges that Mufti represented to him that F.A. Investment's role was to fund the Corporation's business. [*Id.*]. Moore and his wife Linda Moore served as Directors of the Corporation. [*Id.*].

On May 18, 2006, Moore suffered a stroke and was hospitalized and in rehabilitation until September 22, 2006. [*Id.* at ¶ 12].

Beginning in 2007 and continuing to date, Moayad Samman ("Samman") replaced Mufti as the chairman and CEO of KADDB and assumed control of F.A. Investment. [*Id.* at ¶ 14]. Moore alleges that after Samman was in control, F.A. Investment "engaged in a continuing course of conduct to assert total control and direction of the management, policies, and buying and selling practice of the Corporation as they pertained to all firearms." [*Id.*].

Moore alleges that since 2007 F.A. Investment has "engaged in a continuing course of conduct aimed at ensuring that Plaintiff would receive no monetary return from his stock ownership and aimed at ensuring that Plaintiff would be shut out from the operational and financial management of the Corporation" in the following ways. Initially "[i]n 2007, without any prior notice to Plaintiff, and knowing of Plaintiff's financial and physical vulnerability due to a recent stroke, FIA cut *off* funding to the Corporation; forcing Plaintiff to terminate

three employees including Plaintiff's wife and cut back on the hours on another employee. Medical insurance and other insurance payments were stopped and Plaintiff's pay was cut."

"Samman, FAI and KADDB cancelled a certain contract for the sale of Jordanian military surplus which contract had been arranged by the Plaintiff which would *have* benefited the Plaintiff and the Corporation."

**\*3** "Samman and others, acting on behalf of KADDS and FAI, unilaterally fabricated financial entries resulting in a multi-million dollar shareholders loan from KADDS and/or FAI and coerced the Plaintiff into agreement with such entries with the threat of firing him and taking away from him any chance of obtaining a monetary return from his stock ownership in the Corporation."

"FAI prohibited the Plaintiff from selling any Wildey Survivor guns or parts or manufacture and sell ammunition to generate revenue; further stripping Plaintiff of his ability to obtain a monetary return from his stock ownership."

"FAI required thal Plaintiff's work focus entirely on the Viper pistol and other projects of the King without attention to the overall financial health of the Corporation.

Moore further alleges that "[k]nowing of Plaintiff's financial and physical vulnerability due to a recent stroke" Samman, on behalf of FAI and KADDS, proceeded to continue to apply financial pressure on the Plaintiff in an attempt to have him sell his 49% interest to FAI for relatively little value; continually misrepresenting to the Plaintiff that the Viper pistol was a failure ."

"FAI proposed to amend the MLA to circumvent the Corporation and Plaintiff's role in importing and exporting the Viper pistol. Plaintiff and his wife refused to support the proposed amended MLA and subsequently were relieved from their duties as officers of the Corporation" and then "Plaintiff and his wife were removed as Directors of the Corporation." "On September 30,2009 the Plaintiff was fired from his employment with the Corporation." [*Id.* at ¶ 15]. Moore did not have a written employment agreement with the Corporation and he was an at will employee. See [Dkt. # 33, Def. Local 56 Statement at ¶¶ 3–4]. In

the parties' Local Rule 56 Statements, Moore admits that his employment allegations relating to terminating employees, cutting hours, pay or benefits are unrelated to his stock ownership. [*Id.* at ¶ 8].

In the parties' Local Rule 56 Statements, Moore admits that many of the actions he is alleging were a breach of F.A. Investment's fiduciary duty equally affected the value of both Moore's minority shares and F.A. Investment's majority shares. Moore admits that any damage resulting from the alleged cancellation of the contract for the sale of Jordanian surplus equally affected the value of both Moore's minority shares and F.A. Investment's majority shares. [*Id.* at ¶ 10]. Moore also admits that any damage resulting from F.A. Investment's alleged decision to focus on the Viper pistol rather than the Wildey Survivor firearm equally affected the value of both Moore's minority shares and F.A. Investment's majority shares. [*Id.* at ¶ 12].

Moore never sold any of his stock in the Corporation as a result of F.A. Investment's alleged attempts to force him to sell his minority shares. [*Id.* at ¶ 13]. Moore alleges he suffered damages as a result of F.A. Investment's attempts to force him to sell his minority shares in that he was forced to agree to characterize sums paid by F.A. Investment or KADDB as loans. [Dkt. # 39, Pl. Local Rule 56 Statement at ¶ 15].

**\*4** Between June 2004 and December 2007, F.A. Investment's provided more than $1.5 million of funds to the Corporation. There was no written agreement that funds provided by F.A. Investments to the Corporation were to be used as operating capital or a gift. See [Dkt. # 33, Def. Local 56 Statement at ¶¶ 17, 29]. Moore and his wife signed corporate tax returns that classified the funds provided by F.A. Investment as "JAWS LOAN." [*Id.* at ¶ 20].

