UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CONFIGAIR LLC,<br><br>      Plaintiff,<br><br>     v.<br><br>HENRY KURZ,<br><br>      Defendant. | Case No. 3:17-cv-02026-JBA<br><br>July 31, 2019 |
| HENRY KURZ,<br><br>      Third-Party Plaintiff,<br><br>     v.<br><br>DANIEL NAUS, NIZWER HUSAIN, and<br>DUNG NGUYEN,<br><br>      Third-Party Defendants. | |

**RULING ON MOTIONS TO DISMISS AND FOR JUDGMENT ON THE PLEADINGS**

This case involves a dispute between Henry Kurz ("Kurz"), a former member, officer, and director of ConfigAir, LLC ("ConfigAir"), and the three remaining principals of ConfigAir, who retain control over the company. At issue are the company's alleged past and ongoing use of intellectual property created by Kurz, the company's removal of Kurz, the misconduct that Kurz claims the other principals engaged in (including, he alleges, stealing from the company), and the statements that both Kurz and the company have made to each others' customers. Pending before the Court are two motions to dismiss and one motion for judgment on the pleadings.

## I.    Background

There are three separate operative complaints and one set of counterclaims in this case. First, Plaintiff ConfigAir brings federal copyright and related state law claims against Defendant

Kurz, a former member, officer, and director of ConfigAir, seeking damages, declaratory relief, and injunctive relief.

Second, Kurz brings counterclaims against ConfigAir claiming fraudulent inducement and tortious interference and seeking judicial dissolution of the company, injunctive and declaratory relief, the appointment of a receiver, and the appointment of a constructive trust.

Third, acting as a Third-Party Plaintiff, Kurz, individually and derivatively on behalf of ConfigAir, brings three state law claims for breach of fiduciary duties and one state law claim for tortious interference against Third-Party Defendants Daniel Naus ("Naus"), Nizwer Husain ("Husain"), and Dung Nguyen ("Nguyen"), who are the remaining members, officers, and directors of ConfigAir.

Fourth, in a subsequently filed action that was consolidated with this case, Plaintiff Henry Kurz Consulting GmbH ("HKC") brings claims for copyright infringement, slander of title/commercial disparagement, fraudulent misrepresentation, and unfair and deceptive trade practices in violation of the Connecticut Unfair Trade Practices Act against Defendants ConfigAir, Naus, Husain, Nguyen, and McLaren Automotive, Inc.

ConfigAir, Naus, Husain, and Nguyen move to dismiss Counts III (slander of title/commercial disparagement) and V (fraudulent misrepresentation) of HKC's Complaint. ([Doc. # 60].) Naus, Husain, and Nguyen separately move to dismiss Kurz's Amended Third Party Complaint, ([Doc. # 45]), in its entirety. ([Doc. # 47].) Finally, ConfigAir moves for judgment on the pleadings on Counts I and II of its Second Amended Complaint, ([Doc. # 43]), and on Counts I through X of Kurz's Counterclaim, ([Doc. # 46], subsequently amended by [Doc. # 91]). ([Doc. # 49].)

## II. Motions to Dismiss

### A. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although detailed allegations are not required, a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Conclusory allegations are not sufficient. *Id.* at 678–79; *see also* Fed. R. Civ. P. 12(b)(6).

### B. Partial Motion to Dismiss HKC's Complaint

#### a. HKC's Complaint and Relevant Allegations

As relevant here, HKC alleges that Henry Kurz was the sole creator and author of configurator and visualization software, comprised of four component computer programs, which are original works of authorship and copyrightable subject matter. (HKC Compl. [18-cv-1377 Doc. # 1] ¶¶ 14, 18-19.) Kurz "was the exclusive owner of all right, title and interest" in the software. (*Id.* ¶ 19.) On December 1, 2010, Kurz organized and registered HKC in Germany and has been the sole owner and manager of the company since that time. (*Id.* ¶ 20.) The following day, "Kurz transferred exclusive rights in the copyright in the Software to HKC by executing a Software Transfer Agreement written in German." (*Id.* ¶ 21.) "Thereafter, HKC registered each of the four component computer programs comprising the Software with the United States Copyright Office." (*Id.* ¶ 22.)

On "December 21, 2010, Kurz, Naus, Husain and Nguyen formed ConfigAir with the intention of creating and developing configuration software for mobile devices—software that was

separate and distinct from HKC's Software." (*Id.* ¶ 29.) But in 2013, "[w]ith HKC's permission and Kurz's oversight, ConfigAir began licensing and distributing [HKC's] Software to third parties[.]" (*Id.* ¶ 36.)

On "October 18, 2017, Naus, Husain and Nguyen voted in favor of removing Kurz as Vice President and CTO of ConfigAir." (*Id.* ¶ 48.) Three days later, "Naus, Husain and Nguyen voted in favor of removing Kurz as a member of the Board of Directors of ConfigAir." (*Id.* ¶ 49.) On "October 31, 2017, Kurz, on behalf of HKC, notified ConfigAir that, as a result of Kurz's removal from the Board of Directors and as Vice President and CTO of ConfigAir, ConfigAir was no longer authorized to exploit the Software." (*Id.* ¶ 50.) HKC further alleges that since that time, "Naus, Husain and Nguyen have actively and knowingly caused ConfigAir to copy, publicly display, distribute, license and sell the Software, or substantially similar versions thereof, to third parties, including but not limited to McLaren, Maax, and the Doe Defendants, for their own commercial gain without HKC's authorization." (*Id.* ¶ 51.)

On "December 19, 2017, HKC sent letters to several third-party users of the Software notifying them that ConfigAir is no longer authorized to license the Software to them and that, in the event ConfigAir creates software derived from the Software without HKC's authorization, their use of such unauthorized derivative software constitutes infringement of HKC's copyright in the Software." (*Id.* ¶ 60.) Attached to HKC's Complaint and incorporated by reference are "copies of [these] letters from HKC to McLaren and Maax, ConfigAir customers and licensees of the Software[.]" (*Id.*)

On "December 29, 2017, Naus, Husain and Nguyen actively and knowingly caused ConfigAir's counsel to send letters to several third-party users of the Software falsely stating that the code underlying the Software is ConfigAir's 'property.'" (*Id.* ¶ 61.) Attached to HKC's

Complaint and incorporated by reference is a copy of a letter from ConfigAir's counsel to "It-motive AG, a ConfigAir customer and licensee of the Software[.]" (*Id.*)

HKC alleges that "[t]his statement was false, and ConfigAir, Naus, Husain and Nguyen knew that this statement was false, when it was made" and that these parties "intended for the third-party users to rely on the false statements and continue to pay ConfigAir for their use of the Software, or software derived from the Software, without HKC's authorization and without compensating HKC." (*Id.* ¶¶ 62-63.) Finally, "despite receiving actual notice of HKC's ownership of copyright in the Software, and in reliance on ConfigAir's false statements, McLaren, Maax, and Does 1-10 have continued to reproduce, distribute, publicly display, and license copies of the Software, or software derived from the Software, and have continued to pay ConfigAir for such use, without HKC's authorization and without compensating HKC." (*Id.* ¶ 64.)

HKC brings claims for copyright infringement against all defendants (Count I), vicarious/contributory copyright infringement against all defendants (Count II), slander of title/commercial disparagement against ConfigAir, Naus, Husain, and Nguyen (Count III), fraudulent misrepresentation against Naus (Count IV), fraudulent misrepresentation against ConfigAir, Naus, Husain, and Nguyen (Count V), tortious interference with business expectancy against ConfigAir, Naus, Husain, and Nguyen (Count VI), and for violation of CUTA against ConfigAir, Naus, Husain, and Nguyen (Count VII).

In further support of Count III, HKC alleges that "ConfigAir's statements [to its customers] were false and constitute false statements derogatory to HKC's title in and to the Software." (*Id.* ¶ 87.)

### b. Partial Motion to Dismiss Counts III and V

Counterclaim Defendants ConfigAir, Naus, Husain, and Nguyen move to partially dismiss HKC's complaint as to Counts III (slander of title/commercial disparagement) and V (fraudulent misrepresentation) only.

Counterclaim Defendants argue that Counts III and V of HKC's Complaint are based on the same allegation: that ConfigAir told third parties that ConfigAir's former Vice President and Chief Technology Officer, Henry Kurz, was subject to non-competition, non-solicitation, and non-disclosure agreements with ConfigAir and was believed to be in possession of ConfigAir's trade secrets and property. (Partial Mot. to Dismiss at 7-8.) According to Counterclaim Defendants, the fraudulent misrepresentation claim fails as a matter of law because "HKC cannot maintain a claim for fraudulent misrepresentation based on its own explicit allegation that the statements at issue were made to and relied upon by *third-parties*" while the slander of title/commercial disparagement claim fails as a matter of law because "the statements [at issue] were not made *about HKC.*" (*Id.* at 8.)