F.A. Investment alleges that the funds were always intended to be a loan to the Corporation and were never intended to be operating capital or a gift. [*Id.* at ¶¶ 21–22]. Moore alleges that he and his wife were forced to agree to characterize the funds as loans under the threat of being fired. [Dkt. # 39, Pl. Local Rule 56 Statement at ¶¶ 21–22].

F.A. Investment alleges that Moore has suffered no ascertainable loss resulting from the treatment of the funds as a loan. [Dkt. # 33, Def. Local 56 Statement at ¶ 24]. Moore argues that he suffered a loss since "any distribution of profits to Moore will come after the payment of the loans Moore was forced to agree to. As a result the majority shareholder will improperly receive improper distributions by way of repayment of a fictitious loan and Plaintiff's claim to distributions has been diluted." [Dkt. # 39, Pl. Local Rule 56 Statement at ¶ 24].

### Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir.2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.,* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir.2006) (internal quotation marks and citation omitted). At the summary judgment stage of the proceeding, plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D.Conn. Oct.20, 2004) (internal quotation marks and citations omitted).

### Analysis

Defendant argues that Moore as minority shareholder lacks standing to assert a claim for breach of fiduciary duty directly as such claim belongs to the Corporation and must be brought derivatively. Plaintiff argues that his claims are not derivative since he has suffered an individual injury and thus his claim may be brought directly.

**\*5** "In determining standing, courts differ on whether to apply the law of the state in which the suit is brought

or the law of the state of incorporation." *Halo Tech Holdings, Inc. v. Cooper,* Civ.No.3:07–cv–489 (AHN),, 2008 WL 4080081, at *3n.4 (D.Conn. Aug. 29, 2008). Here since the suit was brought in Connecticut and the Corporation is a Connecticut corporation there is no dispute that Connecticut law applies to determine standing. Connecticut courts have acknowledged that the "principles of shareholder standing are largely similar under Connecticut and Delaware law" and therefore Connecticut courts will look to Delaware law to the extent it is instructive. *Id.* (citing *Morgan Howard (United States) LLC v. Lewis,* No.FSTCV0500634S, 2006 WL 2348892, at *4 (Conn.Sup.Ct. July 14, 2006)).

The Connecticut Supreme Court revisited the issue a shareholder standing in its recent decision in *May v. Correy,* 291 Conn. 106, 967 A.2d 495, (2009). In *May,* minority shareholders in a closely held corporation in their individual capacities brought claims against other minority shareholders for breach of fiduciary duty and unjust enrichment. The Connecticut Supreme Court explained that a derivative suit " 'is an equitable action by the corporation as the real party in interest with a stockholder as a nominal plaintiff representing the corporation ... It is designed to facilitate holding wrongdoing directors and majority shareholders to account and also to enforce corporate claims against third persons. If the duties of care and loyalty which directors owe to their corporations could be enforced only in suits by the corporation, many wrongs done by directors would never be remedied.' " 291 Conn. at 114–125, 967 A.2d 56 (quoting *Barrett v. Southern Connecticut Gas Co.,* 172 Conn. 362, 370, 374 A.2d 1051 (1977)).

The *May* court further explained that the Connecticut Supreme Court had previously held in *Yanow v. Teal Industries, Inc.,* 178 Conn. 262, 422 A.2d 311 (1970) that

> A distinction must be made between the right of a shareholder to bring suit in an individual capacity as the sole party injured, and his right to sue derivatively on behalf of the corporation alleged to be injured.... Generally, individual stockholders cannot sue the officers at law for damages on the theory that they are entitled to damages because mismanagement has rendered their stock of less value, since the injury

is generally not to the shareholder individually, but to the corporation-to the shareholders collectively.... In this regard, it is axiomatic that a claim of injury, the basis of which is a wrong to the corporation, must be brought in a derivative suit, with the plaintiff proceeding secondarily, deriving his rights from the corporation which is alleged to have been wronged.... It is, however, well settled that if the injury is one to the plaintiff as a stockholder, and to him individually, and not to the corporation, as where an alleged fraud perpetrated by the corporation has affected the plaintiff directly, the cause of action is personal and individual.... In such a case, the plaintiff-shareholder sustains a loss separate and distinct from that of the corporation, or from that of other shareholders, and thus has the right to seek redress in a personal capacity for a wrong done to him individually.

**\*6** 178 Conn. at 281–82, 422 A.2d 311 (internal quotation marks and citations omitted).

In *May,* the Connecticut Supreme Court explained that it had "reaffirmed the general rule that '[i]n order for a shareholder to bring a direct or personal action against the corporation or other shareholders, that shareholder must show an injury that is separate and distinct from that suffered by any other shareholder or by the corporation.... [A] shareholder-even the sole shareholder-does not have standing to assert claims alleging wrongs to the corporation.' " *May,* 291 Conn. at 115, 967 A.2d 495 (quoting *Smith v. Synder,* 267 Conn. 456, 461, 839 A.2d 589 (2004)).