With respect to Count III (slander of title/commercial disparagement), Counterclaim Defendants contend that because any defamatory statement was only made about Henry Kurz himself and not the company—HKC—that bore his name, HKC does not state a claim.

Commercial disparagement is "a species of defamation" that "like defamation, require[s] that the alleged damaging statement be made concerning the plaintiff." *QSP, Inc. v. Aetna Cas. & Sur. Co.*, 256 Conn. 343, 358-59 (2001) (citations omitted). "Although a defamatory statement may be 'of and concerning' the plaintiff even though on its face it refers to another person, more is required than a mere pleading of defamation by association; rather, a reasonable recipient must understand that the defamatory statement is 'in substance, actually about' the third party."

*Learning Care Grp., Inc. v. Armetta*, No. 3:13-CV-01540 (VLB), 2014 WL 12651264, at *14 (D. Conn. Sept. 30, 2014) (quoting *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 399 (2d. Cir. 2006)). *See also QSP, Inc.*, 256 Conn. at 456 (citing 3 Restatement (Second), Torts § 564 and comment (a) (1976) for the proposition that "[a] defamatory communication is made concerning the person to whom its recipient correctly, or mistakenly but reasonably, understands that it was intended to refer").

HKC argues that "[c]ontrary to ConfigAir's contention, [HKC] has sufficiently alleged— and the documentary evidence attached and incorporated by reference into the Complaint proves—that ConfigAir's false statement regarding ownership of the Software was intended to refer to [HKC]." (Pl.'s Mem. Law Opp'n to Partial Mot. Dismiss at 6.) According to HKC, ConfigAir's "statement was made in direct response to [HKC]'s own statement that it owns copyright in the Software, and thus ConfigAir does not." (*Id.* at 6-7.) Moreover, "ConfigAir's letter containing the statement was sent 10 days after Henry Kurz Consulting's letter and refers to 'recent[] contact[] by Henry Kurz,' the eponymous and sole member of Henry Kurz Consulting and author of the letter sent by Henry Kurz Consulting." (*Id.* at 7.) Finally, "the recipients understood that ConfigAir's statement was intended to refer to Henry Kurz Consulting." (*Id.*)

In reply, Counterclaim Defendants argue that HKC is trying to rescue this claim by relying on unpleaded facts: "Nowhere in the Complaint does HKC allege that ConfigAir knew about the letters HKC sent to third-parties, that ConfigAir's counsel sent letters regarding Kurz to the same third-parties, or that the recipients understood ConfigAir's statements to be about HKC (even though they make no reference to HKC)." (Reply Mem. Supp. Partial Mot. Dismiss at 2.)

Exhibit F to HKC's Complaint contains two December 19, 2017 letters from Kurz, on HKC letterhead, and signed by Kurz in his capacity as CEO of HKC, to individuals associated with McLaren and MAAX Bath Inc. In those letters, Kurz informs the companies that he was until recently the Vice President and CTO of ConfigAir, that he had created and developed certain software currently used by those companies, that in 2011, HKC had granted a revocable permission to ConfigAir to sublicense the software in service agreements to customers, and that after ConfigAir "discontinued" its work with Kurz in October 2017, HKC had revoked the permission. (*See, e.g.* [18-cv-1377 Doc. # 1-6] at 6.) According to Kurz, ConfigAir thus "illegally continues to use and sublicense the software and even incorrectly claims that it has the right to do so." (*Id.*)

Ten days later, current counsel for ConfigAir emailed an individual associated with it-motive AG, with the subject line "Henry Kurz[,]" noting that counsel was "writing because we have reason to believe that you may have recently been contacted by Henry Kurz, one of ConfigAir's former officers and one of its existing shareholders who is currently involved in a legal dispute with [ConfigAir]." (Ex. G to HKC Compl. [18-cv-1377 Doc. # 1-6] at 2.) The email continues:

> If Mr. Kurz has contacted you or your company or contacts you or your company in the future, please be aware that he is subject to binding and enforceable non-competition, non-solicitation, and non-disclosure agreements that he previously entered into with ConfigAir. Moreover, Mr. Kurz is believed to be in the possession of a number of ConfigAir's trade secrets and property, including, but not limited to, the code underlying ConfigAir's software, ConfigAir's customer information, and other confidential information.
>
> To the extent that you or your company are working with Mr. Kurz in a manner that competes with ConfigAir or that he discloses to you or your company any of ConfigAir's trade secret[s] and confidential information, ConfigAir will take legal action against you and your company for, among other things, interfering with ConfigAir's contracts and misappropriating trade secrets. To the extent you have not had any contact with Mr. Kurz, please disregard this letter.

(*Id.*)

The Counterclaim Defendants are correct that HKC's Complaint does not *expressly* allege "that ConfigAir knew about the letters HKC sent to third-parties, that ConfigAir's counsel sent letters regarding Kurz to the same third-parties, or that the recipients understood ConfigAir's statements to be about HKC[.]" (Mem. Supp. Partial Mot. to Dismiss [Doc. # 60-2] at 2 (emphasis omitted).) But HKC does allege that it sent letters to "several third-party users of the Software" on December 19, 2017, attaching and incorporating by reference two illustrative letters, while also alleging that ConfigAir's counsel sent "letters to several third-party users of the Software" regarding near-identical subject matter, attaching and incorporating by reference one such illustrative letter.

First, with respect to the Counterclaim Defendants' argument that HKC's Complaint does not allege "that ConfigAir knew about the letters HKC sent to third-parties," the Counterclaim Defendants ignore the fact that the Complaint incorporates by reference a December 29, 2017 letter sent by ConfigAir that states "we have reason to believe that you may have recently been contacted by Henry Kurz[,]" in addition to letters by Kurz sent ten days previously and apparently concerning identical subject matter.

Second, with respect to the Counterclaim Defendants' argument that HKC does not allege that ConfigAir sent letters regarding Kurz to the "same third-parties" to whom HKC had previously written, it is accurate that the third-party user that received the letter sent by ConfigAir's counsel is not one of the third-party users for which HKC provides a letter that *it* sent. ConfigAir's implication that it and HKC wrote to different third parties about the software may thus be vindicated in discovery if HKC and ConfigAir's communications related to the software in December 2017 were all sent to *different* third-party users of the software. But HKC cannot be

faulted at the motion to dismiss stage for being able to provide only one illustrative letter sent by opposing counsel to third parties. HKC alleges that it sent copies of this letter to "several" third-party users, while similarly alleging that ConfigAir also sent letters to multiple "users[.]" Moreover, the letter from ConfigAir that HKC incorporates into its Complaint appears to be a form letter, insofar as it references no facts or information that is on its face unique to the recipient, it-motive AG. Finally, the letter from ConfigAir is dated merely 10 days after the two incorporated letters from HKC.

These allegations and incorporated documents together suffice to permit the reasonable inference that ConfigAir sent letters to its customers regarding Henry Kurz's ownership of the software in response to letters that Kurz had just sent, in his capacity as HKC CEO, to the third parties whom he believed to be ConfigAir's customers using the software. Further, the Complaint's allegations make clear that Kurz is the sole member and namesake of HKC and that ownership of the software at issue was transferred from Kurz to HKC.

The Counterclaim Defendants base their partial motion to dismiss upon the idea that they cannot be liable for disparagement of HKC, where their statements to third parties only explicitly named Henry Kurz. But for the reasons described above, HKC does not "mere[ly] plead[] . . . defamation by association" but instead plausibly alleges facts sufficient to allow the Court to draw the reasonable inference that at least some of the "reasonable recipients" would have "underst[oo]d that the defamatory statement" made about Kurz "[wa]s 'in substance, actually about'" HKC. *Learning Care Grp., Inc.*, 2014 WL 12651264, at *14 (citations omitted).

Accordingly, the Counterclaim Defendants' motion to partially dismiss HKC's Complaint is denied as to Count III. HKC does not oppose dismissal of Count V, (Pl.'s Mem. Law Opp'n to Partial Mot. Dismiss [Doc. #60-1] at 1), and it will be dismissed.

C.  **Motion to Dismiss Kurz's Amended Third-Party Complaint**

  a.  **Kurz's Amended Third-Party Complaint and Relevant Allegations**

Given the substantial overlap in allegations between Kurz's Amended Third-Party Complaint and HKC's Complaint, discussed *supra*, the Court only describes those allegations unique to Kurz's Amended Third-Party Complaint.