The Connecticut Supreme Court also clarified that a derivative not direct suit is appropriate even where one of the shareholders participated in and benefited from the alleged wrongdoing. "[N]othing in our case law suggests, that an individual cause of action is required when a derivative action would have the indirect effect of redressing an injury to those shareholders whose self-dealing caused the harm to the corporation." *Id.* at 118,

967 A.2d 495. The Connecticut Supreme Court suggested that where a majority shareholder intentionally depletes the corporation's assets for the sole purpose of decreasing the value of the minority shareholder's stock that action would nonetheless be derivative. *Id.* at 119, 967 A.2d 495 (citing *Sax. v. World Wide Press, Inc.,* 809 F.2d 610, 614 (9th Cir.1987)).

Accordingly, the central inquiry before the Court is whether any of the alleged conduct that Moore complains of caused him to suffer an injury that is separate and distinct from that suffered by any other shareholder or by the corporation. If so, Moore will have standing to maintain his claim directly. If however, the alleged conduct resulted in an injury that was not separate and distinct but rather also affected the Corporation or other shareholders, the claim must be brought derivatively and Moore will not have standing to maintain the claim directly.

### a. The injury to Moore from F.A. Investment's decision to cut off funding to the Corporation is not separate and distinct from that suffered by the Corporation or all shareholders

Moore alleges that F.A. Investment "cut off funding to the Corporation; forcing Plaintiff to terminate three employees including Plaintiff's wife and cut back on the hours on another employee. Medical insurance and other insurance payments were stopped." [Dkt. # 1, Compl. at ¶ 15]. However this injury belongs to the Corporation as a whole and is not separate and distinct to Moore as a minority shareholder. First, Moore acknowledges that his allegations regarding the termination of employees, cutting hours, pay or benefits are unrelated to his stock ownership and therefore concedes that this alleged injury is not unique to him as a minority shareholder but rather belongs to the Corporation. Second, cutting off funding to the Corporation is patently an injury to the Corporation and not unique to Moore.

*7 Moore's alleged injury as a minority shareholder is therefore purely derivative to that of the Corporation's injury. Moore's claim is that the Corporation was less profitable as a result of the funding cut thereby causing his stock to be less valuable. Such a claim is quintessentially a derivative claim. *See Yanow,* 178 Conn. at 281–83, 422 A.2d 311 ("Generally, individual stockholders cannot sue the officers at law for damages on the theory that they are entitled to damages because mismanagement has rendered

their stock of less value, since the injury is generally not to the stockholder individually, but to the corporation-to the stockholders collectively."). Therefore, Plaintiff cannot maintain a direct cause of action for breach of fiduciary duty based on this alleged conduct.

### b. The injury to Moore from F.A. Investment's decision to cancel a contract for sale of Jordanian military surplus is not separate and distinct from that suffered by the Corporation or all shareholders

Moore alleges that F.A. Investment "cancelled a certain contract for the sale of Jordanian military surplus which contract had been arranged by the Plaintiff which would *have* benefited the Plaintiff and the Corporation." [Dkt. # 1, Compl. at ¶ 15]. First, Moore concedes in his own allegation that the contract would have benefitted the Corporation and therefore expressly acknowledges that the Corporation was also injured by its cancellation. Second, he admits that any damage resulting from the alleged cancellation of the contract for the sale of Jordanian surplus equally affected the value of both Moore's minority shares and F.A. Investment's majority shares. [Dkt. # 33, Def. Local 56 Statement at ¶ 8]. Accordingly, this injury belongs to the Corporation, would have impacted all shareholders and is therefore not separate and distinct to Moore as a minority shareholder. The cancellation of the contract is really a claim that F.A. Investment interfered with the Corporation's revenues and therefore must be brought derivatively. *See Halo Tech Holdings, Inc.,* 2008 WL 4080081, at *4 (finding that allegations that defendants interfered with company's revenues which "set off a domino reaction-one injury cause another, and so on" did not mean that defendants' mismanagement directly injured shareholder and therefore shareholder's injuries were not separate and distinct from the company's injuries). Therefore, Plaintiff cannot maintain a direct cause of action for breach of fiduciary duty based on this alleged conduct.