Kurz is a German national who is a member of ConfigAir LLC ("the Company") and served as an officer and member of the board of directors of the Company, a manager-managed limited liability company organized under the laws of the State of Connecticut. (Am. Third-Party Compl. [Doc. # 45] ¶ 1.) Kurz owns 200,000 shares, constituting a 33.3% interest, in the Company. (*Id.*)

Naus is a member and served as an officer and member of the board of directors. (*Id.* ¶ 2.) Naus owns 200,000 shares, constituting a 33.3% interest, in the Company. (*Id.*) Husain and Nguyen are also members, officers, and directors, each respectively owning 100,000 shares, constituting a 16.65% interest, in the Company. (*Id.* ¶¶ 3-4.)

Beginning in 2012, Kurz agreed to allow the Company to market HKC's Pre-LLC Software. (*Id.* ¶ 27.) In doing so, he relied on the members' representation that Kurz had, and would always have, full and sole authority for decision-making over the technical aspects of production and development of the Pre-LLC Software. (*Id.* ¶ 28.) Neither Kurz nor HKC assigned or otherwise transferred copyright in the Pre-LLC Software to the Company. (*Id.* ¶ 29.)

On April 20, 2014, Naus proposed organizing a Czech limited liability company (the "Czech Entity") for the purpose of engaging software developers in the Czech Republic. (*Id.* ¶ 33.) Per Naus's proposal, the Company would own 90% of the shares in the Czech Entity, and Naus's

friend, Ales Rastak, would own 10% of the shares in the Czech Entity. (*Id.* ¶ 34.) The Company would contribute initial capital in the amount of $4,500, and Rastak would contribute initial capital in the amount of $500. (*Id.*) All of the members of the Company agreed to this arrangement. (*Id.* ¶ 35.)

In May 2014, Naus informed the members that the U.S. documents presented in connection with establishing the Company as an owner of the Czech Entity were unacceptable to the Czech authorities. (*Id.* ¶ 36.) Naus stated that he and Rastak had decided that the Company's intended 90% interest in the Czech Entity would instead be owned by Naus personally. (*Id.* ¶ 37.) They further decided that Naus's initial capital contribution would be $400, and Rastak's contribution would be $100. (*Id.*) Naus represented to the Company's members that, once the Czech Entity was organized, he would secure the necessary documents from the U.S. authorities, and then transfer his 90% personal interest in the Czech Entity to the Company the next time he was in the Czech Republic. (*Id.* ¶ 38.)

Kurz agreed to this proposal. (*Id.* ¶ 39.) On July 9, 2014, Naus organized ConfigAir s.r.o., a Czech limited liability company. (*Id.* ¶ 40.) Naus owned a 90% interest in ConfigAir s.r.o., and Rastak owned a 10% interest in ConfigAir s.r.o. (*Id.* ¶ 41.) Contrary to his representations, Naus never transferred his 90% personal interest in the Czech Entity to the Company on his next trip to the Czech Republic or at any time thereafter. (*Id.* ¶ 42.)

Although Naus has been to the Czech Republic multiple times since July 2014, Naus remains owner of a 90% interest in ConfigAir s.r.o., and the Company does not own any share in ConfigAir s.r.o. (*Id.* ¶ 43.) Naus knew, but failed to disclose the true owners of ConfigAir s.r.o., including the fact that Naus personally remained a majority owner of ConfigAir s.r.o., to the Company's other members or its board of directors. (*Id.* ¶ 44.)

In July 2014, Naus provided a copy of the Pre-LLC Software to ConfigAir s.r.o. without HKC's permission and without controls in place to ensure that third-parties would not own copyright in software developed based on the Pre-LLC Software. (*Id.* ¶ 45.) In addition, starting in July 2014, Naus began transferring large sums of money from the Company to ConfigAir s.r.o. (*Id.* ¶ 46.) This money was used to pay rent for and refurbish offices in Olomouc, Czech Republic, to purchase electronics and furniture for the offices and the developers working there, and to pay salaries of those developers. (*Id.* ¶ 47.) The Company's board of directors did not authorize Naus to transfer funds from the Company to an entity in which it owned no interest. (*Id.* ¶ 48.)

The board of directors permitted the transfer of the Company's assets to ConfigAir s.r.o. in reliance on Naus's misrepresentation that he would transfer his 90% interest in ConfigAir s.r.o. to the Company. (*Id.* ¶ 49.) Due to Naus's efforts to conceal his continued personal ownership of ConfigAir s.r.o., Kurz did not discover until in or about November 2017 that Naus had never transferred his 90% interest in ConfigAir s.r.o. to the Company. (*Id.* ¶ 51.) Husain and Nguyen did not know until 2017 at the earliest that Naus had never made the promised transfer to the Company. (*Id.* ¶ 52.)

Since the founding of the Company, Kurz consistently devoted at least fifty percent (50%) of his business time to the business and affairs of the Company and carried out all of his duties as Vice President and CTO, including exercising his full and sole authority for decision-making over the technical aspects of production of the Company's software. (*Id.* ¶ 53.)

Kurz primarily worked from his home in Germany but starting in 2013, he spent one week of each month working in ConfigAir s.r.o.'s offices in Olomouc, Czech Republic, where most of the software development team was based. (*Id.* ¶ 55.) Starting in 2016, Naus began calling Kurz in the middle of the night, local time at Kurz's home in Germany. (*Id.* ¶ 56.) If Kurz did not answer

his phone, Naus complained regardless of the fact that Kurz returned Naus's phone calls during business hours in Kurz's time zone and within twelve hours of Naus's attempt to contact him. (*Id.* ¶ 57.) In addition to these harassing phone calls and baseless complaints, Naus began preventing Kurz from carrying out the responsibilities of his position. (*Id.* ¶ 58.) Naus began giving the developers instructions that were contrary to the instructions that Kurz had previously issued and unilaterally overruled Kurz on a number of decisions as to the technology to be implemented by the Company. (*Id.*)

In the summer of 2016, Naus called a meeting of the members of the Company, at which Kurz discussed his concerns about Naus's interference with Kurz's supervision of the developers. (*Id.* ¶ 59.) At the same meeting, Naus complained of the previous instance when Kurz had not returned his call in the middle of the night. (*Id.* ¶ 60.) At the end of this meeting, Naus issued a threat to Kurz that if such a situation arose again, he would be expelled from the Company as CTO, Vice President, and as a member. (*Id.* ¶ 61.)

In response, Kurz warned that, if he were no longer an officer of the Company, the Company would lose its ability to use, market and license versions of the Pre-LLC Software, copyright in which was owned by HKC. (*Id.* ¶ 62.) The Manager[1] did not amend the scope of Kurz's position as Vice President and CTO or his full and sole authority for decision-making over the technical aspects of production of the Company's software. (*Id.* ¶ 63.)

Sometime in 2017, Naus began working in the ConfigAir s.r.o. offices in Olomouc, Czech Republic. (*Id.* ¶ 64.) Around that time, Kurz had planned, with the approval of the other members

---

[1] From the time of the founding of the Company, Kurz, Naus, Husain and Nguyen were the only members of the Company and the only members of the board of directors, which functioned as the Company's "manager." (*Id.* ¶ 18.)

of the Company, to soon develop a new user interface. (*Id.* ¶ 65.) On June 16, 2017, Kurz left Germany for a two-week vacation. (*Id.* ¶ 66.) While he was on vacation, and without the Manager's or Kurz's permission, Naus took on the role of "Scrum Master" – the supervisor for the developers. (*Id.* ¶ 67.)

Without consulting with Kurz or the Manager, Naus eliminated the two teams that Kurz had organized and tasked with development in favor of self-managed teams. (*Id.* ¶ 68.) Naus also organized—without the Manager's or Kurz's knowledge or approval—a one-week workshop in the Czech Republic for all developers (from both Olomouc and Prague) that took place during Kurz's vacation. (*Id.* ¶ 69.)

While outlining the Company's roadmap for developing software, Kurz had advised the other members of the Company, including Naus, that React – a javascript library meant for developing user interfaces — was not the appropriate technology to use in developing the software's user interface. (*Id.* ¶ 70.) Because the developers were unaware of the roadmap that Kurz had developed, they recommended to Naus that they use React. (*Id.* ¶ 71.) When Kurz returned from his vacation, the developers were already developing a new user interface for software to be used by the Company using React. (*Id.* ¶ 72.) Despite being aware of Kurz's roadmap, and despite having no technical training to carry out the functions of CTO, Naus unilaterally approved the use of React. (*Id.* ¶ 73.) Naus also gave a developer named Milan Vojacek the job of leading the development of the new React-based user interface. (*Id.*)

When Kurz returned from his vacation, Naus advised him that the changes that had been made to the development of software were permanent and that Kurz would have no more input in the direction of the development of that product. (*Id.* ¶ 74.) From this point on, Naus unilaterally

prevented Kurz from carrying out his duties as CTO. (*Id.* ¶ 75.) Without the approval of the Manager, Naus assumed those responsibilities. (*Id.* ¶ 76.)