### c. The injury to Moore from F.A. Investment's fabrication of financial entries resulting in a shareholder loan is not separate and distinct from that suffered by the Corporation or all shareholders

Moore alleges that F.A. Investment "unilaterally fabricated financial entries resulting in a multi-million dollar shareholders loan from KADDS and/or FAI and coerced the Plaintiff into agreement with such entries with the threat of firing him and taking away from him any

chance of obtaining a monetary return from his stock ownership in the Corporation." [Dkt. # 1, Compl. at ¶ 15]. Here again the injury from treating the funds as loans is to the Corporation and would affect all shareholders. In fact, Moore argues that he suffered a loss from the treatment of the funds as a loan since "any distribution of profits to Moore will come after the payment of the loans Moore was forced to agree to. As a result the majority shareholder will improperly receive improper distributions by way of repayment of a fictitious loan and Plaintiff's claim to distributions has been diluted." [Dkt. # 39, Pl. Local Rule 56 Statement at ¶ 24]. However, F.A. Investment as majority shareholder would suffer the same exact loss as Moore in that any distribution of profits to it as majority shareholder would also only occur after the payment of the loans. Consequently, Moore has not alleged an injury that is distinct and separate from that which F.A. Investment would also suffer. Moreover, the Corporation itself suffered in that it incurred a debt as opposed to receiving a capital contribution or gift and would arguably be less profitable as a result.

**\*8** Moore seems to be suggesting that F.A. Investments wouldn't be injured in the same way as himself since F.A. Investments would also be receiving the benefits of the loan being paid back to itself. Moore's argument appears to be premised on the fact F.A. Investment would uniquely profit since it forced the Corporation to pay back the funds when it allegedly forced the Corporation to treat the funds as a loan instead of as a gift. However this argument is somewhat misplaced as it focuses on the benefits that F.A. Investment was able to realize in its capacity as lender as opposed to the injuries suffered by the Corporation itself and thereby to all its shareholders. F.A. Investment in its capacity as a shareholder of the Corporation was affected by the loan itself in the same manner as Moore.

The Connecticut Supreme Court's decision in *May* is instructive on this point. In *May*, the plaintiffs alleged that the defendant shareholders set an unreasonably low offering price for additional shares offered to existing shareholders. Some of the existing shareholders were able to offset the injury to their existing shares by participating in the offering and therefore plaintiffs argued their injury was unique from the other shareholders who offset. However the Connecticut Supreme Court explained that the plaintiffs "focused on the wrong inquiry" as the issue wasn't whether existing shareholders were able to

offset their injury but "whether the company, i.e., all existing shareholders, suffered an injury as a result of the unreasonably low offering price of the new shares." *May*, 291 Conn. at 118, 967 A.2d 495. The Connecticut Supreme Court concluded that "[i]t is undisputed that the unreasonably low offering price equally diluted the value of all existing shares. Participating shareholders and nonparticipating shareholders, therefore, were harmed equally by the offering. The mere fact that the participating shareholders were able and willing to offset the injury to their existing shares partially or completely by purchasing new shares at the unreasonably low price did not lessen the dilution of their existing shares. The plaintiffs' argument improperly distracts our attention from the injuries that flow to the corporation from the defendants' allegedly wrongful conduct by focusing on the benefits to certain shareholders that accrued therefrom." *Id.* Here as was the case in *May*, Moore is distracted from the allegedly wrongful conduct by focusing on the benefits that F.A. Investment accrued in its capacity as a lender of the funds. As was the case in *May*, it is undisputed that the effect of treating the funds as a loan resulted in a diminished distribution of profits to all shareholders as a result of the Company having incurred a debt. Therefore, Plaintiff cannot maintain a direct cause of action for breach of fiduciary duty based on this alleged conduct.

Moreover, considering the fact that Moore asserts that F.A. Investment was an investor in the corporation and there was never any written agreement that F.A. Investment would provide funds to the Corporation as operating capital or a gift rather than for a return on its capital, the Plaintiff has not shown that F.A. Investment as a majority shareholder had a fiduciary duty to provide operating capital without consideration as a gift to the Corporation. Therefore it would be questionable if F.A Investment breached its fiduciary duty as a majority shareholder by insisting that it receive a return on its investment by characterizing the infusion of funds as a loan. However, the Court need not address this issue as it is clear that the injury from F.A. Investment's insistence that the Corporation treat the funds as a loan was a derivative one.

**d. The injury to Moore from F.A. Investment's forcing the Corporation to focus on the Viper and not sell any Wildley survivor guns is not separate and distinct from that suffered by the Corporation or all shareholders**