Due to his inexperience with the technical aspects of software development, Naus made impossible demands on the developers and would not accommodate their concerns that his demands could not be achieved. (*Id.* ¶ 77.) Naus regularly imposed on the developers unrealistic deadlines that caused the developers to work exceedingly long hours and compromised the quality and reliability of the software code. (*Id.* ¶ 78.)

In September 2017, Naus, unilaterally and without the approval of the Manager, instructed Kurz not to direct the developers' activities any longer. (*Id.* ¶ 81.) Around this time, two projects – one managed by Nguyen and one managed by Husain – were escalated and required immediate attention in order to correct errors in the software that was having an immediate impact on the customers' business. (*Id.* ¶ 82.)

At the time of the escalation, Naus was on vacation and could not be reached for direction or assistance with the escalation of either project. (*Id.* ¶ 83.) In Naus's absence, Kurz volunteered to assist Husain with the escalation of his project and was able to quickly resolve all issues. (*Id.* ¶ 84.) However, Nguyen prevented Kurz from assisting with the escalation of his project. (*Id.* ¶ 85.) In compliance with Naus's instruction that Kurz not direct the developers' activities, Kurz asked Nguyen to speak directly to Petr Marek, who was directly running the development for the client, and Nguyen refused. (*Id.*) The client's escalation went unresolved and the client was damaged as a result. (*Id.* ¶ 86.) In early October 2017, Kurz asked Naus to call a meeting of the members to discuss this untenable situation but Naus refused. (*Id.* ¶ 87.) That month, as a result of Naus's lack of experience and impossible demands, several of the developers, including Martin Mosko, Tom Rejhon, Lukas Vrajik, and Petr Marek, quit. (*Id.* ¶ 80.)

In October 2017, Naus, Husain, and Nguyen were attending a Configuration Workgroup (CWG) conference in Florida. (*Id.* ¶ 88.) They invited Kurz to come to Florida to have a meeting regarding ongoing disputes between Kurz and Naus over software development. (*Id.*) Kurz traveled to Florida and met with Naus, Husain and Nguyen on October 12, 2017. (*Id.* ¶ 89.)

At the meeting, Kurz sought changes to the operation of the Company in order to improve efficiency and to re-establish his work function as CTO. (*Id.* ¶ 90.) In order to bring about these changes, Kurz proposed that: (1) Naus no longer use the same office as the developers in the Olomouc office; (2) Naus discontinue directing technical development of software falling under the purview of the CTO; and (3) the Company delay implementation of the React-based user interface in order for the members to address whether to change from React to another technology, which would complement the roadmap devised by Kurz. (*Id.* ¶ 91.)

The other members of the Company refused to entertain or address any of Kurz's proposals and instead issued a document outlining a number of directives for Kurz's job performance and conduct. (*Id.* ¶ 92.) This document also provided that if Kurz failed to abide by each directive, he would be terminated and would become a silent partner without any further input in the Company and without any further payment. (*Id.*) Kurz refused to sign the document. (*Id.* ¶ 93.) Naus, who had already consumed significant amounts of alcohol during this meeting, repeatedly cornered Kurz asking him why he cannot sign the document. (*Id.*) Kurz stated that he did not want to answer. (*Id.*) Naus replied: "Then let me formalize the reason for you: If you are made a silent partner without any payment, then you will sue us. Right?" (*Id.*) Kurz responded by saying that he did not plan to sue, but that he did not want to rule out the option either. (*Id.*) After Kurz's

response, Nguyen, who had also consumed a significant amount of alcohol, ended the meeting, leaving the table with the words "Ok, that's it for me." (*Id.*) Naus left the meeting right after. (*Id.*)

During a subsequent conversation, Naus stated to Kurz that the reason that he and Kurz had each received a larger ownership interest in the Company than the other two members was because of the intellectual property they had each contributed. (*Id.* ¶ 94.) Kurz challenged Naus's assertion that Naus had contributed any intellectual property to the Company, at which point, Naus became angry and ceased communicating with Kurz. (*Id.* ¶ 95.)

Naus then called for a virtual meeting on October 18, 2017. (*Id.* ¶ 96.) Naus, Husain and Nguyen voted in favor of removing Kurz as VP and CTO of the Company. (*Id.* ¶ 97.) The Board agreed that Kurz would keep his Google account associated with the Company as long as he is a member and that he would stay on for three months at full salary to aid in the transition. (*Id.* ¶ 98.) The Company has operated without a CTO or anyone in a comparable position since October 18, 2017. (*Id.* ¶ 98.)

On October 21, 2017, Naus called an emergency board meeting for the Company, to be held via video-conference. (*Id.* ¶ 99.) Kurz received only two hours' notice of the meeting and was unable to attend as a result. (*Id.* ¶ 100.) At this meeting, Naus, Husain, and Nguyen voted in favor of removing Kurz as a member of the Board of the Company and also voted to cease the guaranteed payments to all initial members of the Company, including Kurz; to remove Kurz's access to the Company's Google account, including access to its books and records; and to remove the obligation that members devote at least 50% of their time to the Company. (*Id.* ¶ 101.)

Kurz requested a meeting on October 27, 2017 to address the wrongful actions taken by the members at the previous meeting. (*Id.* ¶ 102.) Over Kurz's objections, Naus began video recording the meeting, which caused Kurz to cease his participation. (*Id.* ¶ 103.)

Thereafter, Kurz offered not to revoke the Company's license to market versions of HKC's Pre-LLC Software if given access to his customers and contacts using the software. (*Id.* ¶ 104.) None of the other members responded to Kurz's offer. (*Id.* ¶ 105.) As a result, on October 31, 2017, Kurz notified the Company that it could no longer use versions of HKC's Pre-LLC Software. (*Id.* ¶ 106.)

In November 2017, Naus held a workshop with the developers in Olomouc, Czech Republic to create an alternate software to the Pre-LLC Software. (*Id.* ¶ 107.) The project was given the codename "Breeze" and was intended to replace HKC's Pre-LLC Software. (*Id.* ¶ 108.) The alternative software is an identical copy of the Pre-LLC Software, translated into a different computer language, that generates screen displays that are substantially similar to those displayed by the Pre-LLC Software. (*Id.* ¶ 109.) The developers translated HKC's Configurator Abstraction Layer ("CAL") software and called the translation the Universal Configurator Application ("UCA"). (*Id.* ¶ 110.) They translated HKC's CAL Server and ConfigAir Server software and called the translation the UCA Server. (*Id.* ¶ 111.) They translated HKC's CAL User Interface software and called the translation the React User Interface. (*Id.* ¶ 112.) They translated the CAL Visualization software and called the translation the Big Picture. (*Id.* ¶ 113.)

Naus transferred ownership of the copyright in the translated software to ConfigAir s.r.o., the Czech company owned by Naus and Ales Rastak, without compensation. (*Id.* ¶ 114.) The transfer of copyright in the software to ConfigAir s.r.o. was intended to deprive Kurz of his right to control development and licensing of the HKC's Pre-LLC Software and software derived therefrom. (*Id.* ¶ 115.) Thus ConfigAir s.r.o., in conjunction with the Company, is now poised to exploit Breeze, which contains copies of elements of HKC's Pre-LLC Software. (*Id.* ¶ 116.) Further, the Company and ConfigAir s.r.o. intend to exploit Breeze to the exclusion of Kurz and to enter

into direct competition with him and HKC, thereby subjecting the Company to liability for copyright infringement. (*Id.* ¶ 117.)

Since the wrongful expulsion of Kurz, the Company has sent communications to Kurz's customers that, if they work with Kurz, ConfigAir may take legal action against them. (*Id.* ¶ 118.) The Company knew that these were Kurz's customers when it sent the communications. (*Id.* ¶ 119.) As a result of the communications, the recipients have refused to do business with Kurz. (*Id.* ¶ 120.)

The Company continues to copy, distribute, publicly display, license and/or sell versions of the Pre-LLC Software and/or software progeny without authorization from HKC. (*Id.* ¶ 121.) The Company continues to generate profit from the sale of the Pre-LLC Software and/or software derived therefrom, and otherwise. (*Id.* ¶ 122.) Despite owning a one-third interest in the Company, Kurz has not received his share of the Company's profits for the months of October 2017 to the present. (*Id.* ¶ 123.) Naus, Husain and Nguyen have failed to pay Kurz his salary in October, November and December 2017. (*Id.* ¶ 124.) Naus, Husain and Nguyen have failed to pay Kurz his guaranteed payments in the amount of $2,000 per month. (*Id.* ¶ 125.) They have refused to provide Kurz access to the Company's books and records, despite Kurz's written demands. (*Id.* ¶ 126.)