**\*9** Moore alleges that F.A. Investment "prohibited Plaintiff from selling any Wildey Survivor guns or parts or manufacture and sell ammunition to generate revenue; further stripping Plaintiff of his ability to obtain a monetary return from his stock ownership" and "required that Plaintiff's work focus entirely on the Viper pistol and other projects of the King without attention to the overall financial health of the Corporation." [Dkt. # 1, Compl. at ¶ 15]. Moore appears to be suggesting that the effect of F.A. Investment prohibiting the Corporation from selling any Wildey Survivor guns and requiring the Corporation to focus on the Viper pistol resulted in lower profits for the Corporation. In fact, Moore concedes and acknowledges in his own allegation that that the consequence of the decision to focus on the Viper was detrimental to "overall financial health of the corporation" and admits that any damage resulting from the any damage resulting from F.A. Investment's alleged decision to focus on the Viper pistol rather than the Wildey Survivor firearm equally affected the value of both Moore's minority shares and F.A. Investment's majority shares.. [Dkt. # 33, Def. Local 56 Statement at ¶ 12]. Therefore Moore has failed to prove he suffered an injury distinct and separate from that of the Corporation or F.A. Investment as majority shareholder. To the extent that the Corporation was less profitable and that resulted in the shares of the Corporation being devalued, such injury to Moore's stock is first derivative to the Corporation's injury and second the resulting effect on the value of the shares equally impacted both Moore and F.A. Investment's shares. As discussed above, Moore's allegations that F.A. Investment forced the Corporation to focus on the Viper and not sell any Wildey guns are really a claim that F.A. Investment interfered with the Corporation's revenues and therefore must be brought derivatively. Accordingly, Plaintiff cannot maintain a direct cause of action for breach of fiduciary duty based on this alleged conduct.

### e. Moore has not alleged that he suffered a distinct and separate injury from F.A. Investment's attempts to force him to sell his interest for little value

Moore has alleged that "[k]nowing of Plaintiff's financial and physical vulnerability due to a recent stroke" Samman, on behalf of FAI and KADDS, proceeded to continue to apply financial pressure on the Plaintiff in an attempt to have him sell his 49% interest to FAI for relatively little value; continually misrepresenting to the Plaintiff that the Viper pistol was a failure." [Dkt. # 1, Compl. at ¶ 15]. F.A. Investment argues that Moore has

not alleged any injury since he did not sell his shares in response to F.A. Investment's alleged conduct and therefore cannot maintain a cause of action for breach of fiduciary duty.

Under Connecticut Law, the essential elements to pleading a cause of action for breach of fiduciary duty are "(1). That a fiduciary relationship existed which gave rise to (a) a duty of loyalty on the part of the defendant to the plaintiff, (b) an obligation on the part of the defendant to act in the best interests of the plaintiff, and (c) an obligation on the part of the defendant to act in good faith in any matter relating to the plaintiff; (2). That the defendant advanced his or her own interests to the detriment of the plaintiff; (3). That the plaintiff sustained damages; (4). That the damages were proximately caused by the fiduciary's breach of his or her fiduciary duty." *McCreary v. One Strawberry Hill Ass'n, Inc.,* No.FSTCV106006749S, 2011 WL 2150442, at \*2 (Conn.Super.Ct. April 29, 2011) (Internal quotation marks and citation omitted). Here Moore does not allege that he succumbed to the alleged pressure and did not sell his shares to F.A. Investment for little value. Instead, his response Summary Judgment alleges that he suffered damages as a result of F.A. Investment's attempts to force him to sell his minority shares in that he was forced to agree to characterize sums paid by F.A. Investments or KADDB as loans. [Dkt. # 39, Pl. Local Rule 56 Statement at ¶ 15]. However as discussed above, the injury from characterizing the funds provided by F.A. Investment as loans was an injury to the Corporation and to the extent that the Corporation's accrual of debt impacted the profits of the Corporation and resulted in Moore's shares having less value that injury would also have the same effect on F.A. Investment's shares. Consequently, the injury Moore alleges that he suffered that was proximately cause by F.A. Investment's attempt to force him to sell his shares is not separate and distinct from that of the Corporation and therefore it must be brought derivatively.

**\*10** The Court notes it need not address whether Moore has standing to sue directly if Moore had sold his shares for little value since Moore has admittedly not suffered that particular injury.

### f. The injury to Moore from F.A. Investment's proposed amendment to the MLA is not separate and distinct from that suffered by the Corporation or all shareholders

Moore alleges that F.A. Investment "proposed to amend the MLA to circumvent the Corporation and Plaintiff's role in importing and exporting the Viper pistol." [Dkt. # 1, Compl. at ¶ 15]. First, Moore acknowledges that the proposed amendment to the MLA would have the effect of circumventing the Corporation's role in importing and exporting the Viper and therefore Moore essentially concedes that the injury sustained by the proposed amendment is one that belongs to the Corporation. It also does not appear that Moore in his capacity as a minority shareholder had any unique rights or responsibilities with respect to the MLA. Therefore whatever injurious effect the proposed amendment had would solely accrue to the Corporation. Accordingly whatever injurious impact it had on the value of Moore's shares would be derivative of the injury of the Corporation. Accordingly, Plaintiff cannot maintain a direct cause of action for breach of fiduciary duty based on this alleged conduct.