### b. Motion to Dismiss Kurz's Amended Third-Party Complaint

Naus, Husain, and Nguyen move to dismiss Kurz's Amended Third-Party Complaint in its entirety:

- i. Count One: Breach of Fiduciary Duty—Self-Dealing and Unauthorized Transfer of Assets Without Compensation
- ii. Count Two: Breach of Fiduciary Duty—Preventing Kurz From Exercising Full and Sole Authority Over Software Development

     iii. Count Three: Breach of Fiduciary Duties—Oppressive Actions Toward Minority

          Shareholder and Subjecting the Company to Liability for Copyright Infringement

     iv. Count Four: Injunctive Relief—Tortious Interference.

        i. Count One

Naus, Husain, and Nguyen contend that Kurz lacks standing to maintain a claim for breach of fiduciary duty based on the alleged transfer of Company assets to ConfigAir s.r.o. Specifically, the Movants claim Kurz lacks standing to assert a direct claim in his individual capacity based on an alleged injury to the Company and fails to state a derivative claim on behalf of ConfigAir because he does not allege that he made the prerequisite demand on the Company or state with particularity why the demand should be excused as futile. (Mem. Supp. Mot. Dismiss Am. Third-Party Compl. [Doc. # 47-1] at 7.)

*Direct Claim*

Kurz's direct claim based on the alleged transfer of Company assets alleges no harm suffered by him separate and apart from the harm allegedly suffered by ConfigAir. "A limited liability company is a distinct legal entity whose existence is separate from its members" that "has the power to sue or to be sued in its own name" and "may be a party to an action brought in its name by a member or manager." *Channing Real Estate, LLC v. Gates*, 326 Conn. 123, 137–38 (2017) (internal quotation marks and citations omitted). "A member or manager, however, may not sue in an individual capacity to recover for an injury based on a wrong to the limited liability company." *Id. See also* Conn. Gen. Stat. § 34-271(b) ("A member maintaining a direct action under this section must plead and prove an actual or threatened injury that is not solely the result of an injury suffered or threatened to be suffered by the limited liability company.").

In the Amended Third-Party Complaint's own telling, Naus and the other officers wrongly transferred *ConfigAir*'s assets to ConfigAir s.r.o. While Count One focuses on Naus's alleged wrongdoing with respect to the Czech entity, Kurz also alleges that "Naus further breached this duty by failing to ensure that third-parties would not own copyright in software developed based on the Pre-LLC Software." While this allegation might appear to come closer to an injury suffered by Kurz himself, the Amended Third-Party Complaint alleges that ownership of the Pre-LLC Software rests with HKC, not Kurz, and thus in the context of the factual allegations, Kurz contends that Naus breached a fiduciary duty by subjecting ConfigAir to claims of copyright infringement, presumably by HKC (a claim overlapping with Count III). No allegation identifies any specific harm suffered by Kurz rather than ConfigAir, and Kurz's direct claim under Count I must be dismissed.

*Derivative Claim*

The Movants contend that Kurz's derivative claim must be dismissed because he did not make the prerequisite demand on the Company or demonstrate that demand would be futile.

> A member may maintain a derivative action to enforce a right of a limited liability company if: (1) The member first makes a demand on the other members in a member-managed limited liability company, or the managers of a manager-managed limited liability company, requesting that they cause the company to bring an action to enforce the right, and the managers or other members do not bring the action within ninety days; or (2) a demand under subdivision (1) of this section would be futile.

Conn. Gen. Stat. § 34-271a. "In a derivative action, the complaint must state with particularity: (1) The date and content of plaintiff's demand and the response by the managers or other members to the demand; or (2) why the demand should be excused as futile." *Id.* § 34-271c.

Kurz concedes that he had not made a demand but contends that any such demand would be futile. (Mem. Law Opp'n to Mot. Dismiss Am. Third-Party Compl. at 20-21.)

Kurz alleges that "[t]he board of directors did permit the transfer of the Company's assets to ConfigAir s.r.o. in reliance on Naus's representation that he would transfer his 90% interest in ConfigAir s.r.o. to the Company and due to Naus's failure to disclose the fact that, in fact, he never did transfer his 90% interest in ConfigAir s.r.o. to the Company." (Am. Third-Party Compl. ¶ 50.) Kurz's Complaint alleges that over the course of fall and early winter 2017, the other three members together took steps to overrule Kurz's concerns about management of the company and to remove him as a member of the company. Under these circumstances, Kurz pleads allegations sufficient to permit the Court to draw the reasonable inference that demand would have been futile. Accordingly, the Motion to Dismiss Kurz's Amended Third-Party Complaint is denied with respect to Count I's derivative claim.

### ii. Count Two

Naus, Husain, and Nguyen further argue that Kurz lacks standing and fails to state a claim for breach of fiduciary duty based on allegations of mismanagement.

*Direct Claim*

Under Connecticut law, breach of fiduciary duty claims alleging mismanagement of an LLC must be brought as derivative, rather than direct suits. *See Scarfo v. Snow*, 168 Conn. App. 482, 504, 146 A.3d 1006, 1020 (2016) (where plaintiff "contends that [defendant] essentially mismanaged" a project and that plaintiff therefore "suffered direct injury[,]" "any benefit [plaintiff] would have received from" the project "would have flowed to him only through" the LLC and accordingly "plaintiff's injury is not direct, and he has no standing to sue in his individual capacity." (citations omitted)). *See also Roh v. Devack*, No. 3:07-CV-1901 CSH, 2010 WL 5069874,

at *4 (D. Conn. Dec. 3, 2010) (suit by minority member of an LLC against majority member "essentially amount[ed] to a charge of business mismanagement" and accordingly was "a derivative suit" that "must be brought as such . . . rather than as a direct action.").

Kurz titles Count Two "Breach of Fiduciary Duty-Preventing Kurz from Exercising Full and Sole Authority Over Software Development." (Am. Third-Party Compl. at 20.) Kurz alleges in support of this claim that Naus, Husain, and Nguyen breached their duties by (1) "failing to engage a CTO [Chief Technology Officer] qualified to oversee software development" and (2) by permitting Naus to make ten specific management decisions that undermined Kurz's previous decisions as Chief Technology Officer. (Id. ¶¶ 138, 140.) For example, Kurz alleges that the Movants "breached their fiduciary duties by allowing Naus to . . . eliminate the two teams that Kurz had organized and tasked with development and establishing self-managed teams without Kurz's knowledge or permission in or about June 2017[.]" (Id. ¶ 138.)

The Movants argue the similarity of Kurz's allegations to the business mismanagement claims in *Scarfo* and *Row*, (Mem. Supp. Mot. Dismiss Am. Third-Party Compl. at 12-14), and Kurz offers virtually no explanation as to how his allegations differ substantively from claims that these other courts have identified as not actionable in the context of a direct claim.[2] Accordingly, Kurz's direct claim under Count Two must be dismissed.

---

[2] In supplemental briefing, (April 15, 2019 Letter [Doc. # 90]), Kurz seeks to distinguish this case from *Moore v. F.A. Inv. Holdings, Ltd.*, No. 3:10-cv-891 (VLB), 2012 WL 711473, at *11 (D. Conn. Mar. 5, 2012), which held that a shareholder's claim based on his own removal as a director belonged to the company because "[t]he harm from having a less able and competent board of directors is an injury that belongs to the Corporation in general and therefore [plaintiff] did not suffer any unique or distinct injury as is necessary to bring a direct action." Kurz contends that *Moore* "is inapposite, because the 'privileges' of sole authority and access that Kurz lost were only lost to him." (April 15, 2019 Letter at 2.) While Kurz does allege some forms of injury in this claim that are apparently unique to him, he fails to explain what specific and unique injuries he

*Derivative Claim*

The Connecticut Appellate Court reiterated the breadth of Connecticut's business judgment rule set out in *Rosenfield v. Metals Selling Corp.*, 229 Conn. 771, 643 A.2d 1253 (1994):

> "[T]he business judgment doctrine [is] a rule of law that insulates business decisions from most forms of review. Courts recognize that managers have both better information and better incentives than they . . . . The business judgment rule expresses a sensible policy of judicial noninterference with business decisions . . . . Shareholders challenging the wisdom of a business decision taken by management must overcome the business judgment rule."

*Sojitz Am. Capital Corp. v. Kaufman*, 141 Conn. App. 486, 506 n.22 (2013) (quoting *Rosenfield*). *See also McCreary v. One Strawberry Hill Ass'n, Inc.*, No. FSTCV106006749, 2012 WL 6846391, at *4 (Conn. Super. Ct. Dec. 11, 2012) ("The business judgment rule insulates corporate directors from liability for business decisions within the power of the corporation for which the directors have exercised due care." (quoting *Rosenfield*) (internal quotation marks omitted)); *Horse Tavern Builders, LLC v. Pizzino*, No. FBTCV156049934, 2016 WL 4708528, at *7 (Conn. Super. Ct. Aug. 8, 2016) ("the business judgment rule . . . generally insulates a managing member from personal liability to other members in an LLC for actions taken on behalf of the LLC." (citing *Rosenfield*)).