### g. Moore cannot recover for breach of fiduciary duty based on an employment dispute

Moore alleges that he was fired from his employment with the Corporation. [Dkt. # 1, Compl. at ¶ 15]. However there is no authority under Connecticut law "which supports a claim that the termination of employment of an employeeshareholder by action of the other shareholders and the corporation gives rise to a cause of action for breach of a fiduciary duty." *Lobo v. Rock,* No.332930, 1993 WL 280239, at *2 (Conn.Super.Ct. July 15, 1993) (citations omitted). Here, Moore has not alleged that his termination resulted in a unique and distinct harm to him in his capacity as minority shareholder. Further, under Delaware law, which Connecticut courts routinely look towards as instructive, it is well established that "a shareholder of a closely held corporation who is also an employee cannot recover for breach of fiduciary duty where the claim is essentially an employment dispute." *Wall Street Sys., Inc. v. Lemence,* No.04CIV.5229(JSR), 2005 WL 2143330, at *8 (S.D.N.Y. Sept.2, 2005) (interpreting Delaware law). Accordingly, Moore cannot recover for breach of fiduciary duty as his claim involves a quintessential employment dispute.

### h. The injury to Moore from his removal from the board of directors is not separate and distinct from that suffered by the Corporation or all shareholders

Moore alleges that F.A. Investment removed himself and his wife as directors of the Corporation. [Dkt. # 1, Compl.

at ¶ 15]. Under the Corporation's By–Laws, it expressly provides that "Directors need not be Shareholders and need not be residents of Connecticut." *See* [Dkt. # 38, By–Laws, Ex. 5. Article IV § 1]. Therefore Moore did not have a right to serve as a director on the basis of his status as a minority shareholder. The By–Laws also provides that any director may be removed with cause at any time by the act of shareholders. [*Id.* at Article IV § 7]. Moore has not alleged nor has he put forth any facts that he was removed as a director in violation of the terms of the Corporation's By–Laws. Since Moore did not have a right as a shareholder to serve as a director, any injury he suffered from being removed as a director is therefore unrelated to his status as a minority shareholder.

*11 Again, Moore is focusing on the wrong inquiry and injury by confusing the fact that he had multiple roles and served the Corporation in multiple capacities. As discussed above, Moore cannot maintain a cause of action for breach of fiduciary duty for conduct that was related to his role as an employee in the Corporation and unrelated to his role as a minority shareholder. Similarly, Moore cannot maintain a cause of action for breach of fiduciary duty for conduct that was related to his role as a director which was unrelated to his role as a minority shareholder. Accordingly, the specific injury to Moore from his removal as a director does not flow from his status as a minority shareholder since he had no right as a minority shareholder to serve as a director. Further, Moore does not explain how his removal from the Corporation's board of directors had any unique or peculiar effect on his rights as a minority shareholder nor does Moore argue that under Connecticut Law a majority shareholder has a fiduciary duty to ensure that a minority shareholder participates in a corporation's business as a director of a corporation.

The Court notes that directors of a corporation have a fiduciary duty to the corporation itself and its shareholders. *See Pacelli Bros. Transp., Inc. v. Pacelli,* 189 Conn. 401, 407, 456 A.2d 325 (1983) ("An officer and director occupies a fiduciary relationship to the corporation and its stockholders. He occupies a position of the highest trust and therefore he is bound to use the utmost good faith and fair dealing in all his relationships with the corporation") (internal quotation marks and citations omitted). Since a director occupies a fiduciary relationship to a minority shareholder, a minority shareholder will have an interest in ensuring

that only competent individuals serve as directors. To the extent that Moore's injury derives from the fact that a competent director, namely himself and his wife, were removed from the board that injury would really belong to the Corporation and all shareholders and is therefore not unique to Moore as a minority shareholder. The harm from having a less able and competent board of directors is an injury that belongs to the Corporation in general and therefore Moore in his capacity as a minority shareholder did not suffer any unique or distinct injury as is necessary to bring an direct action.

Moore relies on the Connecticut Supreme Court's decision in *Yanow* and the Connecticut Superior Court's decision in *Leblanc v. Tomoiu,* No. X08CV065001421S, 2007 WL 1828898, at *5 (Conn.Super.Ct. June 5, 2007), interpreting *Yanow* as support for the proposition that a direct cause of action may be maintained where a minority shareholder has been ousted from management of a corporation and where the majority shareholder has looted the corporation. However the facts and circumstances of both these cases are inapposite to the present case. In addition, it appears that *Yanow's* holding has been narrowed by the Connecticut Supreme Court's subsequent decisions in *May* and *Fink v. Golenbock.*

**\*12** In *Yanow,* a minority shareholder in a subsidiary company which was merged into a parent company in a short-form merger brought an action for breach of fiduciary duty against the parent corporation and its officer. 178 Conn. at 265, 422 A.2d 311. The Connecticut Supreme Court concluded that allegations that the parent corporation and its officer looted the subsidiary corporation and failed to disclose important facts concerning corporation transactions stated personal as opposed to derivative causes of action. The Connecticut Supreme Court reasoned that plaintiffs had alleged that the officer of the parent company "took advantage of special facts concerning" the subsidiary company's financial condition which he failed to disclose to the plaintiff and "caused the merger to deprive the plaintiff of his shares and avoid paying the plaintiff their full fair market value." *Id.* at 283, 422 A.2d 311. The Connecticut Supreme Court found that "these causes of action [we]re based upon alleged unlawful acts relating solely to the stock owned by the plaintiff, in violation of the fiduciary duty owed the plaintiff by the defendants, and they thus state individual, and not derivative, claims." *Id.*