Here, Kurz does not allege that Naus or the other members of the Company took *ultra vires* actions, merely conclusorily asserting that the actions were made in bad faith or without reasonable care. (*See* Am. Third-Party Compl. ¶¶ 138-41.) Although Kurz alleges that Naus took certain

---

suffered in his capacity as a shareholder, rather than as an employee. *See Moore* at *15 ("Moore cannot maintain a direct claim for breach of fiduciary duty for conduct related to his status as an *employee* or as a director of the Corporation." (emphasis added)). Kurz's arguments are therefore unavailing.

actions without the Manager's approval, (*see, e.g.,* ¶¶ 63, 67), Kurz does not allege that the Manager was required to approve those actions.

Nor does Kurz, in opposition, explain substantively how the facts pleaded in support of this claim suffice to establish the plausibility of his allegation of bad faith. In the absence of non-conclusory allegations permitting the Court to draw the reasonable inference that the remaining members of ConfigAir acted outside of their authority or without due care in management decisions related to the CTO role, Count Two's derivative claim must be dismissed. Accordingly, the Court grants the Movants' motion to dismiss Count Two in its entirety.

### iii. Count Three

Naus, Husain, and Nguyen also maintain that Kurz lacks standing and fails to state a claim for breach of fiduciary duty based on Count Three's allegations of "Oppressive Actions Toward Minority Shareholder and Subjecting the Company to Liability for Copyright Infringement."

Count Three's allegations related to unfair treatment of Kurz as a shareholder appear to relate to his direct claim under this Count, while the allegations that the other members subjected the company to liability for copyright infringement appear to relate to a derivative claim.[3]

*Direct Claim*

Count Three's direct claim is based upon the allegation that

---

[3] One allegation appears by its own terms to relate to both the direct and derivative claims: "As a result of these actions, Kurz and the Company have been damaged by lost profits of the Company and its members, including Kurz, which could have been generated from the Company's authorized use of the Pre-LLC Software." (Am. Third-Party Compl. ¶ 148.) With respect to the direct claim, this allegation fails to assert any injury suffered by Kurz himself separate and apart from the Company, and with respect to the derivative claim, this allegation runs afoul of the business judgment rule.

Naus, Husain and Nguyen failed to act in good faith or to exercise reasonable care and thus breached their duties by:

    (a) failing to make guaranteed payments in the amount of $2,000 per month to Kurz; [and]

    (b) removing Kurz's access to the Company's Google account, including access to its books and records[.]

(Am. Third-Party Compl. ¶ 146.)

With respect to the allegation that the Company failed to make guaranteed $2,000 monthly payments, Kurz fails to allege any specific injury suffered by him alone, given his allegation that Naus, Husain, and Nguyen "voted to cease the guaranteed payments to all initial members of the Company, including Kurz[.]" (*Id.* ¶ 101.) Because Kurz also fails in his opposition brief to explain why this allegation supports a claim for breach of fiduciary duty, (*see* Mem. Law Opp'n to Mot. Dismiss Am. Third-Party Compl. at 18-19), it fails to support a direct claim.

With respect to Kurz's allegation that Naus, Husain, and Nguyen wrongfully removed Kurz's access to the Company's Google account, Kurz similarly fails to explain what specific duty the Movants breached in doing so, or the basis for Kurz's claim the Movants removed his access in "bad faith and without proper approval of the Manager or the members[.]" Accordingly, Count Three's direct claim is dismissed in its entirety.

*Derivative Claim*

For its part, Count Three's derivative claim is based upon the allegation that

Naus, Husain and Nguyen failed to act in good faith or to exercise reasonable care and thus breached their duties by:

    . . .

    (c) failing to avert the revocation of the Company's license to copy,

publicly display, distribute, license and/or sell the Pre-LLC Software;

(d) continuing to use, market, distribute, license and/or sell the Pre-LLC Software without authority; and

(e) creating derivative works based on the Pre-LLC Software without authority.

(Am. Third-Party Compl. ¶ 146.) In essence, Kurz claims that the remaining members of ConfigAir breached their fiduciary duties to the Company by illegally creating derivative works based on HKC's proprietary software, thus subjecting the Company to liability for copyright infringement by HKC. The Movants make only one argument with respect to this allegation, that Kurz cannot pursue the claim derivatively on behalf of ConfigAir because he did not make the prerequisite demand on the Company or state with particularity why demand should be excused as futile. (*See* Mem. Supp. Mot. Dismiss Am. Third-Party Compl. at 18-22.)

However, while Kurz does not claim to have made the requisite demand, he maintains that he has sufficiently alleged futility. (Mem. Law Opp'n to Mot. Dismiss Am. Third-Party Compl. at 17.) Kurz's allegations in support of the Count Three derivative claim make clear that all three other members participated in at least some of the decisions Kurz challenges here. For example, Kurz alleges that after the three other members voted to remove him as a member, Kurz "offered not to revoke the Company's license to market versions of HKC's Pre-LLC Software" in exchange for providing Kurz with "access to his customers and contacts using the software" but "[n]one of the other members responded to Kurz's offer" and "[a]s a result, on October 31, 2017, Kurz notified the Company that it could no longer use versions of HKC's Pre-LLC Software." (Am. Third-Party Compl. ¶¶ 99-106.) Under these circumstances, Kurz pleads factual allegations sufficient to allow the Court to draw the reasonable inference that demand would have been futile. Absent other

argument in support of dismissing this claim, the Movants' motion to dismiss Kurz's derivative claim under Count Three is denied with respect to Kurz's allegation that the remaining members of ConfigAir breached their fiduciary duties to the Company by subjecting it to liability for copyright infringement by HKC.

#### iv.   Count Four

Finally, Naus, Husain, and Nguyen contend that Kurz fails to state a claim for tortious interference, "because Kurz does not allege any facts demonstrating improper motive, improper means, or otherwise tortious conduct on the part of the Third-Party Defendants as required under Connecticut law." (Mem. Supp. Mot. Dismiss Am. Third-Party Compl. at 22.) The Movants do not substantively contest the sufficiency of Kurz's pleading for the other elements of the tort.

"This court has long recognized a cause of action for tortious interference with contract rights or other business relations" but "not every act that disturbs a contract or business expectancy is actionable." *Daley v. Aetna Life & Cas. Co.*, 249 Conn. 766, 805 (1999) (citations and internal quotation marks omitted). "[F]or a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious." *Id.* (alteration in original). "This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously . . . ." *Id.* (internal quotation marks and citation omitted). "In an action for intentional interference with business relations . . . [a] plaintiff [must] plead and prove at least some improper motive or improper means." *Blake v. Levy*, 191 Conn. 257, 262 (1983).

Kurz bases his claim for tortious interference on his allegation that "[s]ince the institution of the present litigation, Naus, Husain and Nguyen, through their representatives, have sent communications to Kurz's customers claiming that, if they work with Kurz, ConfigAir may take

legal action against them[,]" knowing "that the recipients of the communications were customers or potential customers of Kurz." (Am. Third-Party Compl. ¶¶ 152-53.)

The Movants contend that this fails to plausibly plead tortious conduct, because "the communications identified relate specifically to ConfigAir's enforcement of valid non-competition, non-solicitation, and non-disclosure provisions that Kurz was required to comply with per the unambiguous terms of the Operating Agreement." (Mem. Supp. Mot. Dismiss Am. Third-Party Compl. at 21.) But Movants mischaracterize this letter, which also asserts that "Mr. Kurz is believed to be in the possession of a number of ConfigAir's trade secrets and property, including, but not limited to, the code underlying ConfigAir's software, ConfigAir's customer information, and other confidential information." (Ex. B to Am. Third-Party Compl. at 2.) This assertion is accompanied by a threat to take legal action against companies working with Kurz. (*Id.*)

The Amended Third-Party Complaint plausibly alleges that after the other members of ConfigAir removed Kurz from the Company and Kurz revoked the Company's license to use software created by Kurz and owned by HKC, the remaining members of ConfigAir wrongfully created unauthorized derivative software that infringes on HKC's copyright. In light of these allegations, ConfigAir's letters to Kurz's customers asserting that *Kurz* was in possession of the Company's proprietary software is sufficient to permit the reasonable inference that Naus, Husain, and Nguyen tortiously interfered with Kurz's potential customers. Accordingly, the Movants' Motion to Dismiss Count Four is denied.

For the reasons set forth above, the Movants' Motion to Dismiss the Amended Third-Party Complaint is granted with respect to Count Two, granted with respect to the direct claims under

Counts One and Three, denied with respect to the derivative claims under Counts One and Three, and denied as to Count Four.