However, unlike in *Yanow* F.A. Investment has not deprived Moore of his shares or avoided paying Moore the full market value for his shares. In *Yanow,* the Connecticut Supreme Court's conclusion that the plaintiff had alleged a direct cause of action was based on its conclusion that the plaintiff alleged a unique injury in that he was entirely deprived of the value of his shares when the shortform merger was accomplished. Here there is no equivalent injury to Moore's shares as it is undisputed that Moore still has a 49% interest in the Corporation and did not succumb to F.A. Investment's attempts to force him to sell that interest. Moore's alleged injuries are therefore substantially different from the plaintiff in *Yanow* as Moore was not deprived of the value of his shares. The *Yanow* court's conclusion that the plaintiff sustained a loss separate and distinct was largely premised on the fact that only the plaintiff and no one else was deprived of the value of the shares through the short-form merger. Since there was no short-form merger and Moore has not been forced to sell his shares for under market value, Moore has not alleged an injury that is peculiar to him as was the case in *Yanow.*

Further, Moore has not alleged that F.A. Investment has totally looted the value of the Corporation as was the case in *Yanow.* In *Yanow,* the Connecticut Supreme Court suggested that "[i]f the controlling majority stockholder seeks to injure the minority stockholder through the means of looting the corporation or so wrecking it that the minority stockholder would get nothing out of his assets, the claim resulting therefrom is sufficient to constitute an individual action." *Id.* at 282 n. 9, 422 A.2d 311. However, Moore has not alleged that F.A. Investment had so drained the Corporation of its assets that Moore's shares are effectively worthless. In addition, the *Yanow* court also noted that "[g]enerally, individual stockholders cannot sue the officers at law for damages on the theory that they are entitled to damages because mismanagement has rendered their stock of less value, since the injury is generally not to the shareholder individually, but to the corporation- to the shareholders collectively." *Id.* at 282, 422 A.2d 311. Here Plaintiffs allegations are really that F.A. Investment had mismanaged the Corporation when it forced the Corporation to focus on the Viper, cancelled the Jordanian surplus contract, and prohibited the Corporation from selling the Wildey firearm as opposed to an allegation that F.A. Investment so looted the Corporation that Moore would get nothing out his minority ownership interest in the Corporation.

**\*13** Lastly, it appears that the Connecticut Supreme Court has subsequently narrowed its holding in *Yanow* regarding allegations of corporate looting. As discussed above, the Connecticut Supreme Court in *Yanow* contemplated that a direct action could be maintained where there were allegations that "controlling majority stockholder seeks to injure the minority stockholder through the means of looting the corporation or so wrecking it that the minority stockholder would get nothing out of his assets." *Yanow,* 178 Conn. 281. However, subsequently in *May* the Connecticut Supreme Court explained that "nothing in our case law suggests, that an individual cause of action is required when a derivative action would have the indirect effect of redressing an injury to those shareholders whose self-dealing caused the harm to the corporation." *May,* 291 Conn. at 118, 967 A.2d 495. The Connecticut Supreme Court then cited to a Ninth Circuit decision which held that "[e]ven if the [majority shareholders] depleted [the corporation's] assets with the sole purpose of decreasing the value of [the minority shareholder's] stock and destroying his return on his investment, the action would nonetheless be derivative." *Id.* at 119, 967 A.2d 495 (quoting *Sax. v. World Wide Press, Inc.,* 809 F.2d 610, 614 (9th Cir.1987)).

The *May* court also pointed to the Connecticut Supreme Court's decision in *Fink v. Golenbrook,* 238 Conn. 183, 680 A.2d 1243 (1996) in which it concluded that a shareholder of one half of a closely held corporation could initiate a derivative action against the holder of the other half who "allegedly prevented the plaintiff from participating in the business of the corporation, used corporation assets to establish a new corporation, lost corporate funds in speculative investments and falsely informed corporation clients that the corporation no longer existed." *Fink,* 238 Conn. at 202, 680 A.2d 1243. In *Fink,* the Connecticut Supreme Court concluded the defendant's alleged conduct violated the "statutory duty of care he owed to the corporation. Therefore, a derivative suit on behalf of the corporation was appropriate." *Id.*

The *May* court noted that in *Fink* "we rejected the defendant's argument that, in the case of a closely held corporation in which the plaintiff and the defendant were the only shareholders, any injury caused by the defendant necessarily was an injury to the plaintiff individually, and not an injury to the corporation." *May,* 291 Conn. at

120, 967 A.2d 495 (citation omitted). The *May* court also explained that in *Fink* the Connecticut Supreme Court contemplated that " 'there may be some instances in which the facts of a case give rise either to a direct action or to a derivative action-such as when an act affects both the relationship of the particular shareholder to the corporation and the structure of the corporation itself, causing or threatening injury to the corporation .' " *Id.* (citing *Fink,* 238 Conn. at 202–203, 680 A.2d 1243). However, a claim of looting or wasting of assets is one which does not affect both the structure of the corporation and the relationship of the shareholder to the corporation. Instead a claim of looting is really an injury to the corporation which then affects the relationship of the shareholders to the corporation.