### III. Motion for Judgment on the Pleadings

ConfigAir moves for judgment on the pleadings on Counts I and II of its 22-count Second Amended Complaint, ([Doc. # 43]), and on all Counts (I-X) of Kurz's Counterclaim, ([Doc. # 46], subsequently amended by [Doc. # 91]). ([Doc. # 49].)

#### A. Motion for Judgment on the Pleadings on ConfigAir's Counts I and II

Count I of ConfigAir's Second Amended Complaint seeks declaratory judgment that "ConfigAir owns all legal rights with respect to all of the software that it has sold and marketed since 2013 and Defendant does not have any legal rights with respect to that software[,]" while Count II seeks declaratory judgment providing that the remaining members of the Company "were within their rights under the Operating Agreement to remove [Kurz] as a member of ConfigAir for cause in February, 2018[,]" that the Company thus owed Kurz $20,000 for the return of his initial capital investment, that the Company then repurchased his membership interest by paying him that amount, and that Kurz is no longer a member. (ConfigAir's Second Am. Compl. ¶¶ 94, 103.)

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "The standard for deciding a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) is the same as under Fed. R. Civ. P. 12(b)(6)." *Martino v. Metro N. Commuter R. Co.*, No. 3:10CV1816 JBA, 2013 WL 3208548, at *5 (D. Conn. June 24, 2013) (citing *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010)).

ConfigAir contends that it is entitled to judgment in its favor on Count I because "[u]nder the unambiguous terms of the Operating Agreement, Kurz transferred to ConfigAir all right, title,

and interest in any software he developed and contributed to ConfigAir when he became a member of the Company" as well as "any software that he worked on, developed, and/or contributed to ConfigAir during the course of his work for the Company." (Mem. Supp. Mot. J. Pleadings [Doc. # 49-1] at 11.) But Kurz's Amended Counterclaims allege that on December 2, 2010, he "transferred the copyright for the Pre-LLC Software to HKC[,]" ([Doc. # 91] ¶ 16), and the Company was not founded until 2011, after Kurz alleges the transfer of ownership was effectuated. ConfigAir responds that "Kurz . . . cannot negate the transfer of his rights in the software to ConfigAir by claiming that the software at issue belongs to [HKC]" because "[a]s the sole manager and owner of HKC, Kurz's knowledge is imputed to HKC and he has the inherent authority to bind HKC through his conduct." (Mem. Supp. Mot. J. Pleadings at 4-5.) Aside from whether ConfigAir is right about that proposition as a legal matter, too many disputed factual questions loom over this transaction for ownership of the software to be determined on the basis of the pleadings alone.

In support of its legal argument ConfigAir cites *Nature Conservancy of Connecticut, Inc. v. Three Feathers, LLC*, No. FSTCV095012734S, 2013 WL 3802426, at *6 (Conn. Super. Ct. July 3, 2013), which held that there is "no presumption that the sole member of a limited liability company is acting as its agent, but when there is evidence logically and reasonably indicating the exercise of that authority it may be inferred *by the finder of facts.*" *Id.* (emphasis added). ConfigAir may be vindicated through discovery in establishing the appropriateness of an inference as a matter of fact that Kurz acted as HKC's agent when he signed the Operating Agreement and so transferred ownership of the software to ConfigAir, but the Company fails to demonstrate its entitlement to judgment on the pleadings on this basis. Accordingly, ConfigAir's Motion for Judgment on the Pleadings is denied with respect to Count I of ConfigAir's Second Amended Complaint.

ConfigAir's claim for judgment on the pleadings on Count II is based on the Operating Agreement permitting removal of members for "cause," which is defined to include "gross negligence or willful misconduct that has a material adverse [e]ffect on the Company[,]" maintaining that Kurz's admitted actions between October 2017 and January 2018 all justify Kurz's removal as a member. Specifically, ConfigAir points to Kurz's public statements regarding his copyright dispute with the Company, as well as his communications with law enforcement agencies, two ConfigAir customers, and YouTube. As ConfigAir characterizes the "cause," "Kurz made disparaging statements about ConfigAir to its customers and to the general public, attempted to instigate criminal investigations into the Company, and succeeded on more than one occasion in shutting down product demonstration videos linked to ConfigAir's public website." (Mem. Supp. Mot. J. Pleadings at 16-17.) Kurz responds that the statements he made were all "privileged and true" and that he "made the statements in the posts and communications to correct fraudulent misrepresentations made by ConfigAir and to protect HKC's interest in the Pre-LLC Software and his right to make a living." (Subs. Mem. Law in Opp'n to Mot. J. on the Pleadings [Doc. # 92] at 26-27.)

While the basis for and significance of Kurz's assertion that these statements were privileged is unclear, Kurz's claim that all of these statements were truthful is plausible in light of his Answer to the Second Amended Complaint and Counterclaims. ConfigAir contends that the truthfulness of the statements is irrelevant because the statements and related conduct harmed the Company, thus constituting "gross negligence" or "willful misconduct." Although ConfigAir apparently believes that Kurz's statements self-evidently constitute cause for removal under these standards, Kurz's Answer and Counterclaims contextualize the statements as Kurz's response to Naus and the other members of the Company allegedly taking steps to freeze Kurz out and steal

software created by Kurz and owned by HKC. Moreover, ConfigAir does not explain why for example, if Kurz believed the Company was stealing HKC's software, contacting law enforcement would constitute *misconduct*. In light of dueling plausible allegations on both sides of this dispute, ConfigAir fails to establish its entitlement to judgment on the pleadings, and the Motion is denied with respect to Count II of ConfigAir's Second Amended Complaint.

### B. Motion for Judgment on Kurz's Counterclaim Counts I through X

Kurz's Amended Counterclaims include the following ten counts:

- Count I (Judicial Dissolution of ConfigAir pursuant to Conn. Gen. Stat. §34-267(a)(5))

- Count II (Fraudulent Inducement)

- Count III (Fraudulent Inducement)

- Count IV (Declaratory Judgment)

- Count V (Declaratory Judgment)

- Count VI (Declaratory Judgment)

- Count VII (Constructive Trust)

- Count VIII (Appointment of Receiver Pursuant to Conn. Gen. Stat. §52-504)

- Count IX (Injunctive Relief—Tortious Interference)

- Count X (Expulsion of Daniel Naus Pursuant to Conn. Gen. Stat. § 34-263a(5))

#### a. Count I

Kurz's Counterclaim Count I seeks judicial dissolution of ConfigAir pursuant to Conn. Gen. Stat. §34-267(a)(5), on the grounds that the Company's "controlling members and manager have acted, are acting, and will continue to act in a manner that is oppressive; and the corporate assets are being misapplied or wasted." (Kurz Am. Counterclaims ¶ 143.) ConfigAir argues first

that Kurz lacks statutory standing to bring this claim, because Kurz was removed as a member of the Company in February 2018. But in light of the Court's holding that ConfigAir fails to establish its entitlement to a declaratory judgment providing that the Company properly and validly removed Kurz as a member, this argument is unavailing at this early procedural stage of the litigation.

Next, ConfigAir contends that Counterclaim Count I fails as a matter of law because Kurz's allegations fail to overcome the presumption of the business judgment rule. The Court granted Naus, Husain, and Nguyen's Motion to Dismiss Kurz's Amended Third-Party Complaint with respect to that Complaint's Count Two derivative claim, due to Kurz's failure to overcome the business judgment rule in his challenge to the remaining members' decisions related to management of the CTO role. Here, by contrast, Kurz supports the dissolution claim not just with allegations relating to disagreements about how best to manage the CTO role, but also with allegations relating to the allegedly improper removal of Kurz as a member, and resulting deprival of Kurz "of his rightful share of the profits of the Company." (Am. Counterclaims ¶ 137.) ConfigAir's argument under the business judgment rule here is inapposite, and the Company fails to establish its entitlement to judgment on the pleadings as to Count I of Kurz's Counterclaims at this stage of the litigation.

### b. Counts II and III

Counts II and III of Kurz's Counterclaims allege that the other members of the Company fraudulently induced Kurz to sign the Operating Agreement and to allow the Company to market versions of the Pre-LLC Software. Count II asserts that the other members falsely represented to Kurz that he would serve as CTO and that the Company would go into business to develop the Mobile Software, while in fact intending to secure the Pre-LLC Software and then move to expel

Kurz. Count III asserts that Naus falsely represented to Kurz that the terms contained in the Operating Agreement were required in order to establish an LLC in Connecticut and could not be changed.