**\*14** Accordingly, the Supreme Court's subsequent decisions in *Fink* and *May* clarify that a cause of action based on allegations of corporate looting which had the effect of destroying the Corporation's assets should be considered derivative actions as the harm is really to the Corporation and not the shareholders. The Connecticut Supreme Court has even suggested this would still be the case even where the looting was done with the sole purpose of decreasing the value of the minority shareholder's stock. Accordingly, Moore's reliance on *Yanow* to demonstrate that he is entitled to maintain a direct action is unpersuasive.

Moore also relies on Connecticut Superior Court's decision in *Leblanc v. Tomoiu* for the proposition that a direct action is appropriate where the majority shareholder has looted the corporation and also where a minority shareholder has been ousted from management of a corporation. In *Leblanc,* the minority shareholder brought an action for breach of fiduciary duty against the former officers, directors and shareholders of the company who allegedly came into control of the company and transferred all its assets and technologies to another company owned and controlled by the defendants in a short-form merger. 2007 WL 1828898, at \*1. The *Leblanc* court concluded that plaintiff's allegations that he was a "victim of a 'freeze-out' acquisition in violation of fiduciary duties and disclosure obligations owed by the majority to the minority, and that as a result he has been ousted from management of the corporation and the corporation has been 'looted' of all its assets and forced to shut down" stated a claim that is distinct to him as a minority shareholder. *Id.* at \*5. The *Leblanc* court

relied heavily on the Supreme Court's decision in *Yanow* in concluding that the plaintiff's allegations stated a direct claim. However as was the case in *Yanow,* the facts and circumstances in *Leblanc* are inapposite to the present case for many of the same reasons. Again, since Moore has not been the victim of a short-form merger and has not been deprived of the value of his shares, he does not have the same type of injury as alleged in both *Yanow* and *Leblanc.* In addition, Moore has not alleged that F.A. Investment has looted the Corporation of all its assets as was the case in both *Yanow* and *Leblanc.*

Moreover, the Court does not find the *Leblanc* court's conclusion that the plaintiff can maintain a direct claim on the basis of his allegation that he was ousted from management persuasive in light of the Connecticut Supreme Court's decision in *Fink.* In *Fink,* the plaintiff alleged that the defendant had conspired to drive the plaintiff out of the medical practice and prevented him from returning to the practice. The Connecticut Supreme Court concluded that the defendant had violated a duty to the corporation when he "allegedly prevented plaintiff from participating in the business of the corporation" among other conduct and therefore had appropriately brought a derivative action. 238 Conn. at 201–202, 680 A.2d 1243. As was the case in *Fink,* Moore has alleged that F.A. Investment through Samman has conspired to drive him out of Corporation's business by terminating his employment and removing him as a director from the Board. However, as the *Fink* Court concluded these allegations state a claim that F.A. Investment had violated a duty it owed to the Corporation and not to Moore as a minority shareholder. In addition, the *Leblanc* court's analysis is not persuasive as the *Leblanc* court appears to assume without considering whether the majority

shareholder has a duty to include the minority shareholder in the management of the corporation and does not consider whether the duty allegedly breached was a duty to the Corporation or the minority shareholder. Accordingly, the Court finds that Moore's reliance on *Leblanc* is likewise unpersuasive.

**\*15**  In sum, Moore has failed to demonstrate that he suffered an injury distinct and separate from that suffered by the Corporation or by all shareholders from any of Defendant's alleged conduct and therefore lacks standing to bring a claim for breach of fiduciary duty directly. In addition, Moore cannot bring a claim for breach of fiduciary duty in connection with conduct that is unrelated to his status as minority shareholder. As discussed above, Moore cannot maintain a direct claim for breach of fiduciary duty for conduct related to his status as an employee or as a director of the Corporation. Moore has further indicated that he does not intend to seek leave to amend his complaint to bring a derivative action. Accordingly, the Court grants Defendant's motion for summary judgment.

### Conclusion
Based upon the above reasoning, the Defendant's [Dkt. # 31] motion for summary judgment is GRANTED. The Clerk is directed to enter judgment in favor of Defendant and close the file.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 711473

---

© 2018 Thomson Reuters. No claim to original U.S. Government Works.