ConfigAir argues that Kurz's claims for fraudulent inducement are time-barred, as they are both based on statements allegedly made before he signed the Operating Agreement in 2011, given Connecticut's three-year statute of limitations for tort claims. *See* Conn. Gen. Stat. § 52-577 ("No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."). As a general matter, "[t]he three year limitation period of § 52–577 begins with the date of the act or omission complained of, not the date when the plaintiff first discovers an injury." *Collum v. Chapin*, 40 Conn. App. 449, 451 (1996) (citing *Fichera v. Mine Hill Corp.*, 207 Conn. 204, 212–13 (1988)). *See also Cruz v. Schoenhorn*, No. HHDCV155038500S, 2017 WL 2622400, at *3 (Conn. Super. Ct. May 23, 2017) (citing *Collum*).

Kurz denies that these claims are time-barred because he "alleges that ConfigAir concealed its claim of ownership of the Pre-LLC Software, as well as its intent to expel Kurz, until October 2017." (Kurz's Substituted Mem. Law Opp'n to Mot. J. on the Pleadings at 30.) Kurz cites Conn. Gen. Stat. § 52-595 for the proposition that his claims accordingly did not accrue until that time.

"If any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers its existence." Conn. Gen. Stat. § 52-595. "To prove fraudulent concealment, a plaintiff must demonstrate that the defendant: (1) had actual awareness, rather than imputed knowledge, of the facts necessary to establish the cause of action, (2) intentionally concealed those facts from the plaintiff and (3) concealed those facts for the purpose of obtaining delay on the part of the plaintiff in filing a cause

of action against the defendant." *Flannery v. Singer Asset Fin. Co., LLC*, 128 Conn. App. 507, 515–16 (2011). Moreover, "[t]he doctrine must be affirmatively pleaded with sufficient 'particularity' to satisfy Rule 9(b)'s requirements for allegations of fraud." *AT Engine Controls Ltd. v. Goodrich Pump & Engine Control Sys., Inc.*, No. 3:10-CV-01539 JAM, 2014 WL 7270160, at *11 (D. Conn. Dec. 18, 2014).

Here, the only intentional acts of concealment alleged by Kurz are those which form the basis for his underlying tort claim—that Naus lied to Kurz at the time of the execution of the Operating Agreement in order to induce him to sign the document. Kurz alleges no facts that specifically establish that Naus concealed facts from Kurz for the purpose of obtaining delay on Kurz's part in filing a cause of action, as opposed to merely establishing concealment. With respect to Count II, Kurz fails to plead with particularity any facts suggesting that Naus's plan from the beginning was to freeze Kurz out and steal his software—thus failing the "intentional concealment" requirement for tolling—in light of Kurz's own allegation that "[i]n 2012, Kurz determined that the Mobile Software would not be a viable product for the Company and decided to discontinue development of it."[4] (Am. Counterclaims ¶ 37.) And with respect to Count III, Kurz fails to plead with particularity the basis for his belief that Naus had actual knowledge of the (alleged) fact that Naus was misleading Kurz about the necessity of adopting specific terms in the Operating Agreement. For all of these reasons, ConfigAir's Motion for Judgment on the Pleadings is granted with respect to Kurz's Counterclaim Counts II and III.

---

[4] In the alternative, this shortcoming would suffice to determine that on the merits, ConfigAir's motion for judgment on the pleadings should be granted with respect to Kurz's Counterclaim Count II. But whether on the merits or for failure to establish entitlement to tolling, the outcome is the same.

### c. Counts IV and V

In Counts IV and V of his Amended Counterclaims, Kurz seeks declaratory judgment providing that ConfigAir "has no right, title or interest in or to the copyright in the Pre-LLC Software." (Am. Counterclaims ¶¶ 165, 170.) ConfigAir notes that Kurz alleges that he himself does not hold the copyright in the software, having transferred it to HKC, and argues that Kurz lacks standing for this copyright claim. However, ConfigAir's argument is predicated in part on HKC, the alleged owner, being a non-party, and since the filing of this brief, HKC has become a party to this litigation through the consolidation of its Complaint, as discussed above. Moreover, Kurz alleges that since creating HKC in 2010, he "has been the owner and manager of HKC since its registration." (Am. Counterclaims ¶ 15.)

Discovery may establish that Kurz lacks standing to seek this declaratory judgment, but ConfigAir's argument here is premature in light of his allegations. Accordingly, ConfigAir's Motion for Judgment on the Pleadings is denied with respect to Kurz's Counterclaim Counts IV and V.

### d. Count VI

Kurz's Counterclaim Count VI seeks declaratory judgment that he remains a member of the Company, *inter alia*. For substantially the same reasons why ConfigAir fails to establish entitlement to Judgment on the Pleadings with respect to its Count II, ConfigAir fails to show entitlement to Judgment on the Pleadings with respect to Kurz's Counterclaim Count VI.

### e. Count VII

Kurz's Counterclaim Count VII seeks the remedy of a constructive trust as a result of ConfigAir's allegedly wrongful retention and profit from HKC's Pre-LLC Software, of which Kurz alleges he is the beneficial owner. ConfigAir asserts that this claim and supporting allegation is

"nonsensical" because "ConfigAir owns all legal rights in the software at issue." (Mem. Supp. Mot. J. on the Pleadings at 28-29.) This formulation begs the key question in this case: who owns the software? Accordingly, ConfigAir's argument is unavailing and the Motion for Judgment on the Pleadings is denied with respect to Kurz's Counterclaim Count VII.

### f. Count VIII

Kurz's Counterclaim Count VIII seeks the remedy of the appointment of a receiver. ConfigAir contends that Kurz lacks standing to pursue this claim because he is not a member of the Company. For substantially the same reasons as explained *supra*, this claim is unconvincing at this stage of the litigation and the Motion for Judgment on the Pleadings is denied with respect to Kurz's Counterclaim Count VIII.

### g. Count IX

Kurz's Counterclaim Count IX asserts that ConfigAir has tortiously interfered with Kurz's business, based on the same communications at issue in Kurz's Amended Third-Party Complaint Count Four. For substantially the same reasons that the Motion to Dismiss was denied with respect to that claim, the Motion for Judgment on the Pleadings is denied with respect to Kurz's Counterclaim Count IX.

### h. Count X

Finally, Kurz's Counterclaim Count X seeks the expulsion of Naus as a member of the Company. ConfigAir contends that Kurz lacks standing to bring this claim as a derivative claim, because he is no longer a member and because he fails to show that he made the prerequisite demand on the Company or that such demand would be futile. For the reasons described *supra*, these arguments are unconvincing at this stage of litigation, as the question of whether Kurz was properly removed as a member remains in dispute and because Kurz plausibly alleges facts from

which the Court draws the reasonable inference that demand would have been futile. Accordingly, the Motion for Judgment on the Pleadings is denied with respect to Count X's derivative claim.

ConfigAir additionally argues that Kurz lacks standing to bring this claim directly, "because he does not allege any particularized harm that is distinct from the alleged injury to the Company." (Mem. Supp. Mot. J. on the Pleadings at 33.) In support of Count X, Kurz alleges three specific types of harm that he personally suffered:

> 195. Naus materially breached his fiduciary duty of loyalty to Kurz by having the Company transfer the Company's assets, including money and intellectual property, to an entity in which Naus owns a 90% interest, without authorization from the board of directors and without compensation.

> 196. Naus materially breached his fiduciary duty of care to Kurz by interfering with and usurping Kurz's authority to direct all technical aspects of software development and to manage the development team.

> 197. Naus materially breached his fiduciary duty of care to Kurz by removing Kurz as Chief Technology Officer, Vice President and member of the board of directors of the Company in bad faith.

(Kurz's Am. Counterclaims ¶¶ 195-97.) But for the reasons described *supra*, Paragraph 195's allegations relate to harm actually suffered by the Company, not Kurz individually, while Paragraphs 196 and 197 generally relate to harm suffered by Kurz in his capacity as an employee, rather than as a shareholder. To the extent that Paragraph 197 claims Kurz suffered harm due to his removal as a member, Kurz elsewhere alleges that this decision was effectuated by all three remaining members, and not by Naus alone, and so fails to support a cause of action seeking only Naus's removal. Accordingly, the Motion for Judgment on the Pleadings is granted with respect to Count X's direct claim.

## IV. Conclusion

For the reasons set forth above, the Court orders the following:

The partial motion to dismiss HKC's Complaint is denied with respect to Count III and granted with respect to Count V. The motion to dismiss Kurz's Amended Third Party Complaint is granted with respect to Count II (including both the direct and derivative claims), granted with respect to Counts I and III's direct claims, denied with respect to Count I and III's derivative claims, and denied with respect to Count IV. ConfigAir's Motion for Judgment on the Pleadings is denied with respect to Counts I and II of ConfigAir's Second Amended Complaint. The Motion for Judgment on the Pleadings is granted with respect to Counts II and III of Kurz's Counterclaims, granted with respect to Count X's direct claim, denied with respect to Count X's derivative claim, and denied with respect to all remaining Counts.

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 31st day of July 2019